ORIGINAL

FILED

2014 APR 14  PM 4: 25

CLERK U.S. DISTRICT COURT
CENTRAL DIST. CALIF.
SANTA ANA

BY: _____

1  Daniel T. Pascucci (SBN 166780)
   dpascucci@mintz.com
2  Joseph R. Dunn (SBN 238069)
   jrdunn@mintz.com
3  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   3580 Carmel Mountain Road, Suite 300
4  San Diego, CA 92130
   Telephone: (858) 314-1500
5  Facsimile:  (858) 314-1501

6  Peter A. Biagetti (MA Bar No. 45310)
   pbiagetti@mintz.com
7  MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
   One Financial Center
8  Boston, MA 02111
   Telephone: (617) 542-6000
9  Facsimile:  (617) 542-2241

10 Joseph S. Wu (SBN 149340)
   jwu@usasialaw.com
11 USAsia Law, Inc.
   5670 La Jolla Blvd.
12 La Jolla, CA  92037
   Telephone: (858) 454-8588
13 Facsimile:  (858) 454-4314

14 Attorneys for Plaintiff
   TATUNG COMPANY, LTD.
15

**UNDER SEAL**

16          UNITED STATES DISTRICT COURT

17          CENTRAL DISTRICT OF CALIFORNIA

18

19 TATUNG COMPANY, LTD., a              Case No. SACV13-01743 DOC (ANx)
   Foreign Corporation,
20                          Plaintiff,   **TATUNG COMPANY, LTD.'S
                                         OPPOSITION TO DEFENDANT CHIN-
            vs.                          YING HSU'S MOTION TO DISMISS
21                                       TATUNG'S FIRST AMENDED
   SHU TZE HSU, a foreign national;      COMPLAINT [Dkt. No. 63]**
22 SHOU-POR HOUNG, a foreign
   national; CHIN-YING HSU, a foreign    **[FILED CONDITIONALLY UNDER
23 national; RUI-LIN HSU, a foreign      SEAL PURSUANT TO PROTECTIVE
   national; JACK HOUNG, a foreign       ORDER DATED MARCH 13, 2014]**
24 foreign national; DOUGLAS WOO, a
   California citizen; JENNIFER          Date:    May 5, 2014
25 HUANG, a foreign national; BENSON     Time:    8:30 a.m.
   LIN, a California citizen; JOHN       Dept.:   9D
26 ARAKI, a California citizen; DAVID    The Honorable David O. Carter
   CHEN, a California citizen; ARTHUR
27 MOORE, a California citizen; JUAN     Complaint Filed:  11/05/2013
   SALCEDO, a California citizen; YU     Amended Complaint Filed: 3/13/2014
28 HUI CHEN, a foreign national; LI FU

                                         Case No. SACV13-01743 DOC (ANx)

1  INVESTMENT CO., a foreign company; RH HOLDINGS, LLC, a
2  Delaware limited liability company; WDE SOLUTION, INC., a foreign
3  company; NEXCAST, LLC, a Delaware limited liability company;
4  WESTINGHOUSE DIGITAL, LLC, a Delaware limited liability company;
5  WESTINGHOUSE DIGITAL (TAIWAN), LTD., a foreign company;
6  GORHAM INVESTMENT HOLDING CO., LTD., a foreign company;
7  CHIMEI TRADING CO., LTD, a foreign company; RICH DEMANDER,
8  LTD., a foreign company; BOLLINGTON ENTERPRISES,
9  LTD., a foreign company; PEAK PARADISE ENTERPRISES CO.,
10 LTD., a foreign company; NORTHWOOD PARTNERS, LTD., a
11 foreign company; NEO STAR DEVELOPMENT, LTD., a foreign
12 company; HUNG-WEN (ERIC) CHEN, a foreign national; and DOES 1
13 – 147, inclusive,

14                             Defendants.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................... 1

II.    FACTS ................................................................................................... 2

III.   THE COURT HAS PERSONAL JURISDICTION OVER HSU ....................... 5

    A.   Standard on Rule 12(b)(2) Motion to Dismiss ............................ 5

    B.   Standard for Personal Jurisdiction ............................................. 6

    C.   The FAC's Many Unrefuted Allegations of Hsu's Contacts .................... 7

    D.   Uncontroverted Allegations Support General and Specific Jurisdiction ........................................................................... 9

        1.   Hsu "Purposefully Directed" Numerous Activities at California Entities and Individuals .................................. 9

        2.   Tatung's Claims Arise from Hsu's California Contacts .............. 12

    E.   Personal Jurisdiction over Hsu is Reasonable ............................ 12

IV.    THE RICO ALLEGATIONS AGAINST HSU ARE SUFFICIENT ............. 166

    A.   Tatung's Allegations Satisfy RICO Pleading Standards .................... 166

        1.   Standard on 12(b)(6) Motion to Dismiss .................................... 166

        2.   Tatung Sufficiently Alleges Hsu's RICO Violations ................... 17

    B.   Hsu's Violations Were the Proximate Cause of Tatung's Injuries ........................................................................... 18

    C.   Hsu's RICO Conduct Primarily Occurred within the United States ........................................................................... 20

V.     HSU's CONSPIRACY LIABILITY IS SUFFICIENTLY ALLEGED ............ 22

VI.    THE FRAUDULENT TRANSFER CLAIMS ARE ADEQUATELY PLED ............................................................................................ 23

VII.   ALTER EGO IS SUFFICIENTLY ALLEGED ........................................ 24

VIII.  CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Agilent Techs., Inc. v. Elan Microelectronics Corp.,*
   2005 U.S. Dist. LEXIS 34305 (N.D. Cal. Nov. 29, 2005) ................................. 13

*Allstate Ins. Co. v. Countrywide Fin. Corp.,*
   842 F.Supp.2d 1216 (C.D. Cal. 2012) ................................................... 23, 24, 25

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451, 126 S.Ct. 1991 (2006) .......................................................... 16, 18

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,*
   7 Cal.4th 503 (1994) ................................................................................... 22, 23

*Asahi v. Sup. Ct.,*
   480 U.S. 102, 107 S.Ct. 1026 (1987) ................................................................. 13

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S.Ct. 1937 (2009) ................................................................. 16

*AT&T v. Compagnie Bruxelles Lambert,*
   94 F.3d 586 (9th Cir. Cal. 1996).......................................................................... 6

*Ballard v. Savage,*
   65 F.3d 1495 (9th Cir. 1995) ................................................................... 5, 12, 14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 127 S.Ct. 1955 (2007) ..................................................... 16, 24, 25

*Bowoto v. Chevron Corp.,*
   481 F.Supp.2d 1010 (N.D. Cal. 2007).............................................................. 21

*Bridge v. Phoenix Bond & Indemn. Co.,*
   553 U.S. 639, 128 S.Ct. 2131 (2008) ................................................................. 16

*Bryant v. Mattel, Inc.,*
   2010 U.S. Dist. LEXIS 103851 (C.D. Cal. Aug. 2, 2010) ........................... 16, 17

*Burger King v. Rudzewicz,*
   471 U.S. 462, 105 S.Ct 2174 (1985) ................................................................... 7

*Butte Mining PLC v. Smith,*
   76 F.3d 287 (9th Cir. 1996) ............................................................................... 21

Case No. SACV13-01743 DOC (ANx)

*Calder v. Jones,*
   465 U.S. 783, 106 S.Ct. 1482 (1984) ............................................................. 10

*Cascade Yarns, Inc. v. Knitting Fever, Inc.,*
   2011 U.S. Dist. LEXIS 279 (W.D. Wash. Jan. 3, 2011) ................................. 17

*Church v. Consolidated Freightways, Inc.,*
   1992 U.S. Dist. LEXIS 18234 (N.D. Cal. Sept. 15, 1992) ............................. 14

*Data Disc, Inc. v. Systems Technology Assoc., Inc.,*
   557 F.2d 1280 (9th Cir. 1977) ........................................................... 6, 11, 14

*Dole Food Co. v. Watts,*
   303 F.3d 1104 (9th Cir. Cal. 2002) .......................................................... 5, 6

*Electrograph Sys., Inc. v. Epson Imaging Devices Corp.,*
   2012 U.S. Dist. LEXIS 12063 (N.D. Cal. Feb. 1, 2012) ................................. 11

*Gates Learjet Corp. v. Jensen,*
   743 F.2d 1325 (9th Cir. 1984) .................................................................... 14

*Grunenthal GmbH v. Hotz,*
   712 F.2d 421 (9th Cir. 1983) ...................................................................... 20

*Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,*
   784 F.2d 1392 (9th Cir. 1986) .................................................................... 10

*Hajjar v. Blue Cross & Blue Shield of Tex.,*
   2009 U.S. Dist. LEXIS 84835 (C.D. Cal. Sept. 10, 2009) ............................. 12

*Harris Rutsky & Co. In. Servs. v. Bell & Clements Ltd.,*
   328 F.3d 1122 (9th Cir. 2003) ................................................................ 6, 12

*Hendricks v. StarKist Co.,*
   2014 U.S. Dist. LEXIS 41523 (N.D. Cal. Mar. 25, 2014) ............................. 16

*Holmes v. Sec. Investor Prot. Corp.,*
   503 U.S. 258, 112 S.Ct. 1311 (1992) ..................................................... 19, 20

*Howard v. America Online, Inc.,*
   208 F.3d 741 (9th Cir. 2000) ...................................................................... 17

*IBM v. Brown,*
   1998 U.S. App. LEXIS 483 (9th Cir. Jan. 9, 1998) ....................................... 17

- iii -

*In re Cathode Ray Tube CRT Antitrust Litig.,*
    2014 U.S. Dist. LEXIS 35391 (N.D. Cal. Mar. 13, 2014) .................................. 12

*International Shoe Co. v. Washington,*
    326 U.S. 310, 66 S. Ct. 154 (1945) ...................................................................... 6

*Jobe v. ATR Marketing, Inc.,*
    87 F.3d 751 (5th Cir. 1996) ................................................................................. 11

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770, 104 S.Ct. 1473 (1989) ................................................................. 10

*Larsen v. Lauriel Invs., Inc.,*
    161 F.Supp.2d 1029 (D. Ariz. 2001) ................................................................... 6

*Manzarek v. St. Paul Fire & Marine Ins. Co.,*
    519 F.3d 1025 (9th Cir. 2008) ............................................................................ 15

*Maxtor Corp. v. Read-Rite (Thailand) Co.,*
    2003 U.S. Dist. LEXIS 27208 (N.D. Cal. Dec. 4, 2003) ..................................... 6

*Miller v. Yokohama Corp.,*
    358 F.3d 616 (9th Cir. 2004) .............................................................................. 16

*Moore v. Kayport Package Express,*
    885 F.2d 531 (9th Cir. 1989) .............................................................................. 18

*Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co.,*
    981 F.2d 429 (9th Cir. 1992) .............................................................................. 17

*Oakley, Inc. v. Jofa AB,*
    287 F.Supp.2d 1111 (C.D. Cal. 2003) ............................................................... 13

*Panavision Int'l, L.P. v. Toeppen,*
    141 F.3d 1316 (9th Cir. 1998) ...................................................................... 6, 13

*Poulos v. Caesars World, Inc.,*
    379 F.3d 654 (9th Cir. 2004) .............................................................................. 21

*Republic of the Philippines v. Marcos,*
    862 F.2d 1355 (9th Cir. 1988) ............................................................................ 21

*Roth v. Garcia Marquez,*
    942 F.2d 617 (9th Cir. 1991) .............................................................................. 13

- iv -

*Sher v. Johnson,*
    911 F.2d 1357 (9th Cir. 1990) ................................................................ 10

*Sun Sav. & Loan Ass'n v. Dierdorff,*
    825 F.2d 187 (9th Cir. 1987) .................................................................. 17

*Sunnyside Dev. Co. LLC v. Cambridge Display Tech., Ltd.,*
    2008 U.S. Dist. LEXIS 74850 (N.D. Cal. Sept. 29, 2008) ....................... 23

*Taylor-Rush v. Multitech Corp.,*
    217 Cal.App.3d 103 (1990) .................................................................... 10

*Terracom v. Valley Nat'l Bank,*
    49 F.3d 555 (9th Cir. 1995) .................................................................... 14

*Wolkowitz v. Beverly (In re Beverly),*
    374 B.R. 221 (B.A.P. 9th Cir. 2007) ...................................................... 23

*Yahoo! Inc. v. La Ligue Contre Le Racisme,*
    433 F.3d 1199 (9th Cir. 2006) ................................................................ 10

*Ziegler v. Indian River County,*
    64 F.3d 470 (9th Cir. 1995) .................................................................... 11

**STATUTES**

18 U.S.C. §§ 1341, 1343 ................................................................................. 18

18 U.S.C. § 1961(1) ........................................................................................ 17

18 U.S.C. § 1962 ................................................................................. 17, 18, 19

Cal. Code. Civ. Proc. § 410.10 ........................................................................ 6

Case No. SACV13-01743 DOC (ANx)

# I. INTRODUCTION

This Action centers on the Houng family's operation of a fraudulent scheme with its nucleus here in Orange County. Using their primary instrumentality in the City of Orange, Westinghouse Digital Electronics, LLC ("WDE"), the Houng family induced plaintiff Tatung Company, Ltd. ("Tatung") to extend millions in credit to their California-based enterprise while siphoning assets of WDE to other entities in the enterprise for their own benefit. Ultimately, this "bust out" of WDE's assets culminated in the fraudulent transfer of its "crown jewel" – the LED television business (for a fraction of its value) – to a newly-formed insider entity in California on the eve of Tatung securing a $17+ million arbitration award against WDE in Orange County. Tatung now brings this Action against the parties who designed, directed and participated in a RICO conspiracy that injured Tatung.

As alleged in Tatung's First Amended Complaint ("FAC"), defendant Chin-Ying Hsu ("Hsu") and her co-defendant relatives (the Houng Family Defendants)[1] created layers of artificial separation between themselves and the fraudulent operation implemented in Orange County, using intermediary entities (with offices and operatives in Orange County), to shield their direct involvement in the scheme.

The detailed and well-pled allegations in the FAC (not controverted by any competent evidence) establish far more than the "minimum contacts" necessary for the Court to exert jurisdiction over Hsu. Tatung has pleaded facts demonstrating Hsu's personal involvement in the Orange County-based scheme, and her claimed lack of involvement is belied by her own grandson's sworn testimony.

Hsu's other challenges are grounded in misapplication of legal standards and disregard for the actual contents of the FAC. The FAC and Appendices contain factual allegations which, when uncontroverted (as here) and taken as true, reflect a coordinated fraud that was the direct and proximate cause of Tatung's injuries.

///

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the FAC.

- 1 -

## II.   FACTS

The FAC describes in meticulous detail the formation and operation of a fraudulent artifice centered in Orange County, California. Hsu and the other Houng Family Defendants[2] used the Sham Enterprise to fleece business partners like Tatung through dealings with the family's purportedly legitimate, independent and solvent company, WDE. FAC at ¶¶ 72-76.[3] The Houng family used WDE to induce Tatung to deliver millions in electronics products to WDE in California on credit. *Ibid.* They illegally manipulated WDE and its finances to maximize their personal financial gain. ¶ 77. Relying on other entities in California, dozens of skeleton offshore entities in renowned tax havens, and a network of insiders based primarily in California (the Operational Defendants), Hsu and the other Houng Family Defendants concealed these acts to perpetuate their scheme. ¶¶ 77-79, 84.

Once they secured millions in cash and goods from Tatung through the WDE artifice, the Houng Family Defendants systematically laundered WDE's cash and business opportunities out of the company through a series of fraudulent transfers from 2008 through 2010. *See, e.g.,* FAC at ¶¶ 108-121, Appx. 1-2. This was often accomplished by causing circuitous transfers of WDE funds out of California, through the enterprise offshore, and then back to related California entities. *Ibid.*

Ultimately, the Houng Family Defendants utilized an unwitting statutory assignee, Credit Management Association (CMA), to effectuate a fraudulent transfer of WDE's remaining assets, including its lucrative LED TV business, to newly-formed Westinghouse Digital, LLC ("WD"), which they held out to CMA and others as an unrelated third-party purchaser but covertly controlled. ¶¶ 97, 192-205. WD immediately rehired all WDE employees in their same positions, continuing the same operations as WDE in the same location, yet free of any obligation to Tatung. *Ibid.*

---

[2] The defined term "Houng Family Defendants" is used in the FAC to describe defendants Shu Tze Hsu, Shou-Por Houng, Chin-Ying Hsu, Rui-Lin Hsu, Jack Houng, and Howard Houng. Thus, allegations of conduct by the Houng Family Defendants constitute an allegation of an act by each such defendant, including Hsu.
[3] References to a paragraph (¶) refer to the FAC, unless otherwise noted.

- 2 -

1    Hsu and her fellow Houng Family Defendants orchestrated the scheme using

2 several Orange County companies as their primary instrumentalities. Tatung alleged

3 in detail exactly how Hsu was involved designing the scheme, funding the Sham

4 Enterprise, and implementing the elaborate "bust out" of those companies' assets to

5 defraud Tatung. *See, e.g.*, ¶¶ 42, 43, 53, 73, 74, 89. Paragraph 39 of the FAC

6 summarizes Hsu and her family's specific contacts with California for purposes of

7 personal jurisdiction, including: propping up WDE and Nexis (both in California) as

8 solvent and credit-worthy to secure credit from creditors like Tatung, while secretly

9 keeping WDE perpetually insolvent; inducing Tatung to deliver goods in California,

10 knowing Tatung was being injured, and operating WDE as a sham entity;[4] knowingly

11 laundering funds from WDE and Nexis (both in California) to entities under their

12 control for their benefit; diverting other assets from WDE to entities they controlled;

13 and conspiring to develop and execute the fraudulent bust out scheme.

14    Paragraph 42 includes detailed allegations regarding Hsu's specific contacts

15 with California, and in particular Orange County:

16 • "[Hsu] advanced significant sums of family funds under her
control into the Sham Enterprise ...";

17

18 • "[Hsu] knew, approved of and, on information and belief, directed
how the Hsu family wealth was being used to prop up WDE (a
19 California entity with its principal place of business in California)
through Nexis (a California entity with its principal place of
20 business in California), and to maintain the sham that WDE was a
solvent, legitimate entity so that trade creditors, such as
21 TATUNG, would continue to do business and extend significant
credit to WDE through goods delivered in California. . . ";

22 • "[Hsu] knew, approved of and, on information and belief, directed
her co-HOUNG FAMILY DEFENDANTS actions, and
23 maintained strings on the money advanced into WDE in
California so that when the time came to execute the bust out of
24 WDE's assets, the HOUNG FAMILY DEFENDANTS could pull
their money out of the sham enterprise without risk"; and

25

26 • "At all times leading up to the WDE bust out, [Hsu] remained
active in the decision making process with the HOUNG FAMILY
27 DEFENDANTS as to the timing and implementation of the WDE

28

---

[4] *See* ¶ 39 fn. 3 (alleging the defendants specifically used California as the forum to perpetrate their fraud by requiring Tatung to deliver product to WDE in California).

1   bust out, including maintaining continued communications with
    her children and, in particular, her grandson, [] Richard Houng"

2

3   Tatung describes how Hsu and her co-defendants structured and operated the

4   fraudulent scheme,[5] including detailed allegations of funds flow through the

5   fraudulent enterprises.  In all, the defendants operated their scheme in Orange County

6   – where WDE, Nexis, RH Holdings, Nexcast and WD are located:

7   - Hsu and her co-defendants carried out the fraud by deliberately
      manipulating the finances of multiple California companies she

8     indirectly controlled – WDE, WD, Nexis, RH Holdings and
      Nexcast – to ensure WDE's assets were unavailable to its

9     creditors, including Tatung. *See* ¶¶ 75, 85, 87, 99, and 101-104;

10  - Hsu and her co-defendants used California residents to operate the
      scheme day-to-day in California, and ensure Tatung was unpaid

11    for the goods it delivered in California. *See* ¶¶ 77, 78, 84 and 96;

12  - Hsu invested a portion of her family's fortune in WDE, through
      Nexis (also in California) using her alter ego offshore entity,

13    defendant Gorham, to prop WDE up as a legitimate entity and
      thereby cause its trading partners (including Tatung) to increase

14    the amount of credit they were willing to extend to the company.
      *See* ¶¶ 42, 53, 70 and 81;

15

16  - Through Gorham, Hsu invested these funds to divert WDE's
      PumpTop TV and LED TV businesses through the Investment

17    Enterprise and into Nexcast, WD and RH Holdings, all of whom
      maintain their operations in California. *See* ¶ 53.

18  Tatung further alleges Hsu and her co-defendants kept WDE balance-sheet

19  insolvent, disregarding corporate formalities in the process. ¶¶ 62, 68, 80 fn. 6, 85

20  and 92. Together, Hsu and her family laundered over $100 million from WDE and

21  fraudulently conveyed such funds from California accounts to be concealed in the

22  foreign accounts of sham offshore entities. FAC at ¶¶ 63, 64, 87, 88, 93, 95, 99, 101-

23  104, 108-112, 115-120, 122-127, 129-131 and Appx. 1. Indeed, the flow chart

24  created by Operational Defendant Jennifer Huang, and reproduced in the FAC at

25

26  _____

27  [5] Paragraph 43 alleges Hsu and co-defendants' conduct, "including the use of sham
    California entities to further their unlawful scheme, were deliberately and
    purposefully directed at and within the State of California," and the injuries to Tatung

28  "would not have arisen in the absence of [their] contacts directed to and with the
    State of California (in particular, their manipulation and control over Nexis and WDE
    – both California entities with their principal place of business in California)."

- 4 -

paragraph 126, shows California (and in particular Orange County) entities were the "hub" for the funds laundered from WDE. As explained in the chart and the FAC, the laundered funds in many instances flowed from entities operating in Orange County (WDE and Nexis), to WSI (in the British Virgin Islands), then back to Orange County (RH Holdings, Nexcast and WDE) for the purpose of eliminating millions in WDE receivables within days. *See also* FAC at ¶¶ 111, 113, 115 and Appx. 2 (Orange County funds flowing offshore, and back to Orange County). These transfers were directed by and for the benefit of Hsu and her family members. *See, e.g.,* ¶ 122.

Tatung further alleges Hsu orchestrated the culmination of the bust out scheme through the fraudulent transfer of WDE's "crown jewel" LED TV business to WD, another Orange County company indirectly owned by the Houng family (including Hsu) through defendant Northwood – an insider relationship concealed from Tatung, CMA and other parties to further the fraud. ¶¶ 97, 196-98  Tatung specifically alleges Hsu and certain family members caused their entity, defendant Li Fu, "to create a number of corporate shells through which they ultimately held ownership and control of newly-formed WD" and to fund the purchase price for the LED TV Assets. ¶ 198. Hsu directed the Operational Defendants to misrepresent the value of those assets to purchase the LED TV business for a grossly low price. ¶¶ 199-200.

After Hsu and her co-defendants completed the bust out of WDE and put Nexis into bankruptcy, Gorham (Hsu's off-shore entity) filed a claim against Nexis in the U.S. Bankruptcy Court for the Central District of California (Case No. 8:10-bk-18696-ES), asserting a claim based on purported loans to Nexis in Orange County, which were later conveyed to WDE. ¶ 53; *see also* Declaration of Joseph Wu, Ex. 4.

## III.   THE COURT HAS PERSONAL JURISDICTION OVER HSU

### A.   Standard on Rule 12(b)(2) Motion to Dismiss

To defeat a motion to dismiss, "the plaintiff need only demonstrate facts that *if true* would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (emphasis added); *see also Dole Food Co. v. Watts*, 303

- 5 -

F.3d 1104, 1108 (9th Cir. Cal. 2002).  Importantly, a plaintiff's burden on this issue

at the pleading stage is a "minimal burden." *Maxtor Corp. v. Read-Rite (Thailand)*

*Co.*, 2003 U.S. Dist. LEXIS 27208, *4 (N.D. Cal. Dec. 4, 2003) (denying motion to

dismiss for lack of personal jurisdiction by Thai defendant); *see also Larsen v.*

*Lauriel Invs., Inc.*, 161 F.Supp.2d 1029, 1048 (D. Ariz. 2001) (a plaintiff's burden of

proving jurisdiction is "minimal.").  The court examines allegations in the complaint,

together with competent, relevant evidence submitted by affidavit regarding personal

jurisdiction. *Data Disc, Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280, 1285

(9th Cir. 1977).  Uncontroverted factual allegations in the complaint ***must be taken as***

***true***, and conflicting affidavit testimony is resolved in the plaintiff's favor.  *AT&T v.*

*Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. Cal. 1996).

## B.  Standard for Personal Jurisdiction

California's long-arm statute authorizes personal jurisdiction to the extent

permitted by the Due Process Clause of the Constitution.  Cal. Code. Civ. Proc. §

410.10; *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  Due

process requires a defendant have "minimum contacts" with the forum such that

exercise of personal jurisdiction "does not offend the traditional notions of fair play

and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66

S. Ct. 154, 158 (1945).  A court may exercise "general jurisdiction" if a defendant's

activities in the forum are "substantial" or "continuous and systematic," even if the

claims against the defendant are unrelated to those contacts.  *Id.* at 317.

The court may also exercise "specific jurisdiction" in a tort case when (i) the

defendant "purposefully directed" an intentional act at the forum state, (ii) plaintiff's

claims arise out of the defendant's forum-related actions, and (iii) if the first two

prongs are satisfied, the defendant fails to present a "compelling case" jurisdiction

would be unreasonable. *Dole*, 303 F.3d at 1110-1111 (reversing district court's

dismissal and upholding personal jurisdiction over foreign defendants) (citing *Calder*

*v. Jones*, 465 U.S. 783, 789 (1984)); *Harris Rutsky & Co. In. Servs. v. Bell &*

1 | *Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003) (quoting *Burger King v.*
2 | *Rudzewicz*, 471 U.S. 462, 477 (1985)).

### C. The FAC's Many Unrefuted Allegations of Hsu's Contacts

4 |     Hsu makes little effort to address specific allegations regarding her contacts
5 | with California, instead asserting Tatung's allegations are simply "deficient." The
6 | conclusory statements in Hsu's Motion disregard the actual contents of the FAC.
7 | Even a cursory review of the FAC reveals multiple allegations that the core of the
8 | fraudulent scheme was based in Orange County, with Hsu and her co-defendants
9 | using a web of offshore companies, as well as the guise of California assignment law,
10 | to launder money and assets out of (and, in most instances, back to) Orange County.
11 | *See, e.g.*, ¶¶ 42, 45, 47-58, 80-131, 191-208. The detailed and uncontroverted
12 | allegations regarding Hsu's direct and indirect participation in the conspiracy and
13 | schemes which form the bases for Tatung's claims must be accepted as true.

14 |     The only evidence presented by Hsu to counter the many allegations against
15 | her is paragraph 3 of her declaration, which avers only that Hsu: has not visited the
16 | United States since 2007; does not *currently* have California property, employees,
17 | offices, telephone or bank accounts; has never been "a member or officer" of WDE,
18 | Nexcast or WD; and has never managed or controlled WDE, Nexcast or WD, or
19 | directed anyone to take any actions in regard to those companies.

20 |     First, physical presence is not necessary to support jurisdiction over a foreign
21 | defendant.[6] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct 2174,
22 | 2184 (1985) ("[I]t is an inescapable fact of modern commercial life that a substantial
23 | amount of business is transacted solely by mail and wire communications across state
24 | lines, thus obviating the need for physical presence within a State…"). Nor does her
25 | second assertion, limited to certain types of contacts *as of the date of her declaration*,
26 | have any bearing on the numerous contacts alleged in the FAC that began as early as

---

[6] Hsu fails to describe her presence in the United States or California prior to 2007, or her other contacts (including business contacts) prior to the date of her declaration. Those contacts, of course, are relevant to the jurisdictional challenge she raises.

Case No. SACV13-01743 DOC (ANx)

in 2004.  Hsu's third assertion is also irrelevant because Tatung never alleged Hsu was a member or officer of WDE, Nexcast or WD.  The FAC details how Hsu and her family designed the artifice using intermediary entities and operatives to create virtual separation between them and the enterprise used to perpetrate their scheme.

Hsu's final assertion falls well short.  Her careful language fails to address detailed allegations regarding her personal involvement.  For instance, she does not address her personal involvement with Gorham, WSI, and Li Fu – used to prop up Nexis and WDE, launder assets offshore, and bust out WDE's assets.  More importantly, the portrayal of Hsu as uninformed and uninvolved is directly contradicted by testimony of her grandson, Richard Houng, who detailed Hsu's involvement in the Orange County enterprise.  At the meetings of creditors in the Nexis chapter 7 case, Houng appeared on behalf of Nexis and testified:

- Nexis was a "paper company" with no assets other than its ownership of WDE and a bank account where loans to Nexis (*i.e.*, investments in WDE) were deposited. *See* Wu Decl., Ex. 1 at 3:6-16, 7:6-8:16;

- Gorham was an equity owner of Nexis, along with Richard Houng and his brothers, Jack Houng and Howard Houng. *Id.* at 24:9-25, 33:9-15;

- Gorham had also made a "loan" to Nexis of $17-18 million, albeit with no documentation. *Id.* at 33:16-34:10; Ex. 2, 3:17-6:6;

- Gorham was Hsu's company.  Wu Decl., Ex. 1 at 34:11-35:16; Ex. 2 at 3:9-13;

- Hsu "referred" WSI (the primary offshore entity through which funds were laundered) to Houng to "loan" funds into Nexis.  Wu Decl. at 6:8-13;

- Hsu gifted Houng an 8.2% equity interest in Li Fu – which made "loans" to Nexis (to invest in WDE) – and Hsu manages the Li Fu investment for Houng. *Id.* at 10:2-12:21.

During his deposition in the earlier arbitration, Houng again testified Nexis (the owner of WDE) was owned by defendant Gorham and other Houng family members, and Gorham is owned by Hsu.  Wu Decl., Ex. 3 at 71:19-22; 671:12-13.  He testified an additional $1.5 million from Hsu funded other California instrumentalities of the fraudulent scheme, including Nexcast. *Id.* at 671:5-13.  Finally, in Houng's own

bankruptcy, he filed documents – using the same counsel now representing Hsu in this Action – indicating Hsu, Gorham, Jack Houng and Howard Houng had owned a majority controlling interest in Nexis, the sole owner of WDE. *Id.*, Ex. 5 at p. 23.

These documents and testimony by Houng – Hsu's grandson – reveal Hsu's carefully worded declaration is incomplete and purposefully misleading. Hsu was the actual *owner* of WDE (through Nexis and Gorham), who also (i) invested in the Sham Enterprise in California through undocumented "loans," (ii) provided funds to invest in Nexcast in California through substantial "gifts" to Houng, (iii) was actively involved in managing the Houng family's ownership of Li Fu, the defendant which orchestrated the bust out of the LED TV Assets to WD, and (iv) was the ultimate connection between WSI (the primary offshore sham entity used in the scheme) and its Orange County operations. Thus, to the extent Hsu's declaration even addresses a relevant jurisdictional fact, it is belied by Richard Houng's testimony as to her actual involvement with the alleged scheme in this District. Tatung's allegations of Hsu's extensive contacts have not been – and cannot be – controverted.

**D.    Uncontroverted Allegations Support General and Specific Jurisdiction**

Tatung's uncontroverted allegations establish a prima facie case that Hsu, over the course of at least seven years, and continuing to this day, conspired to (and did) use a series of Orange County entities and operatives to perpetrate a fraud. These contacts with California – through her use of the California-based entities and her Orange County operatives – were both substantial and "systematic and continuous" contacts with California. Thus, Tatung has established a prima facie case for general personal jurisdiction. These contacts, which are not refuted by competent evidence, also establish a prima facie case for specific jurisdiction.

**1.    Hsu "Purposefully Directed" Numerous Activities at California Entities and Individuals**

"Purposeful direction" occurs when a defendant commits an intentional act, expressly aimed at the forum state, causing harm the defendant knows is likely to be

- 9 -

suffered in the forum state. *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990)
(Purposeful direction where defendant "performed some type of affirmative conduct
which allows or promotes the transaction of business within the forum state."). The
defendant's presence in the forum is not necessary. *Calder v. Jones*, 465 U.S. 783,
789, 106 S.Ct. 1482, 1487 (1984). Nor is plaintiff's residence in the forum required.
*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 1481 (1989)
("[P]laintiff's residence in the forum State is not a separate requirement, and lack of
residence will not defeat jurisdiction established on the basis of defendant's
contacts."). In fact, jurisdiction is proper "over a defendant whose only 'contact'
with the forum state is the 'purposeful direction' of a *foreign* act having *effect* in the
forum state." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d
1392, 1397 (9th Cir. 1986).[7]

As above, Tatung's uncontroverted allegations establish Hsu intentionally
directed numerous acts towards California, including (i) investment in multiple
California entities; (ii) manipulation of WDE's finances to induce Tatung to extend it
trade credit and then launder WDE's cash and other assets out of the business; (iii)
her use of legal and accounting professionals residing in California to further her
scheme within the state; (iv) her fraudulent diversion of WDE's PumpTop TV and
LED TV businesses to Nexcast, WD and RH Holdings, all of which maintain their
principal place of business in Orange County; and (v) her and her family members'
illicit transfer of over $100 million out of WDE (and out of California) through the
Sham Enterprise, and through and into the Investment Enterprise. *See, e.g.*, ¶¶ 42, 43,
53, 73, 74, 77, 78, 84, 89, 96, 99, 101-104, 108-112, 115-120, 126, 127 and 129-131.
These allegations in the FAC all point to Hsu's intentional conduct, including her
direct funding of multiple entities used in the conspiracy to defraud Tatung with

---

[7]A single forum-directed act may suffice. *Yahoo! Inc. v. La Ligue Contre Le Racisme*,
433 F.3d 1199, 1210 (9th Cir. 2006) (single contact can support jurisdiction if claim
arises from purposeful contact with the forum); *Taylor-Rush v. Multitech Corp.*, 217
Cal.App.3d 103, 118 (1990) ("Intentional tortfeasors should be prepared to defend
themselves in any jurisdiction where they direct their alleged tortious activity.").

- 10 -

California entities as her primary instrumentality. *See Electrograph Sys., Inc. v. Epson Imaging Devices Corp.*, 2012 U.S. Dist. LEXIS 12063, *37 (N.D. Cal. Feb. 1, 2012) (upholding personal jurisdiction based on defendant's participation in conspiracy aimed at an American company other than plaintiff).

Hsu's reliance on *Jobe v. ATR Marketing, Inc.*, 87 F.3d 751, 754 (5th Cir. 1996) is misplaced. *Jobe* analyzed jurisdiction under Mississippi's long-arm statute, which is more restrictive than the California's statute.[8] *Id.* at 752. More importantly, like the plaintiff in *Jobe*, Hsu conflates "harm" with "damages." The conduct in *Jobe*, breach of a contract to deliver airplanes, occurred in Louisiana — not the forum state, Mississippi. *Ibid.* The court rejected plaintiff's contention the suffered *harm* in Mississippi, holding only the "economic consequences" or damages, such as lost revenue, business and goodwill, were felt in the forum state, Mississippi. *Ibid.* In contrast, the fraudulent scheme perpetrated by Hsu did not simply *involve* California – it was *headquartered* here – and Hsu's tortious conduct injured Tatung *in California* when it delivered its goods to WDE in California, and when WDE's assets in California were busted out, leaving WDE as an empty shell and Tatung without recourse to enforce its California judgment. *See, e.g.*, ¶¶ 39, 150 and 160.[9]

Finally, the FAC alleges Hsu understood (and intended) her conduct would cause injury in California. *See, e.g.*, ¶¶ 39, 42-43, 53, 88, 150, 178. Thus, Tatung has alleged sufficient facts to meet its burden in alleging Hsu "purposefully directed" her conduct at California, and knew it would likely cause harm in California.

///

///

---

[8] In fact, *Jobe* did not analyze due process because it had already held the plaintiff's claims were beyond the reach of Mississippi's long-arm statute. *Id.* at 754.

[9] *See Data Disc, Inc. v. Sys. Tech. Assoc.*, 557 F.2d 1280, 1288 (9th Cir. 1977) ("The inducement of reliance in California is a sufficient act within California to satisfy the requirement of minimum contacts where the cause of action arises out of that inducement."); *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995) ("In tort cases, [] jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at, and having effect in, the situs state.").

- 11 -

### 2.   Tatung's Claims Arise from Hsu's California Contacts

The Ninth Circuit employs a "but for" test to assess whether claims arise from the defendant's contacts in the forum. *Harris Rutsky, supra*, 328 F.3d at 1130.  The test "requires some nexus between the cause of action and the defendant's activities in the forum." *In re Cathode Ray Tube CRT Antitrust Litig.*, 2014 U.S. Dist. LEXIS 35391, *80 (N.D. Cal. Mar. 13, 2014).  This is readily satisfied here.  Tatung's claims are a direct result of Hsu's and her co-conspirators' design and implementation of the scheme, centered in California, through their sham Orange County-based companies.

Citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995), Hsu argues Tatung must allege that, "but for" Hsu's conduct, Tatung would not have been injured *at all*.  Motion at p.10.  Nowhere does *Ballard* even approach such a conclusion.  *Ballard* simply requires a court to inquire whether a plaintiff's claims *against the moving defendant* would have arisen "but for" that defendant's contacts with the forum.  *Id.*, at 1500 ("The question, therefore is this: but for Royal's contacts with the United States and California, would Ballard's claims against the Bank have arisen?").  Here, this "but for' test is met because Tatung's claims *against Hsu* would not have arisen but for her contacts with California.[10]

### E.   Personal Jurisdiction over Hsu is Reasonable

Once a plaintiff presents a prima facie case of either general or specific jurisdiction, reasonableness of jurisdiction is presumed.  *Ballard, supra*, 65 F.3d at 1500 (citing *Sher, supra*, 911 F.2d at 1364).  To rebut this presumption, the defendant must present a "compelling case" jurisdiction is nonetheless unreasonable.  *Hajjar v. Blue Cross & Blue Shield of Tex.*, 2009 U.S. Dist. LEXIS 84835, **10-11 (C.D. Cal. Sept. 10, 2009).  It is a "rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum."

---

[10] Under Hsu's version of the "but for" test, it would be virtually impossible to obtain jurisdiction over any defendant to a conspiracy claim, each one simply arguing the conspiracy would have gone forward without them.

- 12 -

1  *Oakley, Inc. v. Jofa AB*, 287 F.Supp.2d 1111, 1117 (C.D. Cal. 2003).  Courts weigh

2  several factors in assessing reasonableness, none being itself dispositive.  *Toeppen*,

3  *supra*, 141 F.3d at 1323.  The relevant factors here are as follows:

4     Purposeful Interjection in Forum State's Affairs: As detailed in the FAC, Hsu

5  purposefully injected herself into the affairs of California through her use of multiple

6  Orange County entities.  She used Orange County residents to carry out this

7  fraudulent scheme centered in Orange County, and continues her tortious conduct

8  through her indirect ownership and control of WD, headquartered in Orange County.

9  ¶¶ 151, 197-99.  Indeed, Hsu's interjection into California is so pervasive this factor

10  outweighs any burden on Hsu having to litigating this matter in this District.  *Agilent*

11  *Techs., Inc. v. Elan Microelectronics Corp.*, 2005 U.S. Dist. LEXIS 34305, *16 (N.D.

12  Cal. Nov. 29, 2005) (finding purposeful contacts outweighing burden on defendant).

13     Defendant's Burden of Litigating in Forum:  Hsu's single reliance on *Asahi v.*

14  *Sup. Ct.*, 480 U.S. 102, 114, 107 S.Ct. 1026 (1987) is misplaced.  *Asahi* simply

15  reaffirmed the principle "a finding of minimum contacts must come about by *an*

16  *action of the defendant purposefully directed toward the forum State*."  *Id.* at 112-13.

17  [emphasis in original].[11]  Here, uncontroverted allegations establish Hsu *purposefully*

18  *directed* her conduct at California, caused injury to Tatung in California and

19  perpetrated the scheme through use of California entities and operatives.  Hsu (whose

20  counsel also has represented her grandson, Richard Houng, since 2010) chose to

21  execute her scheme in California, and must answer here for her tortious conduct *even*

22  *if* she must experience certain travel burdens.  *Roth v. Garcia Marquez*, 942 F.2d 617,

23  623 (9th Cir. 1991) ("[unless the] inconvenience is so great as to constitute a

24  deprivation of due process, it will not overcome clear justifications for the exercise of

25

26  [11] Because *Asahi* did not do business in California and "did not create, control, or

27  employ the distribution system that brought its valves to California," jurisdiction was
   unreasonable even if foreseeable some of the valves would end up here.  *Id.* at 112.

28  The Court noted, however, that where "minimum contacts have been established,
   often the interests of the plaintiff and the forum in the exercise of jurisdiction will
   justify even the serious burdens placed on the alien defendant."  *Id.* at 114.

Case No. SACV13-01743 DOC (ANx)

1  jurisdiction."); *see also Ballard, supra,* 65 F.3d at 1501 ("modern transportation

2  certainly has made the burden of defending in a foreign forum more palatable").[12]

3      <u>Forum State's Interest in Adjudicating Dispute</u>:  California has a strong

4  interest in adjudicating this dispute. *Church v. Consolidated Freightways, Inc.,* 1992

5  U.S. Dist. LEXIS 18234, *13 (N.D. Cal. Sept. 15, 1992) ("California has a strong

6  interest in preventing fraud by corporations residing and conducting business in

7  California."). California also has an interest providing redress for companies doing

8  business here with California-based entities. *Data Disc, supra,* 557 F.2d at 1288.

9  WDE's assets were fraudulently transferred in California, with Hsu's involvement,

10 under the guise of a California statutory assignment. *See* ¶¶ 191-208. Tatung

11 delivered its goods to WDE in California. WDE, WD, Nexcast, RH Holdings and

12 Nexis (the entities at the center of the fraudulent scheme) are each located in Orange

13 County, each operated out of the same address and by the same Operational

14 Defendants Douglas Woo, Benson Lin, David Chen, John Araki, Arthur Moore and

15 Juan Salcedo. These Operational Defendants are and were California residents

16 employed in Orange County. Multiple California bank accounts were used to

17 effectuate the wire transfers that constitute predicate acts under Tatung's RICO

18 claims. *See, e.g.,* ¶¶ 125, 127-128. California's interest in having this matter

19 adjudicated here weighs in favor of jurisdiction.

20     <u>Efficient Judicial Resolution</u>:  Hsu claims the parties' "citizenship suggests that

21 most of the witnesses and evidence are in Taiwan." Motion at p.11. This is

22 unsupported and untrue. At the center of this Action are financial dealings of

23 California entities, their operatives and their ultimate owners and beneficiaries.

24 Those entities, including WDE, WD, Nexcast, RH Holdings, and Nexcast have been

25

26 [12] Hsu's contention that "the defendant's burden in defending the action is decisive"
is not even supported by the case she cites. Motion at p.12 (citing *Terracom v. Valley*

27 *Nat'l Bank,* 49 F.3d 555, 561 (9th Cir. 1995). *Terracom* simply stated that where the
burden is the same for both the plaintiff and defendant, the scale merely "tips" in the

28 defendant's direction. *See also Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333
(9th Cir. 1984) ("If [this factor were] given controlling weight, it would always
prevent suit against a foreign national in a United States court.").

Case No. SACV13-01743 DOC (ANx)

1   operated at all relevant times in Orange County *out of the same location*.  In addition,

2   six of the Operational Defendants, who will serve as key witnesses, reside in

3   California and (to Tatung's knowledge) remained employed by WD in Orange

4   County.  Non-party Richard Houng –former CEO of WDE and who continues to

5   control WD, Nexcast and RH Holdings – also resides in Orange County.  While

6   certain Houng Family Defendants are located abroad, the bulk of potential witnesses

7   and evidence are located in California, and the efficient resolution of this case

8   requires adjudication in this forum.

9        <u>Plaintiff's Interest in Convenient and Effective Relief</u>: Hsu states, with no

10  support, that Tatung will not be inconvenienced if required to seek relief in a

11  Taiwanese court.  The defendants' fraudulent scheme, however, centered in

12  California and involved multiple California individuals and entities, and Tatung's

13  claims arise under the Federal RICO statutes and California state law.  Indeed, no

14  forum has a stronger connection to this dispute than California.  Hsu offers no

15  explanation how Tatung would obtain Taiwan jurisdiction over the many California

16  defendants, and whether Tatung could pursue the claims set forth in its FAC in a

17  Taiwanese court.  Tatung's claims are not "primarily based on alleged activities

18  occurring in Taiwan."  Motion at p.11.  They arise directly from actions carried out in

19  California, and injury suffered in California.  Tatung's interest in litigating this

20  dispute in the epicenter of defendants' scheme is significant.

21       In short, Hsu fails to present a credible case, much less a "compelling case,"

22  that jurisdiction over her is unreasonable, particularly given the presumption of

23  reasonableness and the uncontroverted allegations of her pervasive tortious conduct

24  directed at California.  The Court should deny her motion under Rule 12(b)(2).

25  ///

26  ///

27

28

- 15 -

## IV. THE RICO ALLEGATIONS AGAINST HSU ARE SUFFICIENT

### A. Tatung's Allegations Satisfy RICO Pleading Standards

#### 1. Standard on 12(b)(6) Motion to Dismiss

On a 12(b)(6) motion, material allegations are accepted as true and construed in the light most favorable to plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). A pleading must contain "only enough facts to state a claim to relief that is plausible on its face," meaning "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1965 (2007) (Rule 8 requires "fair notice of what the...claim is and the grounds upon which it rests."). "[I]f the facts alleged foster a reasonable inference of liability—stronger than a mere possibility—the claim survives." *Hendricks v. StarKist Co.*, 2014 U.S. Dist. LEXIS 41523, *10 (N.D. Cal. Mar. 25, 2014). Fraud claims are subject to Rule 9(b), but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Ibid.*

A RICO plaintiff is not required to allege "every act of mail or wire fraud . . . with the 'particularity' required by Fed. R. Civ. P. 9(b)." *Bryant v. Mattel, Inc.*, 2010 U.S. Dist. LEXIS 103851, *29 (C.D. Cal. Aug. 2, 2010) (citing *Schmuck v. United States*, 489 U.S. 705, 714 (1989)). "This is because the scheme, *not* the communications in furtherance of the scheme, must be fraudulent." *Ibid.* [emphasis in original]. Only mail or wire communications alleged to be fraudulent themselves are subject to Rule 9(b)'s particularity requirement. *Ibid.* A plaintiff adequately alleges the predicate acts of wire and mail fraud by alleging: "(1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails [or wires] or caused a use of the United States mails [or wires] in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Miller v. Yokohama Corp.*, 358 F.3d 616, 620 (9th Cir. 2004) (mail and

- 16 -

wire fraud share elements and are therefore evaluated under the same framework).[13]

RICO *conspiracy* claims are analyzed under the more liberal Rule 8(a) standard. *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 U.S. Dist. LEXIS 279, *25 (W.D. Wash. Jan. 3, 2011). A defendant need not personally commit a RICO violation to be liable for the conspiracy. *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). Instead, the defendant need only be "aware of the essential nature and scope of the enterprise and intended to participate in it." *Ibid.* (citing *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)).[14]

## 2. Tatung Sufficiently Alleges Hsu's RICO Violations

A claim under section 1962(c) "simply requires a 'nexus' between the enterprise and the racketeering activity." *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194-95 (9th Cir. 1987); *see also* 18 U.S.C. § 1961(1) (defining the predicate criminal offenses that constitute "racketeering activity"). Section 1962(a) further makes it unlawful for "a person who has received any income from a pattern of racketeering activity to acquire, establish or operate any enterprise with that income." *IBM v. Brown*, 1998 U.S. App. LEXIS 483, *6 (9th Cir. Jan. 9, 1998). A plaintiff must allege the defendant invested the racketeering income in an enterprise and plaintiff suffered injury by the use or investment of that income. *Nugget Hydroelectric, L.P. v. Pacific Gas and Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992).

---

[13] Hsu appears to argue Tatung's RICO claims fail to satisfy elements of common law fraud. *See* Motion at p.18 (RICO allegations "do not allege any misrepresentations she made or how the misrepresentations deceived Tatung"). This is not the correct standard. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 476, 126 S.Ct. 1991, 2007 (2006) ("Because an individual can commit an indictable act of mail or wire fraud even if no one relies on his fraud, he can engaged in a pattern of racketeering activity, in violation of § 1962, without proof of reliance."); *Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 649, 128 S.Ct. 2131, 2139 (2008) ("[A] person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations.").

[14] *See also Bryant v. Mattel, Inc.*, 2010 U.S. Dist. LEXIS 103851, *48 (C.D. Cal. Aug. 2, 2010) ("A civil RICO plaintiff [may] sue co-conspirators who might not themselves have violated the substantive provisions of § 1962...a conspirator can be held vicariously liable for the underlying torts committed by his co-conspirators.") (internal quotations omitted). In other words, a plaintiff "must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Ibid.*

Case No. SACV13-01743 DOC (ANx)

1    Hsu's myopic view of Tatung's allegations, and blanket denial of their

2    sufficiency, ignores the punctilious nature of the FAC.  Tatung lays out in great detail

3    Hsu's role in crafting the scheme, funding the primary instrumentalities, transferring

4    funds to further the scheme, reinvesting proceeds of the scheme (using Hsu's

5    companies), and siphoning WDE's assets to offshore sham entities and entities Hsu

6    indirectly owned in California.  *See, e.g.*, ¶¶ 39, 42-43, 53, 62-65, 68, 70, 74-78, 80-

7    81, 83-85, 87-90, 93, 99, 106, 109-131, 191-208.  The FAC therefore satisfies Rule

8    9(b) because it "identifies the circumstances constituting fraud so that the defendant

9    can prepare an adequate answer from the allegations."  *Moore v. Kayport Package*

10   *Express*, 885 F.2d 531, 540 (9th Cir. 1989).

11       Moreover, the predicate acts, while not subject to heightened pleading, are pled

12   with particularity in the FAC and Appendices – including the wire transfer senders,

13   recipients, dates and amounts, among other details.  *See, e.g.*, ¶¶ 93, 102, 108, 111,

14   113, 115, 116, 118, 120, Appx. 1, 2.  Tatung alleged the identity of those responsible

15   for each predicate act, and that these acts, and the fraudulent scheme, were not only

16   perpetrated with Hsu's consent and involvement, but at her direction.[15]  Thus, at this

17   early stage (with no discovery), the FAC clearly satisfies the RICO pleading standard.

18       **B.    Hsu's Violations Were the Proximate Cause of Tatung's Injuries**

19       A plaintiff must allege it sustained an injury to its business or property "by

20   reason of" defendant's violation of the RICO statute, 18 U.S.C. § 1962(a)-(d).

21   "When a court evaluates a RICO claim for proximate causation, the central question

22   it must ask is whether the alleged violation led directly to the plaintiff's injuries."

23   *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 1998 (2006).

24

25

---

26   [15]A plaintiff need not allege actual wire transmission or mailing by a RICO
     defendant; merely *causing* a wire transmission or mailing is a predicate act.  18
27   U.S.C. §§ 1341, 1343.  Layers of entities and personnel were employed to insulate
     the Houng Family Defendants from day-to-day operations of the Sham Enterprise,
28   including Hsu's use of BVI company, Gorham, to manage her investment, and her
     reliance on Richard Houng and the Operational Defendants to carry out the design.
     ¶¶ 28, 42, 40, 53, 62, 78.  Operational separation does not insulate Hsu from liability.

- 18 -

1   Tatung expressly asserts its injuries arise directly out of Hsu's violations of RICO.[16]

2   Hsu invested funds into the Sham Enterprise, through Nexis and her offshore entity,

3   defendant Gorham. ¶¶ 42, 53, 80 n.6. Through Gorham, Hsu became the

4   shareholder-in-control of Nexis and, by extension, WDE. ¶ 40. Relying on the

5   legitimacy of entities within the Sham Enterprise, Tatung supplied WDE goods on

6   credit and purchased LCD panels from WSI, as Hsu intended. *See, e.g.,* ¶ 70. All the

7   while Hsu and her operatives laundered WDE's assets from the Sham Enterprise,

8   through and into the Investment Enterprise, to shield them from WDE's creditors,

9   including Tatung. *See, e.g.,* ¶ 64. The Appendices to the FAC detail numerous

10  exemplary acts of racketeering performed by the defendants with Hsu's direction and

11  consent.

12      Moreover, Hsu's reinvestment of proceeds of the scheme, such as her removal

13  of millions of dollars from WDE to offshore members of the enterprise supports

14  Tatung's claim under Section 1962(a). ¶¶ 64, 109-112, 160. Hsu's reinvestment

15  directly caused a "loss of WDE assets from which Tatung would recover payment

16  from WDE but for the pattern of investment and racketeering activity." ¶ 160.

17      Hsu's violations of Sections 1962(a) and (c) and her agreement with her co-

18  conspirators to defraud WDE's creditors also constitute a RICO conspiracy in

19  violation of section 1962(d). Her control over the enterprises and "active

20  participation in the decision-making process with the Houng Family Defendants as to

21  the timing and implementation of the WDE bust out" caused Tatung's injury, and

22  form the basis for the RICO claims against her. ¶ 167, Appx. 1 and 2.

23      The direct link between Tatung's injury and the RICO violations distinguishes

24  this case from *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 112 S.Ct. 1311

25  (1992). *Holmes* involved claims pursued by a nonprofit that had reimbursed clients

26  of two investment brokers when the brokers were unable to meet obligations to

27

28  [16] In challenging causation, Hsu cites only to ¶¶ 70, 85 and 149, which relate to
    Tatung's Section 1962(c) RICO claim. Hsu does not challenge the sufficiency of
    Tatung's causation allegations with respect to its Section 1962(a) and (d) claims.

- 19 -

1  clients as a result of a stock-manipulation scheme. *Id.* at 261. The court held the

2  RICO claims against the perpetrator of scheme were "too remote" to the customers'

3  harm, which was "purely contingent on the harm suffered by the broker-dealers." *Id.*

4  at 272. The plaintiffs in *Holmes*, however, did not actually purchase stock in the

5  fraudulent scheme, so they were not directly injured by the defendant. *Ibid.* Nor

6  were there any allegations of a common scheme where the fraudsters also controlled

7  the broker entities. Instead, only the brokers' subsequent insolvency linked the

8  defendant's acts to the losses suffered by the non-purchasing customers. *Ibid.*[17]

9      Tatung's injuries were not merely "contingent" on harm done to WDE, nor was

10  WDE an arm's length victim of the defendants' fraud. Instead, WDE was the main

11  instrumentality of their scheme – the cornerstone of their Sham Enterprise. *See, e.g.,*

12  ¶ 81. Hsu and her family owned and controlled WDE, the façade through which they

13  induced Tatung to extend millions in trade credit, while diverting WDE's assets for

14  their personal benefit. *See, e.g.,* ¶¶ 42 and 63. WDE's officers and directors

15  (Operational Defendants Woo, Lin, Salcedo, and D. Chen) actively operated WDE

16  and WD and carried out the will of the Houng family. ¶¶14, 16, 18, 20, 42, 43, 44.

17  Indeed, WDE and Nexis have been adjudicated as sham entities through which a

18  massive fraud was perpetrated on Tatung. *See* FAC at Exs. 1-4. WDE is not

19  analogous to the innocent intermediary brokers in *Holmes*, but rather a part of the

20  Sham Enterprise used by Hsu and her co-defendants to directly injure Tatung.

21      **C.    Hsu's RICO Conduct Primarily Occurred within the United States**

22      Hsu contends, without a single citation to the FAC, that Tatung's allegations

23  only pertain to conduct occurring outside the United States. Hsu is wrong. The FAC

24  includes extensive allegations of pervasive, intentional conduct directed at and

25  occurring California. One need not look further than the lengthy description of the

26

---

27  [17] The *Holmes* court also noted the brokers' inability to satisfy their obligations to
    their clients could have been a result of "the broker-dealers' poor business practices
28  or their failures to anticipate developments in the financial markets," not necessarily
    the stock scheme. *Id.* at 273. In contrast, WDE was an instrumentality with no
    purpose other than to perpetrate the fraudulent scheme described in the FAC.

1   fraudulent transfer of WDE's LED TV Assets, the final step in the bust out, which
2   took place in California, between entities located in Orange County, and using a
3   general assignment under California law to conceal their fraud.  FAC at ¶¶ 192-208.

4        To be actionable under RICO, there must "be some degree of connection
5   between the fraud and conduct in, or effects on, the United States." *Grunenthal*
6   *GmbH v. Hotz*, 712 F.2d 421, 424 (9th Cir. 1983); *Poulos v. Caesars World, Inc.*, 379
7   F.3d 654, 663 (9th Cir. 2004) (adopting standard for RICO claims).  To satisfy the
8   "conduct" test, defendant's conduct must involve the use of instrumentalities of
9   interstate commerce in the United States.  *Bowoto v. Chevron Corp.*, 481 F.Supp.2d
10  1010, 1015 (N.D. Cal. 2007) (quoting *Grunenthal, supra*, 712 F.2d at 424).
11  Alternatively, the plaintiff states a RICO claim if "the effect on the commerce of the
12  United States of engaging in [the fraud was] palpable." *Republic of the Philippines v.*
13  *Marcos*, 862 F.2d 1355, 1358 (9th Cir. 1988).

14       Both tests are satisfied here.  As above, Hsu and her co-defendants (1) formed
15  and invested in multiple California entities to serve as the front for the fraudulent
16  scheme; (2) manipulated California-based WDE's finances to induce Tatung to
17  extend millions in credit and payments; (3) used legal and accounting professionals in
18  California to further the scheme here; (4) diverted cash and other assets out of these
19  California instrumentalities to other entities in Orange County, including defendants
20  Nexcast, WD and RH Holdings; and (5) transferred over $100 million out of WDE in
21  California to the conspiracy's sham offshore entities – all of which cased Tatung to
22  suffer substantial injury in California.  *See, e.g.*, ¶¶ 42, 43, 53, 73, 74, 77, 78, 84, 89,
23  96, 99, 101-104, 108-112, 115-120, 122, 126, 127 and 129-131.

24       Hsu relies on *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir. 1996), where
25  the court dismissed securities and RICO claims because the alleged fraudulent stock
26  transaction "was a transaction wholly outside the scope of our securities laws,
27  involving alien sellers, an alien purchaser, and shares of stock in two United
28  Kingdom companies." *Id.* at 291.  There, the fact that the foreign defendants had

- 21 -

purchased, as assets underlying the fraudulently traded stock, mining property in Montana, was "merely preparatory to fraud" and "did not make Montana their operational base." *Ibid.*  *Butte* is clearly distinguishable.  The RICO violations by Hsu and her co-defendants occurred *in California*, involving *California assets*, and *California* entities and operatives as primary instrumentalities.  This conduct is not "merely preparatory," and caused substantial injury to Tatung in California.  Tatung's RICO claims therefore satisfy both the "conduct" and "effects" tests.

## V.   HSU'S CONSPIRACY LIABILITY IS SUFFICIENTLY ALLEGED

Hsu's challenge to Tatung's conspiracy counts (Counts V and VII) is based on her improperly narrow reading of the FAC, effectively limiting her analysis to paragraphs 187 and 211 and ignoring the remainder of the FAC (incorporated into both counts).  Motion at p.19.  Hsu fails to even reference the elements of civil conspiracy: (i) the formation and operation of the conspiracy, and (ii) damage to plaintiff from an act or acts in furtherance of the common design.  *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 511 (1994) (citing *Doctors' Co. v. Super. Ct.*, 49 Cal.3d 39, 44 (1989)).

Count V alleges Hsu's participation in a conspiracy to commit the fraud described in Count IV; namely, causing Tatung to advance money to WSI (which it believed to be a separate entity and not part of the Sham Enterprise), and extend credit to WDE (which it believed to be a legitimate solvent company) under false pretenses.  ¶¶ 42, 70, 72, 76, 81, 175-185.  Likewise, Count VII alleges Hsu's participation in a conspiracy to commit the fraudulent LED TV Transfer described in Count VII.  ¶¶ 42, 53, 63, 95, 97, 197, 199.  Hsu does not and cannot allege these underlying torts (*i.e.*, the fraud that must be pled with particularity) are not sufficiently alleged, instead claiming she is "left guessing what her alleged role was in the conspiracy."  This is disingenuous.

Tatung specifically describes the conspiracy in Count V, the conspirators, its formation and purpose.  Tatung specifically alleges Hsu, in furtherance of the

- 22 -

1  conspiracy, used Gorham to fund the Sham Enterprise to prop up WDE as a
2  legitimate entity and induce Tatung to extend credit to WDE. *See, e.g.,* ¶¶ 53, 187.
3  Tatung also alleges, throughout the FAC, Hsu's knowledge and agreement to the
4  fraud alleged in Count IV, and the resulting injury to Tatung in reliance on the "False
5  Pretenses."[18] Similarly, Count VI details how Hsu helped orchestrate the LED TV
6  Transfer, including through her concealed formation and funding of the transferee
7  (WD), and conspired to effectuate the fraudulent transfer. *See, e.g.,* ¶¶ 197-99.
8  Tatung alleges the fraudulent conduct with sufficient particularity (which Hsu does
9  not deny), and sufficiently alleges the elements of Hsu's conspirator liability,
10  including the acts taken by Hsu which resulted in injury to Tatung.

11  **VI.    THE FRAUDULENT TRANSFER CLAIMS ARE ADEQUATELY PLED**

12          Hsu argues Count VII does not sufficiently specify "Hsu's conduct." But
13  where a fraudulent transfer claim alleges "actual fraud," the fraudulent intent at issue
14  is that of the debtor transferor – WDE in this case. *Wolkowitz v. Beverly* (*In re*
15  *Beverly*), 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007) ("The focus is on the intent of the
16  transferor.") Tatung seeks to recover from Hsu as a transferee and beneficiary of the
17  transfer, *not a transferor*. ¶ 203. No specificity is required regarding *Hsu's* conduct.
18  Even so, the FAC contains sufficiently specific allegations of Hsu's involvement in
19  the LED TV Transfer. *See, e.g.,* ¶¶ 197-199.

20          Hsu also contends Tatung' constructive fraudulent transfer claim fails because
21  Tatung does not allege the *actual* value of the LED TV Assets transferred. The only
22  case she cites, *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F.Supp.2d 1216 (C.D.
23  Cal. 2012), does not stand for the proposition Hsu asserts. *Allstate* simply reiterated
24  the *Iqbal/Twombly* requirement that plaintiff plead facts sufficient for a court to draw

25

26

27

28  ───────────────
[18] *See Applied, supra,* 7 Cal. 4th at 511 ("[T]he conspiracy… renders each participant
in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the
wrong, irrespective of whether or not he was a direct actor…").

Case No. SACV13-01743 DOC (ANx)

a reasonable inference defendant is liable for the misconduct alleged.[19]  The court stripped away conclusory statements and was left with a bare allegation regarding the difference in value of Countrywide's assets before and after the sale ($161.3 billion), and the purchase price paid by Bank of America for the assets ($53 billion).  The court found this value differential, *without more*, was "equally consistent" with liability and non-culpable behavior.  *Id.* at 1226.  In other words, "exactly the sort of consistent-with-liability-but-not-probative-thereof facts that *Twombly* held may not support a claim."  *Id.* at 1227 (citing *Twombly*, *supra*, 550 U.S. at 556).

Tatung's allegations go far beyond those in *Allstate*.  Tatung alleges, among other things, that the LED TV Transfer was the final step in defendants' bust out plan (¶ 192); defendants concealed they owned both WDE (the transferor) and WD (the transferee) (¶¶ 196-198); defendants intentionally misrepresented projected revenues of the LED TV business by $560 million to get CMA's consent to a grossly low sale price (¶¶ 199-200); defendants used CMA as an unwitting intermediary through which to "cleanse" the assets and sell them back to themselves free of select liabilities (¶ 201); and the transfer was made while WDE was embroiled in litigation on all fronts, and on the eve of Tatung obtaining a substantial judgment against WDE.  These facts, taken as true, stand in stark contrast to the bare allegation found insufficient in *Allstate*, and certainly allow the Court to draw the reasonable inference that the LED TV Assets were transferred for less than reasonably equivalent value.

## VII.   ALTER EGO IS SUFFICIENTLY ALLEGED

Count X is in substance a claim for declaratory relief.  Tatung alleges an actual case or controversy as to whether Hsu is liable for the debt owed by WDE, and requests the Court declare Hsu liable under an alter ego theory.  *See* ¶¶ 238-39 and FAC Prayer at ¶ 19.  Count X is a proper claim for declaratory relief and should not be dismissed.

---

[19] Notably, constructive fraudulent transfer claims are not subject to the heightened pleading requirements of Rule 9(b).  *See, e.g., Sunnyside Dev. Co. LLC v. Cambridge Display Tech., Ltd.*, 2008 U.S. Dist. LEXIS 74850, *28 (N.D. Cal. Sept. 29, 2008)

1       In addition, the FAC contains numerous details supporting the conclusion that

2 Hsu was the alter ego of the entities comprising the Sham Enterprise, including

3 WDE.  The FAC details her participation in the purposeful undercapitalization of

4 WDE (*e.g.*, ¶¶ 77, 84-86), her common ownership and control of Sham Enterprise

5 entities (*e.g.*, ¶¶ 70-79), the operation and use of the Sham Enterprise to perpetrate the

6 fraudulent scheme (*e.g.*, (¶¶ 80-84), the concentration of assets in certain entities and

7 liabilities in others (*e.g.*, ¶¶ 85-93), overlapping officers, directors and owners (*ibid.*),

8 use of nominees to operate the companies (*e.g.*, ¶¶ 73-84), diversion of assets (*e.g.*, ¶¶

9 99-131), disregard of legal formalities (*e.g.*, Counts VIII and IX), and many other

10 facts supporting alter ego liability.  Hsu's narrow focus on certain allegations, and not

11 the whole FAC, is fatal to her challenge.  The allegations in Count X are well

12 supported by the lengthy allegations in the FAC, which provide a plausible basis for

13 imposing liability under an alter ego theory.  *Twombly*, *supra*, 550 U.S. at 570.

14 **VIII. CONCLUSION**

15       Hsu has not presented any basis for dismissal of any of the claims in the FAC,

16 much less the entire case against her.  This Court has personal jurisdiction over Hsu

17 and the FAC sufficiently pleads all claims asserted against her.  However, to the

18 extent the Court finds any of the claims against Hsu deficient in any respect, Tatung

19 requests leave to amend and cure any such deficiency.  In addition, to the extent the

20 Court believes any question remains as to personal jurisdiction over Hsu, Tatung

21 requests leave to conduct discovery on that issue so it may supplement the record.

22 Dated: April 14, 2014               Respectfully submitted,

23                              **MINTZ LEVIN COHN FERRIS GLOVSKY**
                             **AND POPEO P.C.**

24                              **and**
                             **USASIA LAW, INC.**

25

26                              */s/ Daniel T. Pascucci*
                             By:  Daniel T. Pascucci

27                                  Joseph R. Dunn
                                 Joseph S. Wu

28                              Attorneys for Plaintiff,
                             TATUNG COMPANY. LTD.

## CERTIFICATE OF SERVICE

I am employed in the County of San Diego, my business address is Mintz Levin Cohn Ferris Glovsky and Popeo PC, 3580 Carmel Mountain Road, Suite 300, San Diego, CA 92130. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On April 14, 2014, I caused a copy of the following document(s):

**TATUNG COMPANY, LTD.'S OPPOSITION TO DEFENDANT CHIN-YING HSU'S MOTION TO DISMISS TATUNG'S FIRST AMENDED COMPLAINT [Dkt. No. 63][FILED CONDITIONALLY UNDER SEAL PURSUANT TO PROTECTIVE ORDER DATED MARCH 13, 2014]**

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

| XX | **MAIL SERVICE:** | Such correspondence was deposited, postage fully paid, with the U.S. Postal Service on the same day in the ordinary course of business. |

Paul L. Gale, Esq.
Troutman Sanders LLP
5 Park Plaza, Suite 1400
Irvine, CA 92614

Attorney for Defendant PEAK PARADISE ENTERPRISES CO., LTD.

Telephone: (949) 622-2704
Facsimile: (949) 622-2739
Email: paul.gale@troutmansanders.com

Steven Katzman
Bienert, Miller & Kaztman
903 Calle Amanecer, Suite 350
San Clemente, CA 92673

Attorney for Defendant WDE SOLUTION, INC.

Telephone: (949) 369-3700
Facsimile: (949) 369-3701
Email: skatzman@bmkattorneys.com

- 26 -

| | | |
|---|---|---|
| **XX** | **EMAIL SERVICE** | Based on a court order or an agreement of the parties to accept service by email, I caused the documents to be sent to the persons at the email address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. |

Benjamin L Wagner     bwagner@mintz.com, docketing@mintz.com, kjenckes@mintz.com

Carol S Zaist     carol.zaist@ndlf.com, stephen.rapaport@ndlf.com

Christopher Land     chris@kithas.com

Daniel Thomas Pascucci     dpascucci@mintz.com, docketing@mintz.com, kjenckes@mintz.com

Eric Joseph Eastham     EJEastham@mintz.com, docketing@mintz.com, KASteinbrenner@mintz.com

Gary A Pemberton     gpemberton@shbllp.com, tlenz@shbllp.com

Joseph R Dunn     jrdunn@mintz.com, docketing@mintz.com, tlmayo@mintz.com

Joseph S Wu     jwulawyer@gmail.com

Mark E Bradshaw     mbradshaw@shbllp.com, sswartzell@shbllp.com

Michael G Spector     mgspector@aol.com

Paul L Gale     paul.gale@troutmansanders.com, anabel.pineda@troutmansanders.com, felisa.lybarger@troutmansanders.com

Peter A Biagetti     pbiagetti@mintz.com

Robyn E Frick     Robyn.Frick@ndlf.com, stephen.rapaport@ndlf.com

Steven J Katzman     skatzman@bmkattorneys.com, admin@bmkattorneys.com

I declare under penalty of perjury that the above is true and correct.

Executed on April 14, 2014, at San Diego, California.

I further declare that I am employed in the office of a member of the bar of this Court, at whose direction the service was made.

/s/Karrie Steinbrenner
Karrie Steinbrenner

28820741v.1

- 27 -

Case No. SACV13-01743 DOC (ANx)