O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

TATUNG COMPANY, LTD.,
a foreign corporation

      Plaintiffs,

    vs.

SHU TZE HSU, a foreign national;
*et al.*,

      Defendants.

Case No.: SA CV 13-1743 (DOC) (ANx)

**ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [749, 750, 763]; DENYING MOTIONS TO JOIN IN CO-DEFENDANTS' MOTIONS [757, 764, 769]; GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [762]**

## I.   INTRO

Before the Court are the Bird Marella Defendants' Motion for Summary Judgment (Dkt. 749); the Former Employee Defendants' Motion for Summary Judgment (Dkt. 750); and Defendant David Chen's Motion for Summary Judgment (Dkt. 763). Also before the Court is Plaintiff's Motion for Partial Summary Judgment (Dkt. 762). The Court heard oral argument on these Motions on November 7, 2016.

## II.   FACTS[1]

After years of litigation and extensive briefing by the parties, a level of familiarity with the facts of this case is assumed. Any facts that the Court finds relevant to the disposition of the instant Motions are noted in the Discussion section below.

## III.   PROCEDURAL HISTORY

On November 5, 2013, Plaintiff filed its initial Complaint. *See generally* Complaint ("Compl.") (Dkt. 1). On November 2, 2015, Plaintiff filed its Fourth Amended Complaint ("4AC") (Dkt. 489). The 4AC asserts twelve causes of action against various defendants:

1. Violation of 18 U.S.C. § 1962(c) (Count I),
2. Violation of 18 U.S.C. § 1962(d) (Count III),
3. Fraud (Count IV),
4. Civil conspiracy to commit fraud (Count V),
5. Fraudulent transfer of LED TV Assets (Count VI),
6. Conspiracy to fraudulently transfer LED TV assets (Count VII),
7. Breach of fiduciary duty (Counts VIII, IX),
8. Declaratory relief—alter ego liability (Count X),
9. Declaratory relief—successor liability and alter ego liability (Count XI),
10. Fraudulent transfer of LED Lighting Assets (Count XII), and
11. Conspiracy to fraudulently transfer LED Lighting Assets (Count XIII).

*See generally* 4AC.

Defendants filed four Motions for Summary Judgment. The following papers have been filed with the Court:

- Defendants Pixi Lighting, Inc. and Ever Venture Solutions, Inc. (collectively, the "Pixi Defendants") filed a Motion for Summary Judgment on August 15, 2016

---

[1] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on objections to disputed evidence upon which the Court does not rely.

(Dkt. 737). Plaintiff filed its opposition on September 6, 2016 (Dkt. 794); the Pixi Defendants filed their reply on September 19, 2016 (Dkt. 827).

- Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu, Chin-Ying Hsu, Howard Houng, Gregory Hu, Li Fu, CMT, and RD (collectively, the "Bird Marella Defendants") filed a Motion for Summary Judgment on August 15, 2016 (Dkt. 749). Plaintiff filed its opposition on September 7, 2016 (Dkt. 812); Bird Marella Defendants filed their reply on September 21, 2016 (Dkt. 842).

- John Araki, Benson Lin, Arthur Moore, Juan Salcedo, Douglas Woo, and Jennifer Huang (collectively, the "Former Employee Defendants") filed a Motion for Summary Judgment on August 15, 2016 (Dkt. 750). Plaintiff filed its opposition on September 6, 2016 (Dkt. 799); the Former Employee Defendants filed their reply on September 19, 2016 (Dkt. 834).

- Defendant David Chen filed a Motion for Summary Judgment on August 15, 2016 (Dkt. 763). Plaintiff filed its opposition on September 6, 2016 (Dkt. 804); Chen filed his reply on September 19, 2016 (Dkt. 838).

All Defendants filed Notices of Joinder concurrently with their respective Motions for Summary Judgment (Dkts. 757 (Former Employee Defendants), 764 (Bird Marella Defendants), 769 (Chen), 772 (Pixi Defendants)). Plaintiff filed an Omnibus Opposition to Defendants' Joinders on September 6, 2016 (Dkt. 803).

On November 3, 2016, Plaintiff filed a Notice of Settlement and Stipulated Withdrawal of Certain Pending Motions (Dkt. 877), in which the Pixi Defendants withdrew their Motion and later-filed Amended Motions (Dkts. 765, 766). On November 4, 2016, Plaintiff filed a Notice of Stipulation (Dkt. 878) dismissing the Pixi Defendants from this case and amending the 4AC to remove Counts XII (fraudulent transfer of the LED Lighting Assets) and XIII (conspiracy to fraudulently transfer the LED Lighting Assets).

Plaintiff filed a Motion for Partial Summary Judgment on August 15, 2016 (Dkt. 762). The Bird Marella Defendants filed their opposition on September 6, 2016 (Dkt. 793). The Former Employee Defendants and David Chen filed a joint opposition on the same day (Dkt.

795). Plaintiff filed an omnibus reply to defendants' oppositions on September 19, 2016 (Dkt. 826).

## IV.   LEGAL STANDARD

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. *See id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there

must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## V.    DISCUSSION

### A. Joinders

Between August 15 and 17, 2016, each group of defendants described above filed a joinder, in which they "join in the substance of the . . . Motions for Summary Judgment" filed by the other groups of defendants. *See* Dkts. 757, 764, 769, 772.

#### 1. Legal Standard

When reviewing whether to allow a party to join in a motion, the court will allow the joinder when either (1) the parties are so similarly situated that filing an independent motion would be redundant, or (2) the party seeking joinder specifically points out: which parts of the motion apply to the joining party, the joining party's basis for standing, and the factual similarities between the joining party and moving party that give rise to a similar claim or defense. *See United States v. Longoria*, CR No. 89-225-FR, 1990 WL 11418, at *4 (D. Or. Jan. 31, 1990) (allowing co-defendants to join on motion to compel discovery of informant's identity where same informant testified against all defendants); *United States v. Ledbetter*, No. 2:14-CR-127, 2015 WL 5954587, at *2 (S.D. Ohio Oct. 14, 2015) (allowing parties to join in discovery motions where the exact same discovery is requested); *United States v. Cerna*, No. CR-08-0730 WHA, 2011 WL 500229, at *12 (N.D. Cal. Feb. 9, 2011) (holding motion to join in another's motion should not "leave the [court] guessing as to the reasons why the motions sought to be joined apply"); *United States v. Svihel*, No. 15-cr-190 (2)(4) (DSD/LIB), 2016 WL 1212364, at *6 (D. Minn. Feb. 25, 2016) (denying "blanket authorization to join in *all* motions" and requiring movant to "allege a basis for standing" and a "factual basis for joining" each motion).

This is consistent with summary judgment rules requiring moving parties to "identify[] each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56. The "notice provision is not an unimportant technicality, but a vital procedural safeguard. . . . [T]he

notice provision ensures that litigants will have at least ten days in which to formulate and prepare their best opposition to an impending assault upon the continued viability of their claim or defense." *Massey v. Cong. Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997) (internal citations omitted).

### 2. Discussion

Each defendant (and group of defendants) is the subject of a different combination of claims than those alleged against other individual and entity defendants. Plaintiff alleges that each individual and entity defendant had a different role in the alleged scheme. The Court finds that the defendants are not similarly situated for the purpose of joining in co-defendants' motions. The Notices of Joinder also do not provide sufficient notice to Plaintiff of which of their co-defendants' grounds for summary judgment each joining party wishes to join. The Court is left to guess how and why the motions sought to be joined apply to the each joining defendant. The motions are inadequate, and the Court DENIES the Notices of Joinder.

### B. 18 U.S.C. § 1962(c)—RICO (Count I)

### 1. Legal Standard

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), provides both criminal and civil liability. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 545; 18 U.S.C. §§ 1961–1968. Civil RICO provides for treble damages. 18 U.S.C. § 1964(c). However, "Congress enacted RICO 'to combat organized crime, not to provide a federal cause of action and treble damages'" for every tort plaintiff. *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002) (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005)).

To state a claim for a civil violation of the RICO Act, a plaintiff must plead that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's

business or property." *Chaset*, 300 F.3d at 1086; 18 U.S.C. §§ 1962(c), 1964(c); *see also Odom*, 486 F.3d at 547.

To satisfy the conduct element, the defendant "must have some part in *directing* [the] affairs" of the enterprise. *See United States v. Fernandez*, 388 F.3d 1199, 1228 (9th Cir. 2004) (emphasis added) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)). "A defendant need not be in charge of or have 'significant control over or within [the] enterprise.'" *Kelmar v. Bank of Am. Corp.*, No. CV 12-6826 PSG (Ex), 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012) (quoting *Reves*, 507 U.S. at 179, n.4). "However, more is required than 'simply being involved,' and '[s]imply performing services for the enterprise does not rise to the level of direction.'" *Kelmar*, WL 12850425 at *7 (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)). In evaluating whether a defendant "had some part in directing the affairs" of the enterprise, the Ninth Circuit has considered whether that defendant (1) gave or took directions; (2) occupied a position in the "chain of command" through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to the achievement of the enterprise's goal. *See Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).

"It is not enough that [a defendant] failed to stop illegal activity." *Walter*, 538 F.3d at 1248. Further, RICO liability requires that "the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves*, 507 U.S. at 185 (emphasis in original).

An "enterprise" is "an ongoing organization, formal or informal." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The key to determining that an enterprise exists is "that the various associates function as a continuing unit." *Id.* There are two categories of "enterprises:" (1) organizations constituting legal entities, such as corporations, and (2) any group of individuals associated in fact. *See id.* at 581–82. The factors courts look for to determine if there is an associated-in-fact enterprise include (1) a common purpose; (2) an ongoing organization; and (3) a continuing unit. *Odom*, 486 F.3d at 552.

A "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . ." 18 U.S.C. § 1961(5). Congress intended racketeering activity to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2096 (2016). Just because a defendant is liable for an underlying predicate offense, like fraud, does not mean he will be liable under RICO. *See Chaset*, 300 F.3d at 1087. RICO's purpose is to reach all involved in the scheme of organized crime, "whether they are generals or foot soldiers." *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994); *see Reves*, 507 U.S. at 184 (holding that "lower rung" employees may be liable even if they are not the primary decision-makers in the enterprise).

Where a defendant commits a predicate offense as part conducting or participating in an enterprise, the defendant may be liable under RICO. 18 U.S.C. § 1962(c); *see Walter v. Drayson*, 496 F. Supp. 2d 1162, 1166 (D. Haw. 2007), *aff'd*, 538 F.3d 1244 (9th Cir. 2008).

To satisfy the injury requirement, a plaintiff must make two showings. "First, a civil RICO plaintiff must show that his injury was proximately caused by the [prohibited] conduct. Second, the plaintiff must show that he has suffered a concrete financial loss." *Chaset*, 300 F.3d at 1086 (alteration in original) (quoting *Fireman's Fund Ins. Co. v. Stites,* 258 F.3d 1016, 1021 (9th Cir. 2001) (internal quotation marks omitted).

## 2. Whether Plaintiff Must Prove Intent

If an alleged predicate, such as fraud, requires a plaintiff to prove intent, then a defendant will not be liable under RICO unless the plaintiff proves intent. *See Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991) (dismissing RICO claims against government entities because a "specific intent to deceive [was] an element of the predicate act," but "government entities are incapable of forming a malicious intent"); *Best Deals on TV, Inc. v. Naveed*, No. C 07-1610 SBA, 2007 WL 2825652, at *8 (N.D. Cal. Sept. 26, 2007) (dismissing RICO claim where plaintiff could not prove an intent to commit the predicate act of money laundering).

### 3.  Domestic Injury Requirement

Section 1964(c) requires civil RICO plaintiffs to allege and prove a domestic injury to their business or property. *RJR Nabisco*, 136 S. Ct. at 2111. Plaintiffs cannot recover for foreign injuries. *Id.*

The Former Employee Defendants, David Chen, and the Bird Marella Defendants argue that Plaintiff's civil RICO claims fail as a matter of law because Plaintiff has not suffered a domestic injury as required by RICO. *See* FE Mot. at 17–18; Chen Mot. at 18; BM Mot. at 20–23. The Bird Marella Defendants filed a Notice of Lodging of Recent Authority on October 7, 2016 (Dkt. 858), attaching *Bascuñanv. Daniel Yarur Elsaca*, 15-CV-2009 (GBD), 2016 WL 5475998, at *1 (S.D.N.Y. Sept. 28, 2016). On October 14, 2016, the Bird Marella Defendants filed an Application for Leave to Supplement Motion for Summary Judgment re: New Authority ("BM Supplemental Motion") (Dkt. 859). This Court granted the Application on October 17, 2016 (Dkt. 864). Plaintiff filed a supplemental brief on October 18, 2016 ("Plaintiff's Supplemental Opposition") (Dkt. 867).

Defendants argue, in short, that no defendant may be held liable for a violation of § 1962 in this case, because civil RICO's private right of action requires there be a domestic injury to the plaintiff's business or property. *See* FE Mot. at 17–18. Defendants argue that Plaintiff, as a foreign corporation, has not suffered and cannot suffer such an injury. *See generally* BM Supplemental Motion.

In *RJR Nabisco Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016), the United States Supreme Court considered whether RICO's private right of action had extraterritorial application. The Court held that 18 U.S.C. § 1964(c) "requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow for recovery for foreign injuries." *Id.* at 2111. The Court expressly avoided defining "domestic" and "foreign" injury. *See id.*

In finding that civil RICO's private right of action required a domestic injury, the Supreme Court reasoned that "providing a private civil remedy for foreign conduct creates a potential for international friction." *Id.* at 2106. While the Court also acknowledged that this

friction would not be present in every case, it found that the "potential for international controversy . . . militates against recognizing foreign-injury claims without clear direction from Congress." *Id.* at 2107. The Court found there was no such direction in the RICO statute.

Defendants rely almost exclusively on *Bascuñan* for the proposition that whether an injury is domestic for the purposes of civil RICO depends exclusively on where the plaintiff suffered the injury, not not at all on where the defendant's alleged conduct took place. The plaintiff in *Bascuñan* was a citizen and resident of Chile. *Id.* at *1. Because the plaintiff was very ill, he hired his cousin—also a citizen and resident of Chile—to manage the very large estate he inherited from his parents. *Id.* at *1–*2. This estate included "a substantial number of shares in . . . the third-largest bank in Chile." *Id.* at *1. With the help of individual and corporate co-conspirators, this cousin allegedly perpetrated several fraudulent schemes, misappropriating millions of dollars from the plaintiff's estate. *Id.* at *2. As part of these schemes, the defendants made fraudulent transactions causing New York banks to wire money to defendants' accounts in New York and elsewhere. *Id.* An individual co-conspirator also traveled to New York and physically removed the plaintiff's bank shares from the plaintiff's safety deposit box in a New York bank. *Id.*

In a thoughtful opinion, the *Bascuñan* court held that "the location where the plaintiff suffered the alleged injury dictates whether the plaintiff may pursue a private right of action under §1964(c)." *Id.* at *5. In so holding, the court pointed to the Supreme Court's finding that "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id.* at 5 (quoting *RJR Nabisco*, 136 S. Ct. at 2108).

The *Bascuñan* court also pointed to language dismissing the *RJR Nabisco* plaintiffs' RICO claims because they "rest[ed] entirely on injury suffered abroad." *Id.* (quoting *RJR Nabisco*, 136 S. Ct. at 2111). In light of this language, the court found that "there will be situations where a defendant's conduct will be . . . subject to a private right of action by a domestic plaintiff, but not a foreign plaintiff, based on where each plaintiff suffered their

1   respective injuries." *Id.* (citing *RJR Nabisco*, 136 S. Ct. at 2115 (Ginsberg, J., concurring in

2   part, dissenting in part, and dissenting from the judgment)).

3        For the reasons laid out below, this Court declines to follow *Bascuñan*.

4        As an initial matter, the *Bascuñan* court makes too much of the Court's language in *RJR*

5   *Nabisco*. In *RJR Nabisco*, the parties stipulated to the district court that the plaintiffs' injuries

6   were not domestic. All parties agreed that the injuries were suffered abroad. Thus, it makes

7   sense that the Court would couch its analysis in terms of "injuries suffered outside of the United

8   States" and "entirely . . . abroad." *RJR Nabisco*, 136 S. Ct. at 2108, 2111.

9        While finding that RICO lacks "foreign-oriented language" that would weigh towards

10   finding extraterritoriality, the Court also explicitly said that the absence of such language "does

11   not mean that foreign *plaintiffs* may not sue under RICO." *Id.* at 2110 n.12 (emphasis added).

12   Accordingly, this Court finds that *RJR Nabisco* does not bar foreign plaintiffs who have

13   suffered only economic injuries from bringing suit pursuant to civil RICO's private right of

14   action.

15        This Court is also concerned that the *Bascuñan* rule amounts to immunity for U.S.

16   corporations who, acting entirely in the United States, violate civil RICO at the expense of

17   foreign corporations doing business in this country. It cannot be the case that the mere fact that

18   a loss is economic means that foreign corporations are unable to avail themselves of the

19   protections of civil RICO, even in cases where all of the actions causing the injury took place in

20   the United States. In the business context, most losses will be economic in nature. There is no

21   evidence that Congress meant to completely bar foreign corporations from the protection

22   offered by this law. It is ludicrous to think that a foreign individual could not sue under civil

23   RICO for financial injuries incurred while they are working, traveling, or doing business in this

24   country as the result of an American RICO operation. But, this is the logical application of the

25   *Bascuñan* rule. At oral argument, the Bird Marella Defendants argued that this public policy

26   concern does not apply to them, as they are all foreign individuals. However, the Court finds it

27   relevant when considering what domestic injury analysis to adopt.

28

As the Supreme Court has acknowledged, "[t]he application of [the domestic injury rule] in any given case will not always be self-evident, as disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" *RJR Nabisco*, 136 S. Ct. at 2111. In this case, the Court finds that there is a domestic injury.

Here, Plaintiff is a foreign corporation doing business in the United States with a corporation wholly owned by an American company. *See* Plaintiff's SGDMF—BM No. 14. Although it is a foreign corporation, Plaintiff maintains a "hub" in the United States. Memorandum in Opposition to Motion for Partial Summary Judgment as to Affirmative Defenses ("BM Memo") (Dkt. 793) Ex. 2 at 288.

In the course of doing business, Plaintiff extended credit and delivered goods to its creditor in the United States. *Id.* Ex. 2 at 32. When Plaintiff was not paid by its creditor, it pursued arbitration in the United States pursuant to a binding arbitration agreement that required arbitration to take place in Los Angeles, California. 4AC Ex. 4 at 2 (Phase II Arbitration Award, JW Case A152234-25); *id.* Ex. 2 at 227–234 (Demand for Arbitration, Case No. A152234-25). The arbitration demand was delivered to the creditor at their California address. BM Memo Ex. 2 at 227. After three years of extraordinarily contentious arbitration, Plaintiff received an arbitration award enforceable in California.[2] 4AC Exs. 3 (Arbitration Award, JW Case A152234-25), 4 (Phase II Arbitration Award, JW Case A152234-25). This award was then confirmed by the state court of California. 4AC Ex. 2 at 2 (Modified Judgment for Tatung Company, Ltd. on Petition to Confirm Arbitration Award, Case No. 30-2010-00376687).

However, Plaintiff was never able to collect the award or the judgment because, it alleges, its creditor and many others engaged in a RICO conspiracy to render the creditor an

---

[2] In the Phase II Arbitration Award, the arbitrator noted that, "In a nearly four-decade judicial career, this Arbitrator recalls no case in which a litigant has engaged in more bad-faith, dilatory and deceptive practices as [Richard] Houng has here, including willful disobedience of statutory obligations and this Arbitrator's orders." 4AC Ex. 4 at 4.

empty shell. *See generally* 4AC. Seven alleged individual conspirators are American citizens.[3]
Six alleged entity conspirators are American citizens.[4]

As part of the alleged conspiracy, assets were siphoned out of the creditor through
fraudulent transfers. At least one of the eventual transferees was an American corporation (Pixi
Inc./Ever Venture Solutions Inc.). *See* 4AC ¶¶ 39, 40.

"A judgment is property." *Kingvision Pay-Per-View Ltd. v. Lake Alice B.*, 168 F.3d 347,
352 (9th Cir. 1999). The facts are clear that Tatung owned a judgment against Richard Houng
and WDE. *See generally* 4AC Exs. 3, 4. The instant litigation is Plaintiff's attempt to hold
responsible those entities and individuals who have conspired to keep Plaintiff's money away
from Plaintiff.

In light of the facts described above, the Court agrees that the "defendants specifically
targeted their conduct at California" with the aim of "thwarting Tatung's rights in California."
Plaintiff's Supplemental Opposition at 6. It would be absurd to find that such activity did not
result in a domestic injury to Plaintiff.

Our decision is not inconsistent with the very few other district court decisions within
the Ninth Circuit that interpret *RJR Nabisco*'s domestic injury requirement. For example, in
*Uthe Tech. Corp. v. Harry Allen and Aetrium, Inc.*, No. C 95-02377 WHA, 2016 WL 4492580
(N.D. Cal. Aug. 26, 2016), the court held that a "shareholder cannot bring a RICO action where
the wrong alleged is a fraud on the corporation." *Id.* at *1. In *Uthe*, the plaintiff was an
American corporation who owned one hundred percent of the shares of a Singaporean
corporation. Plaintiff alleged a scheme to siphon business from this wholly-owned subsidiary.
All of the allegedly fraudulent activity occurred in Singapore and was perpetrated by
Singaporean defendants. The plaintiff's only injury was the diminution in value of its stake in
the Singaporean corporation—an injury the court characterized as "domestic." *Id.* at *2.
However, the court found that as to the injury to the Singaporean corporation, "the claims . . .

---

[3] Gregory Hu (Dkt. 518 ¶ 42), David Chen (Dkt. 505 ¶ 20), Douglas Woo (Dkt. 508 ¶ 16), Benson Lin (Dkt. 506 ¶ 18), John
Araki (Dkt. 504 ¶ 19), Arthur Moore (Dkt. 507 ¶ 21), and Juan Salcedo (Dkt. 509 ¶ 22).
[4] Pixi Lighting Inc. (Dkt. 503 ¶ 39), Ever Venture Solutions Inc. (Dkt. 503 ¶ 40), RH Holdings LLC (Dkt. 51 ¶ 27), Nexcast
LLC (Dkt. 51 ¶ 30), Westinghouse Digital LLC (Dkt. 489 ¶ 30).

flowed only from a foreign conspiracy . . . . Th[e] siphoning occurred a third of the way around the globe from our shore. No injury occurred in the United States." *Id.* at *3.

Unlike in *Uthe*, some of the alleged conspirators here are American and many of the actions that constitute part of the RICO scheme took place in California. The siphoning of assets out of WDE, while part of an allegedly international conspiracy, involved the transfers of assets from WDE to American corporations. There can be no argument that any alleged siphoning "occurred a third of the way around the globe from our shore." *See Uthe*, 2016 WL 4492580 at *3.

For all of the reasons explained above, the Court finds that Tatung has suffered a "domestic injury to business or property" for the purposes of civil RICO's private right of action. *See RJR Nabisco*, 136 S. Ct. at 2111. The Court now proceeds to the defendants' other arguments for summary judgment on Plaintiff's civil RICO claims.

### 4. Statute of Limitations

The statute of limitations for a RICO claim is four years. *See Agency Holding Corp. v. Malley-Duff & Assocs, Inc.*, 483 U.S. 143, 156 (1987). In the Ninth Circuit, the accrual date for civil RICO claims is determined by application of the "injury discovery" rule. *See Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under this rule, the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action. *Id.* A party "should know" when he has enough information to warrant an investigation which, if reasonably diligent, would lead to discovery of the claim. *See id.* at 1110 (citing *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271, 275 (9th Cir. 1988)).

Once the injury is discovered, a RICO plaintiff is responsible for determining within the limitations period whether their injury was caused by a RICO scheme. *See Rotella v. Wood*, 120 S. Ct. 1075, 1081 (2000) (analogizing RICO plaintiff to a medical malpractice plaintiff, who is "responsible for determining within the limitations period then running whether the inadequacy was malpractice"). The purpose of the RICO private right of action is to "encourag[e] civil

litigation to supplement Government efforts to deter and penalize the . . . prohibited practices." *Id.* at 1082. Civil RICO's "treble damages [are] accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better." *Id.*

The United States Supreme Court has acknowledged that "considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable." *Id.* at 1081. Nevertheless, the Court found that the "complex, concealed, or fraudulent" nature of a RICO pattern does not impair a plaintiff's ability to investigate the cause of his injury to a degree that justifies an injury *and* pattern discovery rule. *Id.* at 1081–82.

The Former Employee Defendants argue that *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) holds that "predicate acts outside of the limitations period may not be considered" or, to put it another way, they argue the Court should ignore facts occurring before the limitations period because such facts "cannot give rise to RICO liability." FE Mot. at 19. They are incorrect. The Court in *Klehr* held that the occurrence of a new predicate act within the limitation period does not allow plaintiffs to recover for injury caused by acts outside the limitation period. *Id.* at 189. Plaintiffs have to show that the new act caused new harm, rather than simply using the new act as a hook to seek recovery for harm already caused by previous acts. *Id. Klehr* does not speak to whether a court must completely ignore acts or events that took place before the limitations period. Rather, *Klehr* dictates that a predicate act that is within the limitations period must have caused the injury for which the plaintiff now seeks to recover. *Klehr* is silent on whether events or actions outside of the limitation period can constitute an element of a plaintiff's RICO claim, assuming that the plaintiff also alleges a predicate act that is (1) within the limitation period and (2) causes a separate injury that is (3) the injury for which plaintiff now seeks recovery. This makes sense because a RICO enterprise may carry on for any length of time before resulting in an injury to plaintiff. It cannot be the case that all events, interactions, and communications that are evidence of the RICO enterprise (or conspiracy) must occur during the limitations period. If that were so, civil RICO could not be used to hold accountable enterprises that, for example, take a long time to set up an injurious act or cause an injury that takes a long time to discover.

In this case, the very nature of the injury is disputed. For example, the Bird Marella Defendants characterize Plaintiff's injury as "the very same uncollectable debt" that Plaintiff sought to recover through arbitration in 2009. BM Mot. at 24. The Former Employee defendants characterize Plaintiff's injury as its "inability to collect a debt dating to 2008." FE Mot. at 20. An injury occurring in 2008 would certainly be outside of the limitation period because Plaintiff filed suit in November 5, 2013, triggering a limitation period that started on November 5, 2009. Defendants point to Plaintiff's February 2009 arbitration demand as evidence that Plaintiff realized its injury before the limitation period. *See id. See also* BM Mot. at 24. The Former Employee Defendants argue that the various fraudulent transfers that Plaintiff alleges "merely perpetuated Tatung's inability to collect the exact same debt." FE Mot. at 21. Consequently, the Former Employee Defendants argue, Plaintiff's RICO claim is based almost entirely on acts and an injury that took place outside of the limitation period, and any acts that were within the limitation period did not cause a new injury. *Id.*

The Former Employees argue that "the alleged injury to Tatung's 'business or property' was WDE's nonpayment" of its debt to Tatung. *Id.* at 17. Plaintiff disputes this characterization of its injury and argues that for the purposes of its RICO claim, it was not injured until, at the earliest, WDE's debt to Plaintiff was "rendered uncollectable due to defendants' conduct." FE Opp'n at 45. Plaintiff contends that its suit is timely "because it was not injured until it was unable to collect on the judgment" due to the defendants' siphoning of assets from WDE, leaving it an "empty shell." *Id.* at 43, 46. At oral argument, Plaintiff did not provide a specific date or timeframe for this injury.

The undisputed facts are that Plaintiff won an arbitration award against WDE on May 7, 2010 for $21,962,034. 4AC Ex. 3 at 2. Plaintiff then won a final arbitration award (the "Phase II Award") on November 10, 2010 that included an award of $17 million in damages plus interest from January 1, 2009 and attorney's fees and costs of $3,880,389. *Id.* at 22. The total Phase II Award was $25,742,854. *Id.* The award, increased to $27,601,208.48 due to interest, was confirmed and judgment entered for Plaintiff by the California Superior Court on December 12, 2012. 4AC Ex. 2 at 2.

This Court has previously found that Plaintiff was injured "when WDE's assets in California were busted out, leaving WDE as an empty shell and Tatung without recourse to enforce its California judgment." Order Denying Motion to Dismiss Tatung Co. Ltd.'s Fourth Amended Complaint for Insufficient Service of Process and Lack of Personal Jurisdiction (Dkt. 778) at 14 (quoting Plaintiff's Opposition to Motion (Dkt. 717) at 17). The injury of being left without recourse to enforce a judgment requires—of course—that there be a judgment. As described above, Plaintiff's arbitration award was reduced to judgment in December 2012, well within the limitations period running from November 5, 2009 to November 5, 2013.

The Bird Marella Defendants point to the fact that Plaintiff's alleged RICO injury has the same "components" or "breakdown" as the amount sought by Plaintiff in its 2009 arbitration demand. BM Mot. at 24. They argue this is evidence that the Plaintiff's injury was discovered in at least 2009. *Id.* at 24–25. The Court finds that the "components" or amount of the claim, while relevant, are not dispositive on the issue of whether the injury alleged now is the same injury alleged in 2009.

Plaintiff alleges that actions taken during the 2009–2013 arbitration proceedings rendered WDE's debt uncollectable—as opposed to, at the time of the arbitration, merely not collected. *See* BM Opp'n at 27 (". . . had Defendants not siphoned assets out of WDE and diverted business opportunities . . . Tatung would not have suffered the RICO injury—it would have suffered a breach of contract injury that is not at issue in this case."). Plaintiff alleges that there was a bust-out of WDE that involved the transfer of LED Lighting Assets through a series of several entities before they ended up with dismissed co-defendants Pixi Inc./EVS, and the transfer of LED TV Assets to WD. *See generally* Compl. Plaintiff's claims related to the LED Lighting Assets have been dismissed. *See* Notice of Stipulation (Dkt. 878). The LED TV Asset transfer is the basis of Plaintiff's remaining fraudulent transfer and conspiracy to fraudulently transfer claims. *See* Compl. 193–201. It is undisputed that this transfer occurred in 2010, within the limitations period. *See* Plaintiff's SGDMF—FE No. 157. Thus, to the extent Plaintiff is alleging that the transfer of the LED TV Assets injured Plaintiff by emptying WDE of assets

that could have been used to pay Plaintiff, that injury is within the limitations period. This is so even though the dollar amount is the same or similar to the debt claimed by Plaintiff in 2009.

However, Plaintiff also alleges that "business opportunities"—specifically an opportunity known as the "PTTV business"—were diverted from WDE, thereby lessening the total assets available to pay WDE's creditors, including Plaintiff. BM Opp'n at 59. Plaintiff offers evidence that the PTTV opportunity was diverted in 2007–2008, which is outside of the limitations period. *See* Plaintiff's SGDMF—BM No. 69; Plaintiff's AMF—BM No. 361. The Court cannot find facts offered by any party, undisputed or otherwise, regarding Plaintiff's discovery of this diversion. Consequently, the Court finds that there is a triable issue of fact regarding the timing of Plaintiff's discovery of any injury specifically caused by the diversion of the PTTV opportunity.

Because Plaintiff has offered evidence of an injury occurring during the limitations period, the Court finds that Plaintiff's claim is not barred by RICO's four-year statute of limitations. However, absent a finding that Plaintiff's RICO claim(s) were equitably tolled, Plaintiff can seek only damages that it can tie to injuries that occurred within or that were discovered within the four-year limitations period beginning on November 5, 2009.

Plaintiff argues that a triable issue of fact exists regarding equitable tolling of the RICO statute of limitations. *See* BM Opp'n at 30–32. "Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases." *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996). "The doctrine of fraudulent concealment is invoked only if the plaintiff both pleads and proves that the defendant *actively* misled [it], and that [it] had neither actual nor constructive knowledge of the *facts constituting his cause of action* despite her due diligence." *Id.* at 514 (emphasis in original).

> [E]quitable tolling does not depend on any wrongful conduct by the defendant to prevent the plaintiff from suing. Instead it focuses on whether there was excusable delay by the plaintiff. If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations

for filing suit until the plaintiff can gather what information he needs. However, equitable tolling does not postpone the statute of limitations until the existence of a claim is a virtual certainty.

*Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000), *overruled on other grounds in Socop-Gonzalez v. INS*, 272 F.3d 1176 (9th Cir. 2001).

As discussed above, with the exception of the LED TV Assets that the Court finds were transferred within the limitations period, the Court finds there is a triable issue of material fact regarding Plaintiff's discovery of particular instances of siphoning and diverting that rendered its judgment against WDE uncollectable (and, generally, constitute predicate acts alleged against various defendants). Said differently, there is a triable issue of material fact regarding when Plaintiff discovered its injuries, and thus which injuries are within the limitations period. Accordingly, the Court finds there is a triable issue of fact as to whether Plaintiff's claims were tolled because of excusable delay of such discovery.

Because the Court is not granting summary judgment on Plaintiff's RICO claims on the basis of the statute of limitations, Court will now address the various defendants' arguments for summary judgment on the merits of Plaintiff's RICO claims.

### 5.  Discussion—David Chen

Generally, Chen argues that there is no evidence that he participated, within the meaning of §1962(c), in "any enterprise alleged by Tatung." Chen Mot. at 18. Specifically, Chen argues that "nothing in the record supports the allegation that [he] had any part in the management of the affairs of the enterprise alleged by Tatung or that he even knew any such enterprise existed." *Id.* at 18. On the contrary, Plaintiff offers very detailed evidence, including Chen's own emails, demonstrating that Chen regularly interacted with co-defendants, including Huang and Lin, including at times directing others in the management of WDE and Enterprise funds, including the transfer of funds. Plaintiff's Statement of Genuine Disputes of Material Fact in Support of Opposition to Defendant Chen's Motion for Summary Judgment ("Plaintiff's SGDMF—Chen")

No. 3. Plaintiff also offers evidence that Chen reported to Richard Houng through co-defendant Huang. *Id.* at 7.

### a.  Predicate Acts

The elements of mail fraud and wire fraud are virtually identical. To establish a violation of mail or wire fraud, it is "necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails [or wires] or caused a use of the United States mails [or wires] in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399–400 (9th Cir. 1986); *see* 18 U.S.C. §§ 1341, 1343.

In moving to dismiss this claim against him, Chen argues that "[t]here is no evidence that any of [his] conduct sought to deceive or defraud Tatung." Chen Mot. at 20. Chen further argues that any wire transfers "were done exclusively at [Richard] Houng's behest, without mention of any scheme or plot to disguise the movement of funds." *Id.* However, Chen misunderstands the intent requirement under the mail/wire fraud standard. The requirement of specific intent under these mail/wire fraud statutes is satisfied by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *Schreiber Distrib. Co.*, 806 F.2d at 1400 (citation omitted). In other words, the Court may look to the intent of the *scheme* when determining whether the third element of the mail/wire fraud claim is met. In a mail fraud case, the Ninth Circuit has held that "[i]ntent need not be established by direct evidence, but may be inferred from the defendant's statements and conduct." *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979).

As an initial matter, intent to deceive is "a factual matter rarely free from dispute and thus rarely enabled in summary proceedings." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1204 (Fed. Cir. 2006).

Drawing all inferences in Plaintiff's favor, the Court finds that a reasonable jury could find that Chen formed, with Richard Houng and others, a scheme to defraud Plaintiff and other

creditors, that Chen used email ("the wires") to further that scheme, and that Chen's actions and the scheme itself demonstrate specific intent to defraud.

### b. Common Scheme

Plaintiff has alleged that there was a "common scheme" aimed at "insulating the Houng Family from any possible risk in the event of financial trouble by cycling funds out of WDE, keeping it perpetually underfunded, and leaving it ready for defendants to quickly bust out assets." Chen Opp'n at 18. Thus, Chen's argument that the Court should grant summary judgment in part because he was "not employed by WDE or any other Houng related entity for many of the key events alleged," Chen Mot. at 21, is unavailing for two reasons. First, Chen's liability under § 1962(c) does not depend on his having been employed by WDE or any other entity during the time period(s) in question. Rather, all § 1962(c) requires is that the defendant be "employed by or associated with" an "enterprise." 18 U.S.C. § 1962(c). This, as explained above, is analyzed under the "operation and management" test—it is not required that an individual is employed by any specific entity.

Second, Plaintiff has offered sufficient evidence to raise a triable issue of fact regarding not only Chen's involvement in the alleged common scheme but also Chen's employment at the time of the allegedly fraudulent transfer constituting predicate offenses under § 1962(c). Thus, even if Plaintiff relied solely on Chen's employment to demonstrate his involvement—which it does not—the Court could not grant summary judgment for Chen on Plaintiff's § 1962(c) claim on this basis.

As laid out in the Facts section above, Chen and Plaintiff dispute almost every fact that could possibly be material to Plaintiff's § 1962(c) claim against Chen. Chen has failed to show that there is no genuine dispute of material fact as to Chen's participation in an enterprise under 18 U.S.C. § 1962(c). Accordingly, the Court DENIES Chen's Motion for Summary Judgment on Plaintiff's 18 U.S.C. § 1962(c) claim.

### 6.  Discussion—Bird Marella (Shu Tze Hsu, Shou-Por Houng, Chin-Ying Hsu, Rui-Lin Hsu, and Howard Houng)

The Bird Marella Defendants argue that Plaintiff's § 1962(c) claim fails because it is facially implausible and Plaintiff cannot satisfy the "'heavy evidentiary burden' that applies to such implausible theories of fraud." BM Mot. at 28.

### a.  Attorney-Client Privilege and Rule 30(b)(6) Witness Testimony

The Bird Marella Defendants contend that according to Plaintiff's own Rule 30(b)(6) witnesses, Plaintiff has no knowledge of the Bird Marella Defendants' "specific involvement" in the alleged fraudulent activity. *See id.* at 34–36. The Bird Marella Defendants particularly emphasize testimony that "Tatung's lawyers 'came up with' the factual claims and contentions against the Bird Marella Defendants," and take issue with counsel instructing a 30(b)(6) witness not to disclose the contents of her communications with counsel regarding counsel's investigation into the alleged conspiracy. *Id.* at 34–35.

Plaintiff argues that in accordance with Plaintiff's written objections to Defendants' deposition notices, verbal objections on the record, and rulings made by the Special Master and this Court, the testimony of Plaintiff's 30(b)(6) witnesses "appropriately excluded [some of the] information obtained by [Plaintiff's] counsel." Plaintiff's Statement of General Disputes of Material Fact in Support of Opposition to the Bird Marella Defendants' Motion for Summary Judgment ("Plaintiff's SGDMF—BM") No. 11. Consequently, Plaintiff disputes the Bird Marella Defendants' characterization of the testimony of Plaintiff's 30(b)(6) witnesses. *E.g.*, *id.*

The Court is unconvinced by the Bird Marella Defendants' argument regarding Plaintiff's 30(b)(6) witnesses. Plaintiff's ability to meet the required legal standards is not foreclosed by its 30(b)(6) witnesses' testimony that they lacked personal knowledge or "firsthand knowledge" of the Bird Marella Defendants' involvement with the alleged RICO scheme. The Court will not grant summary judgment on Plaintiff's § 1962(c) claim against the Bird Marella Defendants on these grounds.

### b.  Implausibility and Heightened Evidentiary Standard

The Bird Marella Defendants rely heavily on *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987) for the proposition that a plaintiff who alleges an "implausible" scheme to defraud must meet a heightened evidentiary burden. *See* BM Mot. 28–32.

In *Franciscan*, the defendant tile manufacturer was accused by tile dealers of fraudulently assuring them that it would continue in business and supply them with tile until a certain date. *Franciscan Ceramics, Inc.*, 818 F.2d at 1467. The Ninth Circuit found that contrary to the plaintiffs' allegations, the defendant "did not conduct business as though closing were likely" and had the "true intent" of staying in business. *Id.* at 1470. The court found this because the defendant "invested heavily" in its business right up until it closed, including undertaking "expensive projects." *Id.* The court found that the defendant had "no economic incentive" to "go to such lengths merely to encourage the dealers to buy more tile." *Id.* Therefore, the Ninth Circuit found the plaintiffs' alleged scheme to be implausible.

The *Franciscan* court held that "to avoid the stigma of implausibility, the evidentiary burden of [the plaintiffs] is heavy. If the claim is one that simply makes no economic sense[,] the parties opposing summary judgment must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* (citations and internal quotation marks omitted).

The Court does not find the facts of *Franciscan* to be "closely analogous" to the instant case. However, it is good law. Therefore, the issue is whether Plaintiff's alleged scheme is implausible, thus triggering a heightened evidentiary burden.

The Bird Marella Defendants argue that Plaintiff's underlying theory of the case "simply makes no economic sense." BM Mot. at 32 (citing *Franciscan*, 818 F.2d at 1470). The Bird Marella Defendants point to WDE's payments to Plaintiff totaling $122 million between 2006 and 2008, and argue that these payments

> cannot be squared with Tatung's contention that as of 2004 . . . [the Bird Marella] Defendants had hatched a plan to "prop up" WDE in an effort to

induce Tatung to extend it trade credit, with the ultimate goal of "busting out" WDE's assets, and leaving WDE's creditors to "fight over the remaining WDE carcass."

*Id.* at 33.

In opposition, Plaintiff contends that the Bird Marella Defendants mischaracterize Plaintiff's theory of the case. *See* BM Opp'n at 32–33. Rather than alleging that the plan was always to bust out WDE, Plaintiff argues that it has alleged that the Bird Marella Defendants structured the RICO enterprise in such a way that, should it fail, WDE *could* be busted out without "a trail of ultimate responsibility for the WDE debt leading back to the Houng Family." *Id.* at 33 (citing 4AC ¶ 90). Plaintiff also argues that WDE's partial payment to Plaintiff is not inconsistent with its theory; rather, such payments are common in bust out schemes. *Id.*

The Court agrees with Plaintiff's characterization of its theory of the case. Further, the Court does not find Plaintiff's theory of the case to be implausible. Rather, the Court finds that Plaintiff has produced evidence that strongly suggests its theory is plausible—and certainly enough evidence to overcome summary judgment on its § 1962(c) claim against the Bird Marella Defendants. As a result, the Court finds that Plaintiff is not required to meet a heightened evidentiary standard, as its theory is wholly plausible.

### c.  Direction of the Enterprise and Knowledge of Common Purpose

Finally, the Bird Marella Defendants argue that there is no evidence that Chin-Ying Hsu, Howard Houng, or Rui-Lin Hsu directed the affairs of the alleged enterprise or had knowledge of the enterprise's alleged common purpose of busting out WDE at the expense of WDE's creditors. *See* BM Mot. at 38–43.

#### i.  *Chin-Ying Hsu*

The Bird Marella Defendants argue that Chin-Ying Hsu's deposition testimony reveals a complete lack of knowledge of Gorham (of which she is the named owner), the connection between Gorham and Nexis (Gorham owns a minority stake in Nexis), or Westinghouse (which is owned by Nexis). *Id.* at 39. The Bird Marella Defendants offer evidence that Chin-Ying Hsu

never inquired about any of the Houng Family entities, or controlled or ran the business of Gorham. *Id.* Chin-Ying Hsu's ownership of Gorham, the Bird Marella Defendants argue, is a classic example of "mere association with an alleged enterprise, rather than [the] control" required by the operation and management test. *Id.* at 40.

In opposition, Plaintiff argues that through Gorham, Chin-Ying Hsu "helped fund her family's initial acquisition of . . . Westinghouse." BM Opp'n at 41. Plaintiff offers evidence that Chin-Ying Hsu signed documents as a Nexis shareholder. Plaintiff's AMF—BM No. 168. Plaintiff also offers evidence that Chin-Ying Hsu received large dividends from Nexis, for no apparent consideration, including in a year when Nexis suffered a net loss of over $39 million. *Id.* Nos. 169–70. Plaintiff offers detailed evidence of cash infusions made by Chin-Ying Hsu through Gorham to Nexis and WSI, and offers co-defendant Rui-Lin Hsu's testimony that Chin-Ying Hsu pressured him to offer his personal assets as collateral to support the Westinghouse business. *Id.* Nos. 172, 173. *See also* BM Opp'n at 41–42.

In light of the facts that Plaintiff has presented, there is at least a dispute of material fact regarding Chin-Ying Hsu's "direction" of the affairs of the enterprise. Section 1962(c) does not require Chin-Ying Hsu to have had "managerial control" over the entire enterprise. Rather, Chin-Ying Hsu need only have (1) given or taken directions; (2) occupied a position in the "chain of command" through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) been indispensable to the achievement of the enterprise's goal. *See Walter*, 538 F.3d at 1249.

The Bird Marella Defendants have not shown that there is no dispute of material fact regarding Chin-Ying Hsu's direction or control.

Additionally, despite the deposition evidence cited to in their Motion, the Bird Marella Defendants have not demonstrated that there is no dispute of material fact regarding Chin-Ying Hsu's knowledge of the enterprise's common purpose. Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's § 1962(c) claim against Chin-Ying Hsu.

### ii.   *Howard Houng*

The Bird Marella Defendants argue, generally, that Howard Houng's directorship in Nexis was meaningless. *See* BM Mot. at 40. For example, the Bird Marella Defendants argue that "the mere fact that Howard Houng was asked to sign certain Nexis board resolutions does not establish his direction of the affairs of any enterprise." *Id.* The Bird Marella Defendants further argue that Howard Houng was not at all involved with WDE or consulted about "major decisions" at WDE. *Id.*

In opposition, Plaintiff offers evidence that Howard Houng signed shareholder consents and board resolutions for Nexis, as well as documents in support of Nexis, WDE, and Li Fu loans. Plaintiff's AMF—BM No. 310; *see, e.g.*, Plaintiff's SGDMF—BM No. 79. Especially notable is evidence that in a single board resolution, Howard Houng approved more than one hundred of Nexis's actions and decisions that had occurred in the preceding four years. Plaintiff's AMF—BM No. 311. Included in this mass approval were the WDE's PSA and PPA with Tatung. *Id.* In addition, Plaintiff offers evidence that Howard Houng signed the director and shareholder resolutions that authorized Nexis's waiver of WDE's right to pursue the PTTV business. *Id.* No. 312. According to Plaintiff, these facts show that Howard Houng was in a "high-ranking position[] of authority in the operation of the [e]nterprise" and was a financier and beneficiary of the enterprise. BM Opp'n at 44.

The Court finds that there is a triable issue of fact regarding Howard Houng's involvement in "WDE's operations, decision making, or financial matters." BM Mot. at 40. Evidence offered by Plaintiff leads to the inference that Howard Houng, while not in control of the entire enterprise or even most of it, had managerial control over Nexis—WDE's parent company and a key player in the scheme alleged by Plaintiff.

The Bird Marella Defendants also argue that Howard Houng lacked knowledge of the enterprise's common purpose—that is, of the "general nature of the enterprise and . . . that the enterprise extended beyond his individual role." *Id.* at 42 (quoting *United States v. Christensen*, 801 F.3d 970, 985 (9th Cir. 2015), *opinion amended and superseded on other grounds*, *United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015)). To support this argument, the Bird Marella

Defendants again assert that Howard Houng "had no decisional authority with respect to WDE, was not consulted on decisions regarding WDE, and . . . was not aware [that his personal assets were used to support loans to Westinghouse] and did not have . . . discussion about that subject with anyone." *Id.* at 42. The Court finds there is a triable issue of fact as to Howard Houng's knowledge of the general nature of the enterprise. Plaintiff has offered facts showing that Howard Houng authorized many of Nexis's actions that constitute the scheme alleged by Plaintiff and that he was intimately involved with financial transactions between Houng Family entities that were a part of the alleged scheme. These facts lead to an inference that Howard Houng was aware that the "enterprise extended beyond his individual role."

Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's § 1962(c) claim against Howard Houng.

### iii.    *Rui-Lin Hsu*

The Bird Marella Defendants argue that the facts alleged by Plaintiff are insufficient to establish Rui-Lin Hsu directed or controlled the alleged RICO enterprise. BM Mot. at 41. The Bird Marella Defendants argue Rui-Lin Hsu was not involved in the decision to launch WDE and that he disagreed with CMT's decision provide a guarantee to WDE. *Id.* The Bird Marella Defendants suggest this disagreement is evidence that Rui-Lin Hsu was not a part of the propping up of WDE. Further, they argue that although Rui-Lin Hsu did pledge collateral to support certain loans, he "had no knowledge of who the ultimate borrower on the loans was." *Id.* "[M]ere provision of collateral to support loans to Richard Houng," the Bird Marella Defendants argue, "does not amount to participation in a RICO enterprise. *Id.*

The Bird Marella Defendants further argue that Rui-Lin Hsu lacked knowledge of the common scheme—the "general nature of the enterprise—because he did not know until the day of his deposition that Plaintiff "supplied products to Westinghouse." *Id.* at 42. Further, the Bird Marella Defendants argue that Rui-Lin Hsu's testimony that he disagreed with co-defendant Shour-Por Houng's decision to have CMT provide a guarantee for WDE is evidence that Rui-Lin Hsu did not understand or believe CMT to be a "paper intermediary," as alleged by Plaintiff. *Id. See* BM SUF No. 72.

In opposition, Plaintiff argues that Rui-Lin Hsu personally benefitted from his investment in Westinghouse, including by receiving monthly payments as a consultant to WDE and Nexis. BM Opp'n at 42. Plaintiff asserts that Rui-Lin Hsu *did* have a role in establishing the CMT division that "handled all of WDE's digital photo frame business." *Id.*; Plaintiff's AMF—BM No. 179. Plaintiff further asserts that Rui-Lin Hsu attended regular meetings with Richard Houng and/or co-defendant Jennifer Huang to be updated on WDE. BM Opp'n at 42–43. Plaintiff offers evidence that Rui-Lin Hsu understood that Westinghouse was undercapitalized and that he personally offered collateral for a loan to Nexis, which Nexis then "used to infuse into WDE as capital," thereby propping up WDE. *Id.* at 42. Finally, Plaintiff offers evidence that the "ultimate borrower" of Rui-Lin Hsu's loan guarantees was shown on the face of the guarantees themselves—in one case, the borrowers were WDE, Nexis, and WDT, in another the borrower was Westinghouse. Plaintiff's SGDMF—BM No. 75.

Plaintiff argues that Rui-Lin Hsu was not a small fish but was at all times a "beneficial owner[] of the RICO [e]nterprise." *Id.* at 41. The Court agrees that Rui-Lin Hsu appears to have benefitted from his involvement with CMT, Nexis, WDE, and Westinghouse. Further, whether Rui-Lin Hsu was aware of Plaintiff as a supplier of Westinghouse is irrelevant to Plaintiff's § 1962(c) claim against him. Section 1962(c) does not require that a defendant have awareness of every detail of a scheme, but simply that the defendant have knowledge of the "general nature of the enterprise and know that the enterprise extended beyond his individual role." *Christensen*, 828 F.3d at 780. The evidence Plaintiff has offered leads to the inference that Rui-Lin Hsu was certainly aware that "the enterprise extended beyond his individual role." The facts show that Rui-Lin Hsu was heavily involved with Richard Houng and multiple co-defendants and that he interacted with and funded several of the Houng Family entities, all during the relevant period.

However, the Court finds that Plaintiff has not demonstrated that there is a triable issue of fact as to Rui-Lin Hsu's operation or management of any part of the enterprise. Although Rui-Lin Hsu provided funding to WDE, WDT, and Nexis, the Court finds that that does not lead to an inference that Houng had "some part in *directing* [the] affairs" of the enterprise. *Fernandez*, 388 F.3d at 1228. "[M]ore is required than 'simply being involved,' and '[s]imply

performing services for the enterprise does not rise to the level of direction.'" *Kelmar*, WL 12850425 at \*7. Similarly, these facts do not raise an inference that Rui-Lin Hsu knew "the general nature of the enterprise."

Accordingly, the Court GRANTS the Bird Marella's Motion for Summary Judgment on Plaintiff's § 1962(c) claim against Rui-Lin Hsu.

### 7. Discussion—Former Employee Defendants (Benson Lin, Douglas Woo, and Jennifer Huang)

The Former Employee Defendants argue that Plaintiff cannot show defendants Huang, Woo, and Lin "participated" in the conduct of the alleged enterprise as required by 18 U.S.C. § 1962(c).

#### a. Participation in the Conduct

##### i. *Lin*

The parties dispute whether Lin had "broad managerial authority" within the enterprise. *See* Plaintiff's Statement of Genuine Disputes of Material Facts in Support of Opposition to Former Employee's Motion for Summary Judgment ("Plaintiff's SGDMF—FE") No. 24. The Former Employee Defendants argue Lin did not, but cite no evidence for their claim. *See id.* Among other extensive citations to the record, Plaintiff points to Lin's check-signing authority for WDE's California bank accounts, evidence that Lin managed cash flow between Nexis and WDE, and Lin's role as WDE's representative during an audit-related fraud inquiry. *See id.* Plaintiff also points to Lin's instructions to co-defendant Juan Salcedo to repay a $500,000 loan from Li Fu to WD. *Id.*

The parties seem to agree that Lin had nothing to do with the LED Lighting Asset transfer. Plaintiff's SGDMF—FE No. 253. However, parties disagree as to Lin's involvement in—and alleged authority over—the transfer of the LED TV Assets. *See, e.g.*, Plaintiff's SGDMF—FE No. 123.

The Former Employee Defendants say that Lin "had nothing to do with" Nexcast and Adtek or the decision to assigned WDE's rights. FE SUF Nos. 123—26. Plaintiff contends that

Lin, along with co-defendants Huang and Chen, "worked to reserve cash 'for Nexcast/Adtek' because they were 'getting ready for the [WDE] restructuring process.'" Plaintiff's SGDMF—FE No. 123. Plaintiff points to evidence showing that Lin, Chen, Huang, and Richard Houng then discussed "how much WDE cash to set aside for Nexcast, with figures ranging from $500,000 to $700,000 per month" to support Nexcast's PTTV business. *Id.* Plaintiff argues that this evidence shows Lin played a "lead role" in "segregating funds" for Nexcast/Adtek—funds that could have been used to pay WDE's creditors. *Id.*

The Former Employee Defendants state that Lin had nothing to do with the ABC by which the LED TV Assets were transferred. *See* Plaintiff's SGDMF—FE No. 197. Plaintiff points to evidence of Lin's involvement with the formation of Golden Star and argues that Lin helped Golden Star obtain, from Li Fu, the funding Golden Star needed to purchase the LED TV Assets from CMA—thus enabling the bust-out of WDE. *Id.* Plaintiff also points to evidence that after the ABC, Lin instructed Salcedo to repay the funding from Li Fu that Golden Star used to make the purchase. *Id.* This, and other evidence cited by Plaintiff, allegedly shows that Lin "played a central role in the planning, execution, and aftermath of the ABC," and thus in the bust-out of the LED TV Assets from WDE. *See, e.g.*, *id.*

In light of the facts that Plaintiff has presented, there is at least a dispute of material fact regarding Lin's involvement with the Golden Star ABC, the execution and implementation of which is a key part of several of Plaintiff's claims in this case. The Court finds that there is also at least a dispute of material fact regarding Lin's involvement in, and authority concerning, other alleged means by which WDE assets were "siphoned off"—namely, the funding of Nexcast and the waiving of the PTTV business opportunity.

### ii. Woo

The Court finds that there are numerous disputes of material fact regarding Woo's alleged managerial role in the enterprise. A few examples from the voluminous facts presented by parties to the Court will suffice to demonstrate the factual dispute.

Woo was the president of WDE from its formation until April 2010, president of WD from April 2010 to June 2013, and president of Pixi LLC from December 2010 to June 2013. Plaintiff's

SGDMF—FE Nos. 54, 56, 57. Defendants argue that Woo at no time "exerted 'managerial control' over the alleged enterprise." FE Mot. at 24. Plaintiff points out that co-defendants David Chen and Lin both testified that they took direction from Woo. Plaintiff's SGDMF—FE No. 55. Defendant states that Woo took direction and reported to Richard Houng, without independent decision-making authority. *See* FE SUF Nos. 58, 60. Plaintiff disputes this, pointing to testimonial and other evidence that Woo provided management and leadership for WDE. Plaintiff's SGDMF—FE Nos. 58, 60. The Court finds that §1962(c) does not require Woo to have had "managerial control" over the entire enterprise. Rather, [language from standard]. In addition, drawing all inferences in Plaintiff's favor, it is unlikely that the president of a company has no "control" such that he could completely escape the first element of the RICO standard. The Former Employee Defendants say that Woo "did not conceive, approve, develop, or implement" the ABC or APA by which Golden Star purchased the LED TV Assets from CMA. FE SUF No. 222. Plaintiffs offer evidence, however, that Woo directed subordinates in their work related to the ABC and that he prepared a presentation regarding the transfer of the Westinghouse brand to WD in which he is named as a "principal contact with CBS." Plaintiff's SGDMF—FE No. 222.

The Former Employee Defendants claim that Woo "had no role in the sale from Pixi LLC to Pixi Inc." FE SUF No. 267. In opposition, Plaintiff offers Victor Chang's testimony that Woo made high-level decisions regarding the transfer of the LED Lighting Assets. Plaintiff's SGDMF—FE No. 267.

In light of the evidence that Plaintiff has presented, there is at minimum a dispute of material fact regarding Woo's managerial role in the enterprise.

### iii.    *Huang*

The Former Employee Defendants argue that Huang was never an officer or director of WDE or any other related entity, but was "merely an employee of WDT" with no signataory authority on any WSI accounts. FE Mot. at 24–25. The Former Employee Defendants also assert that Huang performed "all her activities" at the instruction of Richard Houng. *Id.*

Therefore, the Former Employees conclude, there is no dispute of material fact "as to whether the actions of . . . Huang satisfy the operation and management test." *Id.* at 23.

In opposition, Plaintiff offers evidence that Huang manages WDE's overseas bank accounts and financial transactions. Plaintiff's AMF—FE No. 311. Plaintiff also offers evidence that Huang played a significant role establishing WDT as a WDE subsidiary by designing the "loan structure" that was part of the bust-out process and structuring "the flow of funds between Nexis, WSI, RHH, and WDE." Plaintiff's SGDMF—FE No. 10. Further, Plaintiff offers evidence that Huang transferred money from WSI to RH Holdings and had decision-making authority for WDE's funds, among others. *Id.* Nos. 11, 12. Plaintiff argues that Huang cannot plausibly be considered the "smallest of minnows" in light of this evidence. FE Opp'n at 50 (quoting FE Mot. at 24).

The Court agrees. Plaintiff has offered evidence sufficient to demonstrate that there is a triable issue of material fact as to Huang's participation in the conduct of the alleged enterprise as required by 18 U.S.C. § 1962(c).

### b.  Pattern of Racketeering Activity

The Former Employee Defendants also argue that Plaintiff cannot meet its burden of showing that Benson Lin, Douglas Woo, or Jennifer Huang participated in a pattern of racketeering activity. FE Mot. at 25–29. Plaintiff has generally alleged that these defendants engaged in mail/wire fraud and money laundering, which are predicate acts listed in §1961(1). *See* 18 U.S.C. § 1961(1).

The elements of the predicate acts of mail and wire fraud are discussed in Section B.5.a, *supra*. A defendant commits the predicate act of money laundering when the defendant (1) "transports, transmits, or transfers, or attempts to transport, transmit, or transfer . . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States;" (2) knowing that the funds "represent the proceeds of some form of unlawful activity;" and (3) knowing that the "transportation, transmission, or transfer is designed in whole or in part . . . to conceal or

disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18
U.S.C. § 1956(a)(2)(B).

As to the mail and wire fraud allegations, the Former Employee Defendants make bare
assertions that Plaintiff cannot establish any of elements of those offenses as to Lin, Woo, or
Huang. *See* FE Mot. at 27. Plaintiff, on the other hand, offers evidence that Lin and Huang were
deeply involved in the finances of WDE and other Houng Family entities, and used email and
other digital platforms to conduct the entities' financial affairs. Plaintiff's SGDMF—FE No. 24;
Plaintiff's AMF—FE Nos. 295, 310, 313. Plaintiff offers evidence that Lin and Huang used
email to (1) direct others to transfer funds between WDE, Bollington, and Nexis; (2)
communicate about the Houng Family's "equity contributions into WDE," and (3) communicate
about the use of Houng Family stock to collateralize bank loans to WDE. Plaintiff's SGDMF—
FE Nos. 24, 31; Plaintiff's AMF—FE Nos. 296, 301, 312. Plaintiff also asserts that Lin and
Huang emailed about "keep[ing] certain price-protection payments offshore at Bollington . . .
where they were inaccessible to WDE's creditors." FE Opp'n at 55–56.

In light of the evidence offered by Plaintiff, the Court finds there is at minimum a dispute
of material fact as to Lin and Huang's commission of acts of mail and/or wire fraud.

As to the money laundering allegations, the Former Employee Defendants make similarly
bare assertions that Plaintiff cannot meet any of the elements of that predicate offense. *See* FE
Mot. at 28. Because Plaintiff offers evidence of many instances of possible mail and/or wire
fraud, the Court finds that there is genuine dispute of material fact regarding Lin and Huang
participating in a pattern of racketeering activity under § 1962(c).

The Former Employee Defendants also argue that Plaintiff cannot show the alleged
predicate acts (the racketeering activity) was "connected to a common scheme, plan, or motive."
*Id.* at 28–29. The Former Employee Defendants make two specific arguments. First, they argue
that Lin, Huang, and Woo's "extremely limited interaction with the Houng family" precludes
their ability to have acted at the direction and with the consent of the Houng Family. Second,
they argue that WDE's payments to Plaintiff of $122 million dollars makes Plaintiff's alleged
scheme implausible. *See id.* The Court addressed and dismissed the latter argument in Section

B.6.b above. The former argument is unconvincing. Plaintiff has offered voluminous evidence linking the various co-defendants—including Lin, Woo, and Huang—and the various Houng Family entities through overlapping directors and officers, transfers of funds, email communications, and more. The Former Employee Defendants simply have not shown that there is no dispute of material fact regarding the common scheme, plan, or motive of the alleged RICO enterprise.

Finally, Plaintiff failed to argue or offer evidence that Woo committed two or more predicate acts. *See* FE Mot. 55–57. In its Statement of Genuine Disputes of Material Fact, Plaintiff does allege that "Woo was the architect of many facets of fraud perpetrated through the [e]nterprise." Plaintiff's SGDMF—FE No. 55. Plaintiff offers evidence that Woo knew about the plan to separate Nexcast from Nexis and that he worked with Lin and others to backdate "documentation ratifying prior corporate actions of Nexis . . . including 'financing, banking relationships, [and] fund flows between WDE and Nexis.'" *Id.* Plaintiff also offers evidence that Woo played a lead role in the transfer of Westinghouse from WDE to Golden Star/WD. Perhaps most relevantly, Plaintiff offers evidence that David Chen, "one of the architects of the money laundering scheme," took direction from Woo. *Id.* Further, Plaintiff alleges and offers evidence that after the ABC, Woo signed a check to CBS from Golden Star to pay a debt owed by WDE. *Id.*

These facts are relevant to many of Plaintiff's claims against Woo, but do not lead to the inference that Woo committed acts of mail/wire fraud or money laundering. The Court will not "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Instead, the Court relies "on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* Here, Plaintiff has failed to identify evidence supporting its assertion that Douglas Woo committed predicate acts of mail/wire or money laundering. Accordingly, the Court GRANTS the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's § 1962(c) claim against Woo.

In light of the evidence offered by Plaintiff regarding Lin and Huang's participation in the enterprise and commission of predicate acts, the Court DENIES the Former Employee

Defendants' Motion for Summary Judgment on Plaintiff's §1962(c) claim against Lin and Huang.

### C.  18 U.S.C. §1962(d)—RICO Conspiracy (Count III)

#### 1.  Legal Standard

Eighteen U.S.C. § 1962(d) proscribes a conspiracy to violate sections (a), (b), or (c)—that is, to violate RICO. To be liable for conspiracy under (d), "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States,* 522 U.S. 52, 65 (1997).

> A defendant must also have been 'aware of the essential nature and scope of the enterprise and intended to participate in it.' To establish a violation of section 1962(d), Plaintiffs must allege *either* an agreement that is a substantive violation of RICO *or* that the defendants agreed to commit, or participated in, a violation of two predicate offenses.

*Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (emphasis added) (quoting *Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir. 1993)). Importantly, "[i]t is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n,* 298 F.3d 768, 774–75 (9th Cir. 2002) (citations and internal quotations omitted).

Finally, "[t]he illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved. If a RICO conspiracy is demonstrated, all conspirators are liable for the acts of their co-conspirators." *Id.*

### 2.  Discussion—David Chen

Plaintiff has offered ample evidence to overcome summary judgment on its § 1962(d) claim against Chen.

As discussed in the § 1962(c) analysis above, Plaintiff has offered sufficient facts to overcome summary judgment on the issue of whether Chen violated that section. Thus, the Court need only address whether there is any genuine dispute of material fact whether Chen was a part of a *conspiracy* to violate RICO.

Chen argues that the 'operation and management' test "would only be useful or legally equitable if there is some indication that the employee knows that he [is] acting on behalf of the enterprise." Chen Mot. at 19. He further argues that "there is nothing in the record that support the allegation that [he] entered into any agreement . . . to enter into a conspiracy to advance the fraudulent purposes of the enterprise." *Id.* at 22. Specifically, Chen contends that he cannot be said to have "agreed" because (1) there is no evidence the alleged conspiracy was described to him, (2) he never encountered information that would lead to a reasonable inference that his actions were illegal or had a fraudulent purpose, and (3) from 2008–2010 he "did not have access to WDE's financial information or any control over the disposition of WDE's funds or assets." *Id.* Chen asserts, generally, that his "subordinate role" during the relevant period precluded him from "know[ing] anything was amiss, if anything was." *Id.*

In opposition, Plaintiff contends that there is ample evidence from which Chen's intent to participate in the enterprise can be inferred. Chen Opp'n at 19. In brief, Plaintiff points to evidence of Chen's "management role," his participation in the cycling of funds into and out of WDE, and his meeting with other co-defendants to discuss the ABC. *Id.* Plaintiff argues that "at the very least, the Court can infer . . . that Chen knew of the [e]nterprise's general scope and that it extended beyond his individual role." *Id.* (internal quotations and citations omitted). The Court agrees. Plaintiff has raised several triable issues of fact relevant to its § 1962(d) claim against Chen.

The Court has no opinion on whether or not Michael Corleone's "button-men" were aware of the "essential nature and scope" of, and intended to participate in, the Corleone family

business. *See* Chen Mot. at 19. However, the Court finds that there is at least a triable issue of fact regarding the extent of Chen's knowledge of the Houng Family enterprise and his intent (or agreement) to participate in it. Indeed, as the Court will have multiple occasions to note in this Order, intent "is a question of the state of mind . . . a factual matter rarely free from dispute and thus rarely enabled in summary proceedings." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1204 (Fed. Cir. 2006).

Finally, the Court finds that there is at least a triable issue of fact regarding Chen's liability for two or more predicate offenses—which, if established, would constitute a violation of § 1962(d). *See* Section B.5.a., *supra*. Accordingly, the Court DENIES Chen's Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against Chen.

### 3.  Discussion—Bird Marella

The Bird Marella Defendants argue that Plaintiff's RICO conspiracy claim fails against all of the Bird Marella Defendants for three reasons: (1) there was no domestic injury, (2) Plaintiff's claims are time-barred, and (3) Plaintiff fails to establish any Bird Marella Defendant committed any predicate offenses "with the requisite intent to defraud." BM Mot. at 43. As all of these arguments are addressed under Section B.6 above, the Court will not address them here.

The Bird Marella Defendants also argue that Plaintiff's RICO conspiracy fails against Chin-Ying Hsu, Howard Houng, Rui-Lin Hsu, Gregory Hu, CMT, and RD because Plaintiff "cannot establish that any of these Defendants were aware of the nature of the alleged enterprise." *Id.*

As for Chin-Ying Hsu, Howard Houng, and Rui-Lin Hsu, the Bird Marella Defendants rely on their arguments for summary judgment on Claim 1 and argue that these three defendants lacked knowledge of "the alleged enterprise's plan to 'prop up' WDE, siphon its profits offshore, and 'bust-out' its assets." *Id.* at 43–44. As explained above in Section B.6.c, the Court finds that there is a dispute of material fact as to whether Chin-Ying Hsu and Howard Houng were aware of the nature of enterprise. However, the Court also finds that the evidence

offered by Plaintiff does not raise an inference that Rui-Lin Hsu was aware of the nature and extent of the enterprise as required by § 1962(c). Accordingly, the Court DENIES the Bird Marella Defendant's Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against Chin-Ying Hsu and Howard Houng, and GRANTS the Bird Marella Defendant's Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against Rui-Lin Hsu.

As for Gregory Hu, the Bird Marella Defendants argue that Plaintiff has offered no evidence contradicting Hu's testimony that he never took any formal action as a director of Bollington, and that Hu's tax services for Houng Family members do not give rise to the inference that Hu knew of any fraudulent scheme. *Id.* at 44.

In opposition, Plaintiff offers evidence that Hu served as the record owner and director of Bollington, as a nominee, at co-defendant Shu Tze Hsu's request. Plaintiff's AMF—BM Nos. 222, 327. Plaintiff argues that "at minimum, a triable issue of fact exists regarding . . . Hu's purported lack of knowledge regarding the connection of Bollington/WSI with the rest of the [e]nterprise." BM Opp'n at 49. The Court disagrees. Plaintiff has simply not offered enough evidence to overcome summary judgment of its RICO conspiracy claim against Hu. The mere fact that Hu was a nominee director, while perhaps indicative of the general Houng Family predilection for nominating titular directors in a (now failed) effort to appear corporately separate, does not, without more, lead to the inference that Hu knew of the alleged scheme or that he agreed to participate in it. Similarly, Hu's nonchalance and apparent disregard for his legal obligations as director, while troubling, are not sufficient to raise an inference that Hu is liable under § 1962(d). *See id.* at 48. Accordingly, the Court GRANTS the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against Hu.

As for CMT and RD, the Bird Marella Defendants argue that "the mere fact that these companies . . . had a commercial business relationship with WDE . . . does not establish either knowledge of, or intention to participate in, any RICO scheme." BM Mot. at 44. They also argue that CMT and RD "suffered significant monetary losses" as a result of doing business with WDE, leading to a CMT suing WDE in Taiwan over millions of dollars. *Id.* Rather than

being co-conspirators, the Bird Marella Defendants argue, CMT and RD are creditors of WDE who are "diligently . . . pursuing recovery." *Id.*

In opposition, Plaintiff argues that CMT and RD "played a significant role in . . . help[ing] maintain WDE's appearance as an independent, profitable organization." BM Opp'n at 45. Plaintiff offers evidence that CMT and RD made a large profit from WDE, and provided direct support to WDE. Plaintiff's AMF—BM Nos. 316–18, 320. Plaintiff also alleges and offers evidence that CMT assisted in busting out WDE's LED TV Assets by consenting to an "Acknowledgment of Assumption and Release of Claims." BM Opp'n at 47. This Acknowledgment bound "CMT to waive all rights CMT may have against WDE and CMA as part of the ABC." *Id.* This is important, Plaintiff suggests, because without such waiver CMA would not have consented to the ABC. *Id.*

In light of the facts that Plaintiff has presented, there is at least a dispute of material fact regarding CMT and RD's role in, and knowledge of, the alleged RICO conspiracy to prop up and then bust out WDE. Intent "can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co.*, 298 F.3d at 774–75. Here, Plaintiff has offered evidence sufficient to lead to the inference that CMT and RD knowingly played a significant role in the financial machinations that Plaintiff alleges were directed at keeping WDE insolvent and defrauding creditors, including Plaintiff. Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against CMT and RD.

### 4. Discussion—Former Employees

The Former Employee Defendants argue that Plaintiff's RICO conspiracy fails because Plaintiff's substantive RICO violation claims fail. As explained above, the Court denies the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's § 1962(c) claim against Lin and Huang, and grants the motion as to Woo. *See* Section B.7., *supra*. Thus, as an initial matter, this argument is unavailing as to Lin and Huang. In addition, as discussed above, several other of Plaintiff's substantive RICO violation claims will survive the instant motions

for summary judgment. Accordingly, the Court will not grant summary judgment against Plaintiff on the basis of failure to prove substantive RICO violations.

### a.  Agent's Immunity Rule

The Former Employee Defendants also argue that none of the Former Employee Defendants cannot be liable for a RICO conspiracy under § 1962(d) because "their actions are protected by the agent's immunity rule." FE Mot. at 33.

The agent's immunity rule provides that "duly acting agents and employees cannot be held liable for conspiring with their own principals." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 512 (1994). Put differently, "[a] cause of action for civil conspiracy may not arise . . . if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." *Berg & Berg Enters, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 824 (2005), *as modified on denial of reh'g* (Aug. 25, 2005) (quoting *Doctors' Co. v. Super. Ct.*, 49 Cal. 3d 39, 44 (1989)). "This requires that the alleged conspirator agent already owe the duty to the plaintiff according to substantive law principles before his or her liability through conspiracy may be established." *Id.* at 825.

This rule has "particular force" in a situation that involves agents and employees within the corporate structure of the principle, such that a conspiracy is alleged between a corporation and its own employees. *Black v. Bank of Am.*, 30 Cal. App. 4th 1, 6 (1994).

Thus, to the extent the Former Employee Defendants (1) did not owe Plaintiff an independent duty *and* (2) were acting as agents or employees of their employer, who is also accused of conspiring to violate RICO, the Former Employee Defendants cannot be found liable for a RICO conspiracy.

### i.   Independent Duty to Plaintiff

The Former Employees are John Araki, Benson Lin, Arthur Moore, Juan Salcedo, Douglas Woo, and Jennifer Huang. As discussed in more detail in Section I below, the Court finds there is at least a triable of fact as to whether WDE was insolvent during the relevant

period. As a consequence, the trust fund doctrine may or may not apply to those Former Employee Defendants who were officers or directors of WDE. The Former Employee Defendants make individualized arguments on the agent's immunity rule only as to Moore and Huang. In Section I, the Court finds that Moore did not exercise sufficient authority for the trust fund doctrine to apply to him, but that there is at least a triable issue of fact as to the application of the trust fund doctrine to Huang.

In the absence of any argument regarding the application of the trust fund doctrine to Araki, Lin, Salcedo, and Woo, the Former Employee Defendants have not sufficiently shown that there is no dispute of material fact as to the trust fund doctrine's application to those individuals. Thus, there remains a triable issue of fact as to whether Araki, Lin, Salcedo, and Woo owed Plaintiff an independent duty under the trust fund doctrine.

Accordingly, the Court will not grant summary judgment on Plaintiff's RICO conspiracy claim on the basis of the agent's immunity rule.

### b. Agreement to Conspire

The Former Employee Defendants also argue that Plaintiff cannot show that the Former Employee Defendants conspired to violate § 1962(c). FE Mot. 34–37. First, they argue that none of the Former Employee Defendants had "any conscious agreement" to engage in racketeering activity or two predicate acts. *Id.* at 34. To this end, the Former Employee Defendants primarily assert that the Former Employee Defendants did not commit any of the predicate acts of which they are accused. *Id.* at 35. These allegations are "especially meaningless" as to Araki, Moore, and Woo, they argue. *Id.*

In opposition, Plaintiff argues "there is ample evidence from which defendants' agreement to participate in the [e]nterprise . . . can be inferred." FE Opp'n at 63. Specifically, Plaintiff offers evidence that Huang provided Richard Houng with charts describing the "loan structure" allegedly used to prop up WDE, and was a key participant in a loan restructuring process aimed at supporting WDE. Plaintiff's SGDMF—FE No. 10. It also offers evidence that Woo knew the Houng Family controlled WDE. Plaintiff's AMF—FE No. 331. In addition,

Plaintiff argues and offers evidence that Woo, Araki, Moore, and Huang met in person; Moore, Lin, Salcedo, and Chen participated in conference calls; and Woo, Araki, Moore, and Huang gathered in Taiwan—all to discuss actions related to the LED TV Transfer and the ABC. See Plaintiff's AMF—FE No. 342; Plaintiff's SGDMF—FE Nos. 187, 317. Finally, Plaintiff offers evidence of what it describes as each Former Employee Defendant "carr[ying] out their respective duties" concerning  the LED TV Transfer. FE Mot. at 63–64.

Intent may be inferred "from the words, actions, or interdependence of activities and persons involved. If a RICO conspiracy is demonstrated, all conspirators are liable for the acts of their co-conspirators." *Howard*, 208 F.3d at 751. Based on the evidence offered by Plaintiff in response to the Former Employee Defendants' arguments on Claim 1 and Claim 3, the Court finds that the Former Employee Defendants are not all similarly situated. As discussed above in this Section and in Section B.7., Plaintiff has offered detailed evidence of co-defendants Lin, Woo, and Huang's involvement with the alleged enterprise. Consequently, the Court finds there is at least a triable issue of material fact concerning Lin, Woo, and Huang's intent to agree to participate in the alleged enterprise. However, Plaintiff has not offered evidence that leads to the inference that Araki, Salcedo, and Moore agreed to participate in the alleged enterprise.

Second, the Former Employee Defendants argue that Plaintiff cannot show that the Former Employee Defendants were aware of "the essential nature and scope of [the] enterprise and intended to participate in it." FE Mot. at 36. The Former Employee Defendants incorrectly contend that in order to meet this standard Plaintiff must show that each of the Former Employee Defendants knew "each entity's specific role within" the enterprise. *Id.* at 37. If this were the rule, defendants could avoid RICO conspiracy liability merely because the conspiracy is very large or very complex. "[T]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *Christensen*, 801 F.3d at 986. Plaintiff need not demonstrate that each defendant knew of every other defendant and of every entity alleged to be a part of the alleged enterprise.

For the reasons explained above, the Court GRANTS the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's RICO conspiracy against Araki, Salcedo, and

Moore, and DENIES the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's RICO conspiracy claim against Lin, Woo, and Huang.

### D. Alter Ego (Count X)

#### 1. Legal Standard

"We apply the law of the forum state in determining whether a corporation is an alter ego" of an individual. *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir.), opinion amended on denial of reh'g *sub nom. S.E.C. v. Hickey*, 335 F.3d 834 (9th Cir. 2003) (quoting *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993)).

"Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors." *Robbins v. Blecher*, 52 Cal. App. 4th 886, 892 (1997). "Corporate entities are presumed to have a separate existence, and the corporate form will be disregarded only when the ends of justice require this result." *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 217 Cal. App. 4th 1096, 1107 (2013); *see also Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 960 (N.D. Cal. 2015). "Under the alter ego doctrine, however . . . a court may disregard the corporate entity." *Robbins*, 52 Cal. App. 4th at 892.

Alter ego is an "extreme remedy" and is "sparingly used." *Sonora Diamond Corp. v. Super. Ct.*, 99 Cal. Rptr. 2d 824, 836 (Cal. App. 5th Dist. 2000). Courts apply the doctrine "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose." *Id.*

"To establish a party as the alter ego of a corporation, the applicant must show '(1) that there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an equitable result will follow.'" *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 597 (N.D. Cal. 2012) *aff'd sub nom. Bank of Montreal v. Salyer*, 599 F. App'x 706 (9th Cir. 2015) (quoting *Automotriz del Golfo de Cal. v. Resnick,* 47 Cal. 2d 792, 796 (1957)); *see also United States v. Boyce*, 38 F. Supp. 3d 1135, 1154–55 (C.D. Cal. 2014), *appeal dismissed* (Nov. 13,

2014) (quoting *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010)). Both factors are necessary for a Court to impose alter ego liability. *Bank of Montreal*, 476 B.R. at 597.

> In assessing the unity of interest prong, courts consider numerous factors, including inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers.

*Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (citations omitted); *see also Bank of Montreal*, 476 B.R. at 597–98. "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th at 245. Further, "[c]ommon ownership alone is insufficient to disregard the corporate form." *Stewart*, 81 F. Supp. 3d at 961 (quoting *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014)) (internal quotation marks omitted).

To establish inequity in the absence of alter ego liability under the second prong, "a plaintiff must plead facts sufficient to demonstrate that 'conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form.'" *Stewart*, 81 F. Supp. 3d at 963 (quoting *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539). The second element of the alter ego test requires a plaintiff to show that an inequitable result will follow if the court rejects the alter ego theory. *Bank of Montreal*, 476 B.R. at 597. There must be "direct evidence of specific manipulative conduct," for a court to find alter ego. *Inst. of Veterinary Pathology, Inc. v. Cal. Health Labs., Inc.*, 172 Cal. Rptr. 74, 78 (Cal. App. 4th Dist. 1981). The "specific manipulative conduct" must include "some conduct amounting to bad faith" which would make it inequitable for the "equitable owner of a corporation to hide behind its corporate veil." *Roman Catholic Archbishop v. Super. Ct.*, 93 Cal. Rptr. 338, 342 (Cal. App. 1971). Without something more, simply availing oneself of the protections provided by corporate charters is

not misconduct sufficient to justify a court in finding a corporation to be an alter ego. *Calvert v. Huckins,* 875 F. Supp. 674, 678 (E.D. Cal. 1995) (finding insufficient grounds for alter ego status where parent company had ownership interest in a subsidiary, parent and subsidiary had interlocking directorates and officers, parent incorporated subsidiary's income figures into its financial reports, parent had guaranteed promissory note for subsidiary, and parent and subsidiary shared counsel).

But the misdeeds need not be fraud: the "second requirement turns on an inequitable result and not on actual fraud." *Linco Servs., Inc. v. DuPont*, 239 Cal. App. 2d 841, 844 (1966). For example, the court in *Linco* found alter ego status where an unrelated company secured loans for a corporation so that it would be "clothed with the indicia of financial stability" in order to "secure[] its reentry into active business" but then abandoned the corporation. *Id.* By abandoning the corporation after "clothing it" with the appearance of financial security, the unrelated company had created an injustice to those who relied on the facade. *Id.*

Notably, "California courts have rejected the view that the potential difficulty a plaintiff faces collecting a judgment is an inequitable result that warrants application of the alter ego doctrine." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) (citations omitted).

### a.  Equitable Interest as "Ownership"

In the past, courts only treated a corporation as the alter ego of an individual where "one person own[ed] all the stock of a corporation and use[d] the corporation as a mere conduit for the transaction of his own business." *Imperial Paper & Color Corp. v. Sampsell*, 114 F.2d 49, 52 (9th Cir. 1940), *rev'd,* 313 U.S. 215 (1941). Complete ownership was tantamount to finding an alter ego. *See Wenban Est. v. Hewlett*, 227 P. 723, 731 (Cal. 1924) ("[t]here was a complete unity of interest and ownership in the assets . . . [i]n other words, the corporation was her alter ego").

However, California courts have moved away from the stringent requirement that an individual have complete ownership before a court could find a corporation to be an alter ego of

the individual. *O'Donnell v. Weintraub*, 67 Cal. Rptr. 274, 278 (Cal. App. 2d 1968) (holding "alter ego does not require that every share must be owned by the individual who seeks to mask his activities behind the fiction of a corporate identity"). Instead, courts now give more weight to whether "the corporation is, in fact, controlled by the individual sought to be held [liable] and [whether] recognition of the separate existence of the controlled corporation would work a fraud or an injustice." *Id.* Even owning a single share was enough "ownership" to find alter ego liability in *Riddle v. Leuschner*, 335 P.2d 107, 111 (Cal. 1959). Additionally, the California Supreme Court has held that "[t]he *equitable* owners of a corporation . . . are personally liable when they treat the assets of the corporation as their own and add or withdraw capital from the corporation at will." *Minton v. Cavaney*, 364 P.2d 473, 475 (Cal. 1961) (emphasis added).

The Ninth Circuit formerly held that under California law, "an individual must own at least a portion of a corporation before an alter ego relationship is deemed to exist." *S.E.C. v. Hickey*, 322 F.3d 1123, 1130 (9th Cir. 2003), opinion amended on denial of reh'g *sub nom*. *S.E.C. v. Hickey*, 335 F.3d 834 (9th Cir. 2003). However, the Ninth Circuit revisited the issue seven years later in *In re Schwarzkopf*, 626 F.3d 1032 (9th Cir. 2010). In *Schwarzkopf*, the Ninth Circuit held that *Hickey* "did not foreclose the possibility that equitable ownership might be sufficient in some contexts." *Id.* at 1038. The court went on to conclude that despite the holding in *Hickey*, "California case law suggests that equitable ownership is sufficient." *Id.*

The court found the defendant in *Schwarzkopf* to be an equitable owner of a trust because he "acted as owner of the trust and its assets." *Id.* at 1039. The defendant "acted as an owner" of the trust by using his own assets along with the assets of the trust to purchase land, allowing the named trustee to have no role other than to write checks demanded by the defendant, and using the trust to purchase a home and other assets that he used rent-free. *Id.*

Additionally, in a case where an employee was "going to receive"—but had not yet received—shares of a company, the court found the employee to be an equitable owner before she received the shares. *Minton*, 364 P.2d at 475. A court also found ownership even though a defendant only owned the corporation indirectly, using a chain of several corporations and trusts. *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 599 (N.D. Cal. 2012), *aff'd sub nom.*

*Bank of Montreal v. Salyer*, 599 Fed. Appx. 706 (9th Cir. 2015) (unpublished) (holding that defendant was the equitable owner of an LLC where LLC was owned by a corporation that was owned by a trust that was owned by defendant).

### 2. Discussion—Bird Marella (Shou-Por Houng, Shu Tze Hsu, Rui-Lin Hsu, or Chin-Ying Hsu)

The Bird Marella Defendants argue that Plaintiff's alter ego claim must fail because Shou-Por Houng, Shu Tze Hsu, Rui-Lin Hsu, and Chin-Ying Hsu owned no shares of WDE and did not dominate or control WDE. BM Mot. at 45. Further, Defendants argue that no inequity would result if the above-listed defendants were not held liable under the alter ego theory. *Id.*

Plaintiff argues that these defendants' equitable ownership of WDE permits a finding of alter ego. Thus, the issue is whether "equitable ownership" of the kind alleged by Plaintiff is "ownership" sufficient to create an alter ego relationship between the above-named defendants and WDE.

First, as explained above, the fact that the named Bird Marella Defendants own no shares of WDE is not dispositive. Second, the Court finds that there is a triable issue of material fact regarding whether Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu "acted as owner[s]" of WDE and its assets, such that they were equitable owners. *See In re Schwarzkopf*, 626 F.3d at 1039. Finally, the Court finds that there is a triable issue of material fact regarding Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu's domination or control of WDE.

Plaintiff offers evidence that Shu Tze Hsu and Shou-Por Houng communicated to CMC executives that it was their intention to "give everything to the [CMC] without seeking returns—that is, to contribute Westinghouse to the CMC "family of companies." Plaintiff's AMF—BM No. 27, BM Opp'n at 54. Plaintiff also offers evidence that Shu Tze Hsu and Shou-Por Houng contributed personal assets and the assets of Li Fu (of which they are majority owners) to obtain loans for the benefit of WDE. Plaintiff's AMF—BM Nos. 333–352. Plaintiff also offers numerous citations to deposition evidence of Li Fu assets being used by Shu Tze Hsu to directly, and indirectly through other Houng Family entities, support "the Westinghouse

business"—part of the alleged propping up of WDE. *See* BM Opp'n at 55–57. Further, Plaintiff offers similar evidence of extensive personal guarantees, including of stock, made by Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu—and to a lesser extent Howard Houng—for the same purpose. Plaintiff's AMF—BM Nos. 176, 340. Plaintiff also offers evidence that Rui-Lin Hsu met regularly with Richard Houng and co-defendant Jennifer Huang to discuss WDE's business, and that he consented to the gift of Westinghouse to CMC. *Id.* Nos. 177, 181. The Court finds that this evidence lead the inference that Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu acted as the owners of WDE and its assets—in part because some of the assets given to WDE or used to support loans to WDE *were* their assets.

These facts also lead to an inference of "comingl[ed] funds and other assets and failure to segregate funds of the separate entities" and "the treatment by an individual of the assets of the corporation as his own"—two of the indicia of alter ego. *See Goodrich v. Briones*, 626 F.3d 1032, 1038 (9th Cir. 2010). The Court finds that there is a genuine dispute of material fact regarding both Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu's equitable ownership of WDE and their domination and control of WDE.

The Bird Marella Defendants argue that no inequity would result from the Court finding the Bird Marella Defendants are not alter egos if WDE. BM Mot. at 45. Plaintiff and the Bird Marella Defendants dispute almost every fact that could be material to determining the inequity prong of the alter ego analysis, including whether Plaintiff was aware of WDE's undercapitalization and the nature of Plaintiff's injury. *See id.* 52–56; BM Opp'n 57–64. In light of the evidence offered by Plaintiff, the Court finds there is a genuine dispute of material fact on this issue.

For the reasons state above, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's alter ego claim against Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu.

Finally, as to Chin-Ying Hsu, the Bird Marella Defendants offer evidence of testimony—from defense witnesses and Plaintiff's witnesses—that none of the Bird Marella Defendants, including Chin-Ying Hsu, had domination or control over WDE. This is the only

discussion of Chin-Ying Hsu in the Bird Marella Defendant's Count X analysis. *See* BM Mot. 45–58. Plaintiff offers no evidence of Chin-Ying Hsu's control over WDE and does not discuss her at all in its Count X analysis, except to assert that Shou-Por Houng and Shu Tze Hsu "confirmed" their gift of Westinghouse with her. *See* BM Opp'n 54. This is manifestly insufficient to show that Chin-Ying Hsu may be held liable as an alter ego of WDE. Accordingly, the Court GRANTS the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's alter ego claim against Chin-Ying Hsu.

### E. Fraud (Count IV)

#### 1. Legal Standard

"The elements of fraud in California are: '(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.'" *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004)).

To establish the second element, actual knowledge of falsity is not always required. *Gagne v. Bertran*, 43 Cal. 2d 481, 487 (1954) (stating that "the representation need not be made with knowledge of actual falsity, but need only be an assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true . . . .") (internal quotations omitted); *see also* Cal. Civ. Code § 1572. Courts have found knowledge of falsity where a defendant did not know a statement was false at the time it was made but permitted the statement to stand after learning of the statement's falsity. *Black v. Shearson, Hammill & Co.*, 266 Cal. App. 2d 362, 367 (1968).

A person making misrepresentations is liable only to those in whom he or she intended to induce reliance. *Bell v. Renaldo*, 51 Cal. App. 3d 779, 781 (1975). The statement may be indirect, such as a statement made to one person intending that he or she communicates it to another. *See Varwig v. Anderson-Behel Porsche/Audi, Inc.*, 74 Cal. App. 3d 578, 581 (1977).

However, there is no requirement for intent to induce a *particular* action. *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 92–93 (2001).

"Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995). Justifiable reliance requires a showing of actual reliance. *See Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1088 (1993). In addition to actual reliance, a plaintiff must show that the circumstances were such as to make it reasonable for plaintiff to accept the defendant's statements without an independent inquiry or investigation. *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324, 133–32 (1986).

> A failure to disclose or concealment can constitute actionable fraud in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact.

*Falk*, 496 F. Supp. 2d at 1094–95; *see also Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1328 (C.D. Cal. 2013).

### 2. Discussion—Bird Marella Defendants (Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu)

Plaintiff alleges that it entered into a business relationship with WDE premised in part upon the omission of material information in the sole possession of defendants. 4AC ¶¶ 148–149. The intentional concealment of material facts in the sole possession of defendants during the course of business transactions gives rise to a duty to disclose in California. *See Jones v. ConocoPhillips*, 198 Cal. App. 4th 1187, 1199 (2011) (citations omitted) (duty to disclose without any confidential relationship may arise where the defendant alone has knowledge of material facts which it actively conceals from the plaintiff); *L.A. Mem'l Coliseum Comm'n v.*

*Insomniac, Inc.*, 233 Cal. App. 4th 803, 831 (2015) (The "duty to disclose must be grounded in some sort of *transaction* between the parties . . . [for example] a duty to disclose may arise from the relationship between . . . parties entering into any kind of contractual agreement.").

The Bird Marella Defendants argue that Shu Tze Hsu, Shou-Por Houng, and Rui-Lin Hsu did not have a duty to disclose because they are not alter egos for WDE, WSI, or WDT. *See* BM Mot. at 59. Alternatively, the Bird Marella Defendants argue that Plaintiff's substantive fraud claim fails because Plaintiff cannot establish that any material facts were concealed from it—that is, that Plaintiff knew about the lack of corporate separateness between WDE and WSI, and about WDE's undercapitalization. *See id.* at 63–67.

### a. Defendants' Alter-Ego Liability for WSI and WDT

Plaintiff acknowledges that its fraud claim against Shu Tze Hsu, Shou-Por Houng, and Rui-Lin Hsu is based on a theory of alter ego liability—that is, it is based on these defendants' alter ego liability for WDE. BM Opp'n at 67. The legal standard for alter ego liability is laid out in Section D.1., *supra*.

The Bird Marella Defendants argue that because Shu Tze Hsu, Shou-Por Houng, and Rui-Lin Hsu were never the alter egos of WDE, they were never the alter egos of WSI or WDT, either. BM Mot. at 60. Plaintiff argues that these defendants are alter egos of WDE, and that if they are alter egos of WDE, they are necessarily also alter egos of WSI and WDT. BM Opp'n at 67. Finding defendants to be liable as alter egos of the parent company, but not the wholly-owned subsidiary, Plaintiff argues, would be "an absurd result." *Id.*

As explained in Section D, *supra*, the Court finds that there is a triable issue of fact as to whether Shou-Por Houng, Shu Tze Hsu, and Rui-Lin Hsu have alter ego liability for WDE.

### b. Parent Liability for Subsidiary

"A parent corporation may be directly involved in financing and macro-management of its subsidiaries . . . without exposing itself to a charge that each subsidiary is merely its alter ego." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). For a parent to be liable for the misdeeds of its subsidiaries under an alter ego theory, the parent must play a role in the

misdeeds. *Est. of Cartledge v. Columbia Cas. Co.*, No. CIV. 2:11-2623 WBS GGH, 2011 WL 5884255, at *4 (E.D. Cal. Nov. 23, 2011) (finding parent could not be liable under alter ego theory where the complaint contained no allegations that the parent "played any role in any abuse of corporate privileges" the subsidiary may have engaged in.); *Bank of Montreal v. SK Foods, LLC*, 476 B.R. 588, 602 (N.D. Cal. 2012), *aff'd sub nom. Bank of Montreal v. Salyer*, 599 Fed. Appx. 706 (9th Cir. 2015) (unpublished) (holding plaintiff "failed to meet its burden of showing that an alter ego finding would be appropriate" against a parent corporation because there was not enough "evidence in the record to connect any wrongdoing to [the parent corporation]").

The inquiry into alter ego liability is individual as to each owner and corporation. *Whitney v. Wurtz*, No. C 04-5232 PVT, 2007 WL 1593221, at *2 (N.D. Cal. June 1, 2007), *aff'd sub nom. Whitney v. Arntz*, 320 Fed. Appx. 799 (9th Cir. 2009) (unpublished) (rejecting plaintiff's argument that "once the corporate veil was pierced as to any shareholder, all shareholders would be liable as alter egos" and holding that "the inquiry into alter ego liability is individual" as to each shareholder). Further, just because the "alter ego theory makes a 'parent' liable for the actions of a 'subsidiary' which it controls . . . does not mean that where a 'parent' controls several subsidiaries each subsidiary then becomes liable for the actions of all other subsidiaries. There is no respondeat superior between the subagents." *Roman Catholic Archbishop*, 93 Cal. Rptr. at 342.

"The application of the alter ego doctrine is limited to 'individuals who influence and govern the corporation or who were actors in the course of conduct constituting the abuse of the corporate privilege.'" *Whitney*, 2007 WL 1593221, at *2 (quoting *Firstmark Capital Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 95 (9th Cir. 1988)).

### i.  WDT

WDT is a wholly-owned subsidiary of WDE. Richard Houng testified that Shu Tze Hsu and Shou-Por Houng controlled the Houng Family's overseas assets. Plaintiff's SGDMF—BM No. 115. WDT is an overseas asset. *See* 4AC ¶ 31; FE Mot. at 24. Thus, logically, Shu Tze Hsu and Shou-Por Houng controlled WDT to some, and perhaps to a significant, extent. Defendants

have failed to show that there is no genuine dispute of material fact regarding Shu Tze Hsu and Shou-Por Houng's alleged control of WDT. Accordingly, the Court cannot grant summary judgment on the grounds that these two defendants are not the alter egos of WDT.

### ii.  WSI

Plaintiff asserts that "the record is replete with evidence of the Houng Family's relationship and control of WSI, including . . . [evidence of the] Houng Family's personal assets and assets of Li Fu [being] pledged to support loans to fund WSI." BM Opp'n at 69. The Court agrees. Plaintiff asserts that each of the record shareholders and directors of WSI are family members and friends of the Houng Family and were selected by the Houng Family. *Id.* at 68. Plaintiff disputes defendants' arguments that they lacked knowledge of WSI and did not control WSI and points to evidence that Shou-Por Houng corresponded with co-defendants about WSI. *Id.* Plaintiff offers email and testimonial evidence showing that Shu Tze Hsu was involved with the WSI's "new owner issue" and WSI's role in a "loan repay flow." *Id.* Shu Tze Hsu also signed the paperwork through which Li Fu guaranteed a loan for WSI and authorized millions of dollars in transfers between Li Fu and WSI. *Id.* at 69.

Accordingly, the Court finds that there is at least a triable issue of material fact regarding Shu Tze Hsu and Shou-Por Houng's alter ego liability for WSI.

### c.  Lack of Corporate Separateness/Plan to "Bust Out" WDE's Assets

The Bird Marella Defendants do not dispute WDE and WSI's lack of corporate separateness. Rather, they argue that Plaintiff and/or Plaintiff's employees were aware of that fact, precluding Plaintiff's fraud claim. BM Mot. at 66–67.

In the 4AC, Plaintiff alleges that the Bird Marella Defendants intended Plaintiff to:

. . . rely (and continue to rely) upon the pretenses that each of these entities

was a legal entity with corporate separateness and sufficient capitalization

as the law presumes (rather than as part of a greater sham enterprise lacking

corporate separateness to effectuate a ruse on their trade creditors) and

without knowledge of their plan to keep WDE perpetually insolvent so they may bust out WDE at any time . . . .

4AC ¶ 379. In asking the Court for summary judgment, the Bird Marella Defendants offer evidence that certain of Plaintiff's employees were aware that WDE and WSI were run by the same people, had the same address, and/or were controlled by Richard Houng. BM SUF Nos. 123–27. In opposition, Plaintiff argues that awareness that WDE and WSI had the same leadership is not equivalent to knowledge that the two were operated as a single enterprise—or that Plaintiff as not "entitled to reply on those companies refraining from illegal activities and maintaining corporate separateness as the law requires." BM Opp'n at 72. The Court finds that Defendant has failed to show there is no genuine dispute of material fact on this issue.

In addition, as Plaintiff correctly points out, Defendants do not present any evidence that Plaintiff was aware of the "plan to keep WDE perpetually insolvent," or the fact that WDE was undercapitalized. *See id.* at 71–72. The Bird Marella Defendants and Plaintiff also do not agree on the details of the transaction during which Tatung extended credit to WDE, including the timing of an investigation of WDE's credit, what financial data WDE provided to Plaintiff, and whether the numbers provided by WDE—if any were provided—were true. Plaintiff's SGDMF—BM Nos. 15, 16, 19.

The Bird Marella Defendants have failed to show that there are no disputes of material fact regarding Plaintiff's awareness of the allegedly concealed fact(s). Accordingly, the Court finds there is at least a triable issue of fact regarding the first element of fraud—misrepresentation (including false representation, concealment, or nondisclosure). For all of the reasons explained above, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's fraud claim against Shu Tze Hsu, Shou-Por Houng, and Rui-Lin Hsu.

### F.  Civil Conspiracy to Commit Fraud (Count V)

#### 1.  Legal Standard

"The elements of an action for civil conspiracy are (1) the formation and operation of the conspiracy and (2) damage resulting to plaintiff from (3) an act or acts done in furtherance of the common design." *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, No. C-14-03236-RMW, 2015 WL 3488923, at *3 (N.D. Cal. June 2, 2015) (internal citations omitted).

To allege a conspiracy, the "plaintiff must allege, at a minimum, an agreement to commit the wrongful acts. The conspiracy may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *Id.* If "a plaintiff alleges that a defendant is liable for *intentional* misrepresentations under a civil conspiracy theory, Rule 9(b) requires that the plaintiff allege with particularity facts that support the existence of a civil conspiracy." *Id.* (emphasis added).

To be liable, an alleged conspirator must have knowledge of the planned tort and intent to aid in its commission. *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995) (internal citations omitted). "Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense." *Id.* The legal doctrine of conspiracy

> imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors.

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510–11 (1994).

Finally, "[w]hen an issue requires determination of state of mind, it is unusual that disposition may be made by summary judgment." *Consol. Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.*, 355 F.2d 437, 438 (9th Cir. 1966).

### 2.  Discussion—David Chen

Chen argues that Plaintiff's civil conspiracy to commit fraud claim must fail because
Plaintiff's fraud claim (Count IV) fails. As discussed above, the Court finds that there are
genuine disputes of material fact regarding the elements of Plaintiff's fraud claim against the
Bird Marella Defendants (the only parties named in that claim who have a pending Motion for
Summary Judgment). Accordingly, the Court will not be granting summary judgment for Chen
on this basis.

Chen next argues that "the object and purpose of the conspiracy . . . is so arcane, Tatung
has virtually no chance of showing" that Chen entered into an agreement to commit the fraud
alleged in Count IV. Chen Mot. at 25. Chen contends Plaintiff is required to show (1) Chen had
"substantial contact" with the Houng Family, (2) understood the Houng Family's "illegal
operation of the various corporations," and (3) agreed to participate in the bust-out of WDE. *Id.*
at 26.

In opposition, Plaintiff argues its evidence raises "several triable issues" about Chen's
agreement with and involvement in the fraudulent enterprise. Chen Opp'n at 22. Plaintiff
reiterates its arguments against Chen under Count 3 (and by inference, Count 1). *Id.* As
explained in the Court's analysis of Count 3, *supra*, the Court finds there is at least a triable
issue of material fact regarding the extent of Chen's knowledge of the Houng Family enterprise
and his intent (or agreement) to participate in it. The Court also finds that intent is "a factual
matter rarely free from dispute and thus rarely enabled in summary proceedings." *Ferring B.V.*,
437 F.3d at 1204.

For the reasons described above and in Section C.2., *supra*, the Court DENIES Chen's
Motion for Summary Judgment on Plaintiff's conspiracy to defraud claim against Chen.

### 3.  Discussion—Bird Marella (Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu)

The Bird Marella Defendants argue that Plaintiff's civil conspiracy to commit fraud claim
must fail because Plaintiff's fraud claim fails. As discussed above, the Court finds that there are

genuine disputes of material fact regarding the elements of Plaintiff's fraud claim against the Bird Marella Defendants.

Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's civil conspiracy to commit fraud claim.

### 4.  Discussion—Former Employee Defendants

The Former Employee Defendants argue that they are entitled to summary judgment on Plaintiff's civil conspiracy to commit fraud claim because (1) Plaintiff cannot prove its underlying fraud claim and (2) Plaintiff cannot show that the Former Employee Defendants entered into a conspiracy to participate in that fraud. FE Mot. at 38.

The Former Employee Defendants are not named in Plaintiff's fraud claim. Therefore, the Court will not address the Former Employee Defendants' arguments regarding that claim. Sufficed to say, the Court is not granting summary judgment against Plaintiff as to its substantive fraud claim. *See* Section E, *supra*.

As to its second asserted ground for summary judgment on the conspiracy to defraud claim, the Former Employee Defendants argue that (1) the Former Employee Defendants are protected by the agent's immunity rule, and (2) Plaintiff cannot show that the Former Employee Defendants had knowledge of and agreed to further the alleged fraud. FE Mot. at 42–43. The Former Employee Defendants also argue that Moore, as an attorney, cannot be held liable for conspiracy to commit fraud. The Court will address each of these assertions in turn.

### a.  Agent's Immunity Rule

The agent's immunity rule is described at length in Section C.4.a., *supra*. In brief, to the extent the Former Employees (1) did not owe Plaintiff an independent duty and (2) were acting as agents or employees of their employer, who is also accused of conspiring to commit fraud, the Former Employees cannot be found liable for conspiracy.

As discussed in Section I (Breach of Fiduciary Duty) below, the Court finds there is at least a triable of fact as to whether WDE was insolvent during the relevant period. As a consequence, the trust fund doctrine may apply to those Former Employee Defendants who

were officers or directors of WDE. The Former Employee Defendants make individualized arguments on the agent's immunity rule only as to Moore and Huang. In Section I below, the Court finds that Moore did not exercise sufficient authority for the trust fund doctrine to apply to him, but that there is at least a triable issue of fact as to the application of the trust fund doctrine to Huang.

As to Araki, Lin, Salcedo, and Woo, the Former Employee Defendants have not sufficiently shown that there is no dispute of material fact as to the trust fund doctrine's application to those individuals. Thus, there remains a triable issue of fact as to whether Araki, Lin, Salcedo, and Woo owed Plaintiff an independent duty under the trust fund doctrine.

Additionally, Plaintiff has offered evidence that Woo and Araki received Nexcast membership units "as a reward for their participation in the scheme." FE Opp'n at 60 n.11; Plaintiff's AMF—FE No. 332, 363. As Plaintiff correctly notes, an agents are not precluded from conspiracy liability when they "act 'as individuals for their individual advantage' and not solely on behalf of the principal." *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 47 (1989). *See also Hardisty v. Moore*, No. 11-CV-01591-BAS BLM, 2015 WL 6393884, at *10 (S.D. Cal. Oct. 22, 2015). Thus, there is at least a triable issue of material fact as to the application of the agent's immunity rule to Woo and Araki, in light of Plaintiff's evidence that the "individual advantage" exception to the rule may apply.

Accordingly, the Court will not grant summary judgment on Plaintiff's RICO conspiracy claim on the basis of the agent's immunity rule.

### b. Moore's Liability

The Former Employee Defendants also argue that Moore, as an attorney, cannot be held liable for any of the conspiracies alleged by Plaintiff. *See* FE Mot. at 71–75.

In California, a plaintiff generally cannot bring a civil conspiracy claim against an attorney for a conspiracy between the attorney and client. Cal. Civ. Code § 1714.10. However, there are two situations when a conspiracy claim does lie against an attorney for conspiracy: "(1) Where the attorney violates a duty that he or she independently owes to the plaintiff; and

(2) where the attorney's acts go beyond the performance of a professional duty owed to the client and are, in addition, done for his or her own personal financial gain." *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 32 Cal. Rptr. 3d 325, 335 (Cal. App. 6th Dist. 2005), *as modified on denial of reh'g* (Aug. 25, 2005). This rule exists to impose liability on an attorney when "he or she is acting in more than just a representative capacity." *Id.*

Where an attorney violates a duty that he independently owes to the plaintiff, the attorney may be liable for conspiracy. *Pavicich v. Santucci*, 102 Cal. Rptr. 2d 125, 137 (Cal. App. 6th Dist. 2000) (affirming trial court's finding that plaintiff properly stated conspiracy claim against attorney where plaintiff alleged that attorney breached duty to abstain from injuring plaintiff through "express misrepresentation," even though the attorney was not "acting in any capacity other than as attorney" for co-defendants).

As the Court has previously held, "[i]t is well established that an attorney has an independent legal duty to refrain from defrauding nonclients." April 23, 2015 Order (Dkt. 394) at 43 (citing *Rickley v. Goodfriend*, 212 Cal. App. 4th 1136, 1151 (2013), *reh'g denied* (Feb. 5, 2013), *review denied* (Apr. 10, 2013))).

The Court finds that the evidence offered by Plaintiff demonstrates a genuine dispute of material fact regarding Moore's involvement in the alleged fraud—specifically, his facilitation of the ABC through which the LED TV Assets were siphoned from WDE, his preparation and (allegedly pretextual) negotiation of the APA by which the LED Lighting Assets were purchased from WDE, and his role in delaying the resolution of the Tatung-WDE arbitration. *See* FE Opp'n at 29–33 (numerous citations to the record).

Accordingly, the Court will not grant summary judgment in favor of Moore on Plaintiff's conspiracy to commit fraud claim—or any of the conspiracy claims addressed in this Order—based on an argument that Moore is immune.

### c.  Knowledge and Agreement

The Former Employee Defendants argue that they had no knowledge of "the object and purpose of the purported conspiracy, and an agreement to injure Tatung." FE Mot. at 46. The

-59-

Former Employee Defendant's blanket assertions that they were not involved in any conspiracy are insufficient for summary judgment. Because liability for conspiracy does not rely on employment by any particular entity and the conspiracy alleged by Plaintiff includes actions leading up the date of the PPA, the Court is not convinced by evidence that various Former Employee Defendants were not employed by WDE when Plaintiff entered a PPA with WDE. *See id.*

Plaintiff argues that each of the Former Employee Defendants "played a material role in defrauding Tatung." FE Opp'n at 72. Plaintiff offers evidence that Salcedo represented to auditors that WDE and WSI were unrelated, an inaccurate statement. Plaintiff's SGDMF—FE No. 51. Plaintiff also offers evidence, discussed in greater detail elsewhere in this Order, that Lin and Huang facilitated transfers between WDE, WSI, and other entities. *Id.* No. 11; Plaintiff's AMF—FE Nos. 293, 294, 296, 311, 313, 315. These transfers, Plaintiff alleges, generally served the purpose of "creating the appearance that WDE was adequately capitalized." FE Opp'n at 72. Plaintiff offers evidence that Araki "coordinated" Shou-Por Houng's instructions regarding CMT's commission—allegedly a "key part of WDE's insolvency." *Id.* Further. Plaintiff states that Woo had "general management" of WDE and thus oversaw "these efforts;" Plaintiff offers evidence this included backdating some documents related to allegedly fraudulent fund transfers. *Id.*

In light of the evidence offered by Plaintiff, the Court finds that there is a genuine dispute of material fact regarding the intent of Woo, Lin, and Huang to aid in the commission of the alleged fraud. Accordingly, the Court DENIES the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's conspiracy to commit fraud claim against Woo, Lin, and Huang, and GRANTS the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's conspiracy to commit fraud claim against Salcedo and Araki.

### G. Fraudulent Transfer of LED TV Business (Count VI)

### 1. Legal Standard

Courts are to liberally construe California's Uniform Voidable Transactions Act ("UVTA"), California Civil Code §§ 3439.01 *et seq.*, "with a view to effecting their purpose."[5] *Borgfeldt v. Curry*, 144 P. 976, 977 (Cal. App. 1st Dist. 1914). Their purpose "undoubtedly is to prevent debtors from placing property which legitimately should be available for the satisfaction of demands of creditors beyond [creditors'] reach." *Id.*

In general, a voidable transaction is "a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." *Kirkeby v. Super. Ct. of Orange County*, 93 P.3d 395, 399 (Cal. 2004) (quoting *Yaesu Elecs. Corp. v. Tamura*, 33 Cal. Rptr. 2d 283, 286 (Cal. App. 2d Dist. 1994)).

Section 3439.01 defines a transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset . . , and includes payment of money, release, lease, and creation of a lien or other encumbrance." Cal. Civ. Code § 3439.01.

A debtor is liable under §§ 3439.01 *et seq.* if the debtor made the transfer:

> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, *and* the debtor either:
>
> > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
> >
> > (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Cal. Civ. Code § 3439.04(a). This is true regardless of whether the debtor made the transfer before or after the creditor's claim arose. *Kirkeby*, 93 P.3d at 399.

---

[5] The Uniform Fraudulent Transfer Act is now known as the Uniform Voidable Transactions Act. *See* Cal. Civ. Code § 3439.

Under Cal. Civ. Code § 3439.08(b)(1), "the judgment may be entered against the following:

> (A) The first transferee of the asset or the person *for whose benefit the transfer was made*.
>
> (B) An immediate or mediate transferee of the first transferee, other than either of the following:
>
>> (i) A good faith transferee that took for value.
>>
>> (ii) An immediate or mediate good faith transferee of a person described in clause (i)."

Cal. Civ. Code § 3439.08(b)(1) (emphasis added).

"Whether a conveyance was made with fraudulent intent is a question of fact, and proof often consists of inferences from the circumstances surrounding the transfer." *Filip v. Bucurenciu*, 129 Cal. App. 4th 825, 834 (2005). In determining intent under (a)(1), courts look to, among other factors, the "badges of fraud" enumerated in (b). The enumerated badges of fraud are:

> (1) Whether the transfer or obligation was to an insider.
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer.
>
> (3) Whether the transfer or obligation was disclosed or concealed.
>
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (5) Whether the transfer was of substantially all the debtor's assets.
>
> (6) Whether the debtor absconded.
>
> (7) Whether the debtor removed or concealed assets.
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b). "[T]hese factors do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other." *Filip*, 129 Cal. App. 4th at 834. "Even the existence of several 'badges of fraud' may be insufficient to raise a triable issue of material fact." *Annod Corp. v. Hamilton & Samuels*, 100 Cal. App. 4th 1286, 1299 (2002).

The UVTA provides an affirmative defense in § 3439.08(a). Under the statute,

a showing of good faith and reasonably equivalent value is all that is required to defeat a creditor's action based on [§ 3439.08(a)]. Obviously, if a transfer is made both in good faith and for a reasonably equivalent value, then the transfer is not a fraudulent transfer under section 3439.04, subdivision (b), either, since subdivision (b) applies only to transfers made without receipt of reasonably equivalent value.

*Id.* at 1294. "If the debtor received reasonably equivalent value, the inquiry ends there." *Id.* at 1295.

### 2.  Discussion—Bird Marella (Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu, Chin-Ying Hsu, Howard Houng, Li Fu, and CMT)

The Bird Marella Defendants argue that Plaintiff's fraudulent transfer claim fails because (1) the Bird Marella Defendants were not beneficiaries of the "initial transfer" of the Assets, (2) any benefit was not a direct result of the transfer, and (3) the Bird Marella Defendants' alleged equitable ownership does not, without more, qualify them as beneficiaries. *See* BM Mot. at 70–72.

The Bird Marella Defendants and Plaintiff agree that an owner of a transferee does not become a beneficiary of a transfer by virtue of their ownership alone. BM Opp'n at 76. However, Plaintiff contends that "there is no legitimate dispute" that the Bird Marella Defendants benefitted as a result of their equitable ownership of both the transferor (WDE) and transferee of the LED TV Assets (WD). *Id.* Plaintiff asserts that by acquiring the LED TV Assets from WDE for below market value, without WDE's debt, the BM Defendants realized an inherent increase in the value of those assets. BM Opp'n at 76. Defendants concede that relief from an obligation is a benefit for the purposes of liability. *See* BM Mot. at 70–71.

As to CMT specifically, Plaintiff offers evidence that about $8.6 million in debt owed by WDE to CMT was assumed Golden Star/WD as part of the LED TV Assets transfer, compromising about half of the total debt "selectively assumed" by Golden Star/WD. Plaintiff's AMF—BM Nos. 354, 355. As a result, Plaintiff argues, CMT benefitted from the LED TV Assets transfer as both the owner of Golden Star/WD and as a creditor of WDE whose debt was "preferentially assumed by a related party." BM Opp'n at 77.

The Court finds that at least a triable issue of fact exists as to whether or not the Bird Marella Defendants benefited from the transfer of the LED TV Assets, whether through relief from an obligation or more directly, such that they are individuals "for whose benefit the transfer was made."

Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's fraudulent transfer claim.

### H. Civil Conspiracy—Fraudulent Transfer of TV Assets (Count VII)

#### 1. Legal Standard

The Court explained the standard for a civil conspiracy claim under Section F above, and the standard for fraudulent transfer in Section G above.

### 2.  Discussion—David Chen

Chen argues that Count VII fails against him "as a matter of law and fact." Chen Mot. at 27. Chen primarily argues that he was not employed or not an officer at any of the times relevant to Plaintiff's claim under Count VII. *See id.* at 28. He asserts that his role in the transfer was "purely ministerial" and "he did not have any input" in the ABD or give advice related to the ABC. *Id.* However, Plaintiff has offered evidence that Chen was employed by WDE or Golden Star entity during the relevant times and that Chen played an active role in the "cycling" of funds through Houng Family entities. Plaintiff's SGDMF—Chen Nos. 3, 42; Plaintiff offers email and testimonial evidence that shows Chen discussing the transferring of money and at least helping to design the alleged scheme. *Id.* No. 42. Plaintiff also offers evidence that Chen was heavily involved with the XRoads fairness evaluation that Plaintiff alleges in part based on fraudulently misrepresented documents. *Id.* Plaintiff also offers evidence of emails from Chen in which he discusses the possible legal consequences of continuing the practice of cycling funds through the Houng Family entities through loans. *Id.* No. 3. Finally, Plaintiff offers evidence that it says is evidence that Chen was "project lead" on the ABC. *Id.* No. 42 (citing Declaration of Eric J. Eastham, Ex. 48).

The Court is not convinced that a meeting agenda stating "turn over project lead to Juan and Benson" is sufficient evidence that Chen himself was project lead. *See* Dec. of Eric J. Eastham, Ex. 48. Nevertheless, in light of the evidence Plaintiff has offered, the Court finds that there is a genuine dispute of material fact regarding Chen's involvement in the LED TV Asset transfer and his knowledge its unlawful nature. Accordingly, the Court DENIES Chen's Motion for Summary Judgment on Plaintiff's conspiracy to fraudulently transfer claim against Chen.

### 3.  Discussion—Bird Marella

#### a.  Count VII—Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu, Chin-Ying Hsu, Howard Houng, Li Fu, and CMT

The Bird Marella Defendants argue that Plaintiff has failed to establish that Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu, Chin-Ying Hsu, Howard Houng, or CMT had any

knowledge of the alleged "scheme to transfer WDE's assets to WDE for less than their true value in an effort to shelter WDE's assts from creditors." BM Mot. at 75.

As to Howard Houng, the Bird Marella Defendants argue that there is no evidence that Howard Houng was involved in the LED TV transfer or that he even had knowledge of the transfer. *Id.* at 76. Plaintiff offers evidence that Howard Howard Houng "learned . . . of WDE's decision to restructure as early as June 25, 2008," and that Shou-Por Houng and Richard Houng "maintained communications" with Howard Houng both before and after the ABC. BM Opp'n at 80; Plaintiff's SGDMF—BM No. 83; Plaintiff's AMF—BM No. 160. This evidence does not lead to the inference that Howard Houng had knowledge of the planned tort (that is, the fraudulent transfer of the LED TV Assets) and intended to aid in its commission. *See Kidron*, 40 Cal. App. 4th at 1582. "Mere association does not make a conspiracy. There must be evidence of some participation of interest in the commission of the offense." *Id.* Accordingly, the Court GRANTS the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's conspiracy to fraudulently transfer claim (Count VII) against Howard Houng.

As to Chin-Ying Hsu, Plaintiff argues that because Shou-Por Houng and Shu Tze Hsu consulted Chin-Ying Hsu regarding the gift of Westinghouse to CMC, the Court can conclude that she "as also kept informed and, in fact, consented to the transfer of WDE's LED TV Assets to Golden Star/WD to preserve the asset away from WDE's other creditors." BM Opp'n at 80. The evidence offered by Plaintiff under Count VII as to Chin-Ying Hsu raises no such inference and the Court does not so conclude. Instead, the COUrt finds that Plaintiff has not offered sufficient evidence to raise a genuine dispute of material fact regarding Chin-Ying Hsu's knowledge of the alleged conspiracy to transfer the LED TV Assets or its unlawful purpose. Accordingly, the Court GRANTS the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff's conspiracy to fraudulently transfer claim (Count VII) against Chin-Ying Hsu.

As to the remaining Bird Marella Defendants named in Count VII, the Court finds that Plaintiff has offered evidence sufficient to raise a genuine dispute of material fact regarding those individual's knowledge of the alleged conspiracy to transfer the LED TV Assets and its

unlawful purpose. The Bird Marella Defendants offer deposition evidence from the Bird Marella Defendants asserting, variously, their lack of involvement in or knowledge of the transfer, their lack of knowledge of the name Westinghouse, and/or their lack of knowledge of Plaintiff as a creditor. *See* BM Mot at 75–77. Plaintiff, however, offers evidence that after Plaintiff initiated arbitration proceedings against WDE, Richard Houng, Shou-Por Houng, and Rui-Lin Hsu began planning to liquidate WDE. Plaintiff's AMF—BM No. 153. Plaintiff offers evidence that the cash portion of the purchase price of the LED TV Assets was paid by Li Fu under Chairwoman Shu Tze Hsu. *Id.* No. 358. Rui-Lin Hsu signed the Acknowledgement of Assignment and Release required to complete the transfer. *Id.* at 157. Plaintiff offers evidence of Shou-Por Houng's ongoing communications with co-defendants regarding the transfers, including emails that lead to the inference that Shou-Por Houng's role was to facilitate or manage the transfer. See Plaintiff's SGDMF—BM No. 77; Plaintiff's AMF—BM Nos. 154, 158, 159.

Accordingly, the Court DENIES the Bird Marella Defendants' Motion for Summary Judgment on Plaintiff;s conspiracy to fraudulently transfer claim (Count VII) against Shu Tze Hsu, Shou-Por Houng, Rui-Lin Hsu, and CMT.

### 4.  Discussion—Former Employees

The Former Employee defendants first argue that Tatung's civil conspiracy to fraudulently transfer the LED TV Assets claim must fail because Tatung's underlying fraudulent transfer claim (Count VI) fails. Tatung has not named any of the Former Employee defendants in Count VI. As discussed above, the Court is not granting summary judgment on Count VI as to any of the defendants who were named in that count. Consequently, the Court will not grant summary judgment on Count VII for the Former Employee Defendants on that basis. The Court also declines to analyze that Former Employee Defendants argument that the decision to transfer the LED TV Assets was immunized by the business judgment rule because, again, the Former Employee Defendants are not named in Count VI.

The Former Employee Defendants next argue that liability is precluded by the agent's immunity rule. The agent's immunity rule is describe at length in Section C.4.a., *supra*. In brief, to the extent the Former Employee Defendants (1) did not owe Plaintiff an independent duty and (2) were acting as agents or employees of their employer, who is also accused of conspiring to fraudulently transfer the LED TV Assets, the Former Employee Defendants cannot be found liable for conspiracy. The Court analyzed the application of the agent's immunity rule to the Former Employee Defendants in Section C.4.a., and will not repeat that analysis here.

Finally, the Former Employee Defendants argue that Plaintiff cannot show that the Former Employee Defendants conspired in the allegedly fraudulent transfer of the LED TV Assets. Specifically, they argue that the Former Employee Defendants believed that the transfer was fair based on the "facts they knew at the time," XRoads' fairness opinion, and SingerLewak LLP's report. FE Mot. at 53. The Former Employee Defendants also argue that CMA validated the amount of consideration paid for the assets by conducting due diligence investigation and marketing the assets to see if a higher price could be obtained. *Id.* at 54. Generally, while the Former Employee Defendants admit they knew of the transfer, they argue that none of them knew or believed that the transfer was fraudulent.

In opposition, Plaintiff argues that the Court can, and should, "infer an agreement to fraudulently transfer the LED TV Business from their involvement with the transaction . . , their knowledge of the Houng Family's relationship with the 'buyer,' Northwood, and their efforts to conceal its nature." FE Opp'n at 75.

As to Salcedo, the Court finds that Plaintiff has not offered enough evidence to raise a genuine dispute of material fact regarding Salcedo's knowledge of the allegedly fraudulent nature of the transfer of LED TV Assets. Plaintiff alleges that Salcedo "led the effort to fraudulently revise WDE's November 2009 financial forecasts." Plaintiff's SGDMF—FE No. 165. Plaintiff offers evidence that Salcedo "managed WDE's relationship with XRoads," and "prepared financial documents for CBS," and "managed cash flow projections for Golden Star." Plaintiff's AMF—FE Nos. 359, 360, 364. But none of these things leads to the inference that Salcedo knew of the allegedly fraudulent nature of the transfer, much less intentionally

misrepresented financial information. *See* Fed. R. Civ. P. 9(b) (requiring Plaintiff to plead facts supporting intentional misrepresentation with particularity). The Court finds that Plaintiff has not offered any evidence that the revision was "not credible." *Id.* Consequently, the Court GRANTS the Former Employee's Motion for Summary Judgment on Plaintiff's Count VII against Salcedo.

As to the other Former Employee Defendants, the Court finds that Plaintiff has offered evidence that raises a genuine dispute of material fact regarding their knowledge of and participation in the allegedly fraudulent transfer of the LED TV Assets. *See* FE Opp'n at 75 (citing numerous items in the record). Accordingly, the Court DENIES the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's Count VII against all of the Former Employee Defendants except Salcedo.

## I.  Breach of Fiduciary Duty (Counts VIII, IX)

### 1.  Legal Standard

The essential elements of a breach of fiduciary duty cause of action under California law are: (1) that a fiduciary relationship existed; (2) that there was an act or omission by the fiduciary in breach of such duty; (3) that plaintiff sustained damages; and (4) that the damages were proximately caused by the fiduciary's breach. California Elements of an Action § 8:1.

In California, "directors owe a fiduciary duty to an insolvent corporation's creditors to avoid actions that 'divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims.'" *Tatung Co., Ltd. v. Hsu*, SACV131743DOCANX, 2015 WL 11089493, at *19 (C.D. Cal. Oct. 22, 2015) (citing *Berg & Berg Enterprises, LLC v. Boyle*, 100 Cal. Rptr. 3d 875, 894 (Cal. App. 6th Dist. 2009)). This doctrine is known as the "trust fund doctrine." *Id.* Under this doctrine, "all of the assets of a corporation, immediately on its becoming insolvent, become a trust fund for the benefit of all of its creditors." *In re Jacks*, 266 B.R. 728, 736 (Bankr. App. 9th Cir. 2001) (quoting *Saracco Tank & Welding Co., Ltd. v. Platz*, 65 Cal. App. 2d 306, 315, 150 P.2d 918, 923 (1944)).

The court in *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020 (2009) explained the scope of California's trust fund doctrine as follows:

> . . . recovery for breaching the fiduciary duties imposed under the trust-fund doctrine in California 'generally pertains to cases where the directors or officers of an insolvent corporation have diverted assets of the corporation 'for the benefit of insiders or preferred creditors.' While no California cases 'expressly limit the fiduciary duty under the trustfund doctrine to the prohibition of self-dealing or the preferential treatment of creditors, the scope of the trustfund doctrine in California is reasonably limited to cases where directors or officers have diverted, dissipated, or unduly risked the insolvent corporation's assets.' In other words, the doctrine is not applied to create a duty owed by directors to creditors solely due to a state of corporate insolvency. Application of the doctrine requires, in addition, that directors have engaged in conduct that diverted, dissipated, or unduly risked corporate assets that might otherwise have been used to satisfy creditors' claims.

*Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1040–41 (2009) (quoting *CarrAmerica Realty Corp. v. Nvidia Corp. et al.*, 2006 WL 2868979, at *6).

### 2.  Discussion—David Chen

### a.  De Facto Officers and Fiduciary Duties

"It is settled that de facto directors have the same fiduciary duties as de jure directors." *S. Seas Corp. v. Sablan*, 525 F. Supp. 1033, 1038 (D. N. Mar. I. 1981), *aff'd*, 691 F.2d 508 (9th Cir. 1982). Plaintiff argues that to the extent Chen was not an officer of WDE, or was not an officer during certain relevant periods, the Court may hold Chen liable as a de facto officer. Chen Opp'n at 22. Plaintiff relies on *South Seas Corp. v. Sablan*. But *South Seas Corp.* is distinguishable on the facts.

In *South Seas Corp.*, the court held that "[a] de facto officer is one who actually possesses an office under color of election or appointment and who continuously exercises its functions. *Id.* (citing *Indep. Lead Mines Co. v. Kingsbury*, 175 F.2d 983, 986 (9th Cir. 1949), *cert. denied* 338 U.S. 900 (1949)). The court found that two directors were not de jure directors because their election had been technically defective as some shareholders did not legally own the majority shares with which they voted the directors into office. *S. Seas*, 525 F. Supp. at 1038. Despite this defect in their election, the two directors "continuously exercised the functions of their office under the belief that they were de jure electees." *Id.* Because of this, the two "clearly were de facto officers." *Id.* The court concluded that the two directors had fiduciary duties to their corporation. *Id.*

In the instant case, the undisputed facts are that Chen was a de jure officer of WDE from 2005 to 2007 and from 2008 to 2010, with no indication of election improprieties. Chen Mot. Ex. 1 at 2, 8–9. Plaintiffs argues, in the alternative, that "in light of Chen's authority and responsibilities, there is no question that Chen occupied a senior position in the chain of command and [thus] owed a duty to WDE's creditors" as a de facto officer of WDE. Chen Opp'n at 22.

The Court finds Plaintiff's de facto officer argument unconvincing. However, Plaintiff has offered sufficient evidence to at least raise a triable issue of fact regarding whether Chen was a de jure officer of WDE during the material period, giving rise to a fiduciary duty to WDE's creditors, including Plaintiff. *See* Chen Mot. Ex. 1 at 2, 8–9.

### b. WDE's Insolvency

Chen also argues that the trust fund doctrine does not apply to him because WDE "was operating at least through April 2, 2010." Chen Mot. at 30. The Court does not follow the Northern District of Texas, *see id.* at 30, but does find that the trust fund doctrine applies only when a company is insolvent. *See Berg & Berg*, 178 Cal. App. 4th 1020, 1040–41. As discussed below in greater detail, the Court finds that there is at least a triable issue of fact as to whether WDE was insolvent during the relevant period.

Accordingly, the Court DENIES Chen's Motion for Summary Judgment on Plaintiff's breach of fiduciary claim.

### 3. Discussion—Former Employee Defendants

First, the Former Employee Defendants argue that under California's trust fund doctrine, none of the Former Employee Defendants owed a direct duty to Plaintiff because WDE was solvent and did not cease operating until at least April 2, 2010. *See* FE Mot. at 58. In addition, the Former Employee Defendants point out that Moore and Huang were never officers or directors at WDE. *Id.*

The Former Employee Defendants are correct that the trust fund doctrine only applies once a corporation is insolvent.[6] *See Berg & Berg*, 178 Cal. App. 4th 1020, 1040–41. A bankruptcy court has held—and this Court, upheld by the Ninth Circuit, confirmed—that WDE and Richard Houng "owed Tatung fiduciary duties that arose upon WDE's insolvency pursuant to California's 'trust fund doctrine.'" *In re Houng*, 499 B.R. 751, 771 (C.D. Cal. 2013), *aff'd*, 636 F. App'x 396 (9th Cir. 2016). Specifically, the bankruptcy court found that WDE was insolvent at all times during the course of its relationship with Tatung. *See* Phase II Award at 10–11; *In re Houng*, 499 B.R. at 774.

This Court will not now grant summary judgment for defendants based on an argument that WDE was actually solvent during and even after its relationship with Plaintiff. Moreover, Plaintiff has offered sufficient evidence to overcome summary judgment and demonstrate that there is at least a triable issue of fact as to whether WDE was insolvent during the relevant period. *See* FE Opp'n at 67.

Whether Moore and Huang were officers or managers under the trust fund doctrine is another question entirely. The Former Employee Defendants argue that Moore cannot be liable under the trust fund doctrine because he was not a director, but senior counsel. FE Mot. at 43.

---

[6] "[T]here is no fiduciary duty prescribed under California law that is owed to creditors by directors of a corporation solely by virtue of its operating in the 'zone' or 'vicinity' of insolvency." *Berg & Berg*, 178 Cal. 4th at 1041.

Plaintiff argues that Moore should be held liable as a de facto officer of WDE despite his title of senior counsel. FE Opp'n at 68. Again citing to *South Seas Corp.*, Plaintiff argues that Moore "occupied a senior position in WDE's chain of command," and point out that Moore has admitted that he "manag[ed] all legal affairs for the Company, including litigation, contracts, legal compliance, [and] general counseling." *Id.* Although there is no doubt that Moore held an important executive role at WDE, the Court is not convinced that Moore can be held liable as a de facto director. Again, the de facto directors in *S. Seas* were did not merely hold senior positions in the chain of command but *were elected as directors*, albeit improperly, and exercised all the powers of de jure directors. *See S. Seas*, 525 F. Supp. 2d at 1038. Plaintiff offers evidence that Moore was aware of the "lacks of corporate separateness" between WSI and WDE. Plaintiff's SGDMF—FE No. 35. Plaintiff also offers evidence that Moore was responsible for those schedules relating to the ABC that had "legal significance . . . or content." *Id.* Further, Moore provided documents to XRoads as part of the fairness opinion process. *Id.* Plaintiff alleges and offers evidence that Moore worked with other co-defendants and Richard Houng to delay the Tatung-WDE arbitration until after the ABC. *Id.* No. 39. In other words, Plaintiff alleges facts that show Moore exercised a great deal of legal authority in his position as WDE's senior counsel—but nothing that rises to the level of a single shareholder or a seated (but improperly elected) director.

Some courts do look to the level of control rather than the official title when determining whether a fiduciary duty is owed. *See, e.g.*, *In re Tsai*, 2:13-BK-27391-PC, 2014 WL 1154032, at *7 (Bankr. C.D. Cal. Mar. 19, 2014) (holding that "director" was not liable because at the time of the transfers at issue, he was not "authorized to sign on any financial accounts"); *In re Maddux*, ADV 03-00661-PHX-RTB, 2006 WL 6810967, at *4 n.6 (Bankr. App. 9th Cir. Nov. 28, 2006) (finding it likely a shareholder was a corporate officer and/or director where the shareholder was the only shareholder of the corporation). It is conceivable that the trust fund doctrine could apply to someone with the title of senior counsel. However, Plaintiff has not offered facts to create a material dispute of fact as to whether Moore exercised sufficient authority for the trust fund doctrine to apply to him. The Court finds that he did not.

Accordingly, the Court GRANTS the Former Employee Defendants' Motion for Summary Judgment on Count VIII against Moore.

The Former Employee Defendants offer many of the same arguments regarding defendant Jennifer Huang. *See* FE Mot. at 43. Plaintiff argues in opposition that as "General Manager of WDE's subsidiary in Taiwan, WDT, [Huang] can be held liable as [a] *de facto* officer[] and director[] despite [her] title." FE Opp'n at 68. Plaintiff offers evidence that Huang manages WDE's overseas bank accounts and financial transactions. Plaintiff's AMF—FE No. 311. Plaintiff also offers evidence that Huang played a significant role establishing WDT as a WDE subsidiary, designing the "loan structure" that was part of the bust-out process, and structuring "the flow of funds between Nexis, WSI, RHH, and WDE." Plaintiff's SGDMF—FE No. 10. Further, Huang transferred money from WSI to RH Holdings and had decision-making authority for WDE's funds, among others. *Id.* Nos. 11, 12.

While this is not a clear cut case of de facto directorship, the Court finds that Plaintiff has alleged sufficient facts to prevent summary judgment as to Count VIII against Huang. Accordingly, the Court DENIES the Former Employee Defendants' Motion for Summary Judgment on Count VIII against Huang.

Finally, as to the other Former Employee Defendants, because there is a genuine dispute of material fact regarding WDE's insolvency, the Court DENIES the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's breach of fiduciary duty claim (Count XIII).

### a. Benson Lin

Plaintiff has separately alleged an additional breach of fiduciary duty claim against Former Employee Defendant Benson Lin (Count IX). *See* Compl. ¶ 424–430. The Former Employee Defendants assert that the only difference between Count VIII and Count IX is that "Lin is alleged to also have had a fiduciary duty by virtue of his position with Nexis, so he is doubly liable for the same acts." FE Mot. at 63. The Court has already found that there is evidence to support Plaintiff's argument that WDE was insolvent. Thus, here, the Court

addresses only whether Lin, as a director of a parent company, owed a fiduciary duty to the creditors of a subsidiary.

At an earlier stage in this proceeding, that Court observed that the parties had not presented any relevant California law squarely on point, and that the Court was not able to find any through its own research. April 23, 2015 Order (Dkt. 394) at 62. That has not changed. In the Court's April 23, 2015 Order, the Court found that

> imposing a fiduciary duty on Nexis's directors to WDE's creditors is appropriate in this instance because of the fraudulent nature in which WDE and Nexis were allegedly managed. Tatung alleges in the SAC that Nexis and WDE were together kept perpetually insolvent, and that the Defendants operated the companies in a fraudulent manner to maintain the insolvency for the purposes of furthering the goals of the sham enterprise. *See* SAC ¶¶ 78, 79, 87, 91, 93, 105-111. By virtue of this fraudulent operation, Tatung alleges that WDE and Nexis were used in conjunction without respect for corporate separateness. Any legal separation between the two, such that as the duties of the director of one company could be shielded from obligations to the creditors of the other, would amount to an abuse of the corporate form. "The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court.'" *McLaughlin v. L. Bloom Sons Co.*, 206 Cal. App. 2d 848, 853 (Ct. App. 1962) (citing *Stark v. Coker*, 20 Cal. 2d 839, 846 (1942)). "Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. . . ." *Shapoff v. Scull*, 222 Cal. App. 3d 1457, 1470 (1990) *disapproved of on*

*other grounds by Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 869 P.2d 454 (1994)).

April 23, 2015 Order at 62–63. The Court held that "[i]n light of this fraudulent operation, Tatung has sufficiently alleged that Shou-Por Houng and Benson Lin's duties as directors of (insolvent) Nexis extended to the creditors of (insolvent) WDE, as essential alter-egos of one another." *Id.* at 63.

The Court finds that nothing has changed since the last time the Court addressed this issue. In asking the Court for summary judgment, the Former Employee Defendants cite to *Gordon v. Bindra*, No. 2:14-CV-01058-ODW, 2014 WL 2533798 (C.D. Cal. June 5, 2014) for the proposition that "the fiduciary duty created by insolvency [under the trust fund doctrine] does not extend to officers and directors of WDE's parent." FE Mot. at 63–64. But *Gordon* merely holds that "[w]hile Delaware law might recognize some sort of duty owed by the directors of a parent corporation to a subsidiary, there is no indication that California follows this rule as well." *Id.* at *6. The Court found that "[o]ne could reasonably conclude that if a subsidiary owes no fiduciary duty to its creditors, neither would the parent's directors who are even further removed from the subsidiary's creditors. But even if there was a duty owed by the parent's directors, it is even more unclear whether such a duty would run to the subsidiary or only to the creditors." *Id.* (emphasis added). The duty that WDE owed to Plaintiff is not at issue, and *Gordon* brings no clarity to the question of whether Nexis, as the parent of WDE, owes Plaintiff a duty as a result of WDE and Nexis' fraudulent actions. The Court thus maintains that imposing a fiduciary duty on Nexis's directors to WDE's creditors is appropriate in this instance.

Further, the evidence offered by Plaintiff raises a genuine dispute of material fact as to whether Lin breached his duty to Plaintiff during his directorship of Nexis. See Plaintiff's SGDMF—FE Nos. 55, 268. Accordingly, the Court DENIES the Former Employee Defendants' Motion for Summary Judgment on Plaintiff's breach of fiduciary duty claim (Count IX) against Lin.

### 4.  Discussion—Bird Marella (Shou-Por Houng and Howard Houng)

#### a.  Derivative and Direct Suits

Defendants Shou-Por Houng and Howard Houng, two of the Bird Marella Defendants, move for summary judgment on Count IX, arguing Plaintiff's breach of fiduciary duty claim fails as a matter of law because Plaintiff must bring such a claim as a derivative claim on behalf of all WDE shareholders. *See* BM Mot. at 80–83.

The Bird Marella Defendants cite few cases from relevant jurisdictions. Defendants do rely on one California case, *Avikian v. WTC Fin. Corp.*, 98 Cal. App. 4th 1108 (2002), for the proposition that "the depletion of WDE's assets is a classic injury to the corporation . . . that must be addressed in a derivative action." BM Mot. at 82. *Avikian* is distinguishable on the facts.

In *Avikian*, ownership of the corporation's assets—including its rights of action—was specifically vested in an insurance commissioner pursuant to a restraining order issued in prior liquidation proceedings. *Avikian v. WTC Fin. Corp.*, 98 Cal. App. 4th 1108, 1116 (2002). The order precluded anyone other than the commissioner from asserting claims on behalf of the corporation. *Id.* Appellant, a shareholder of the corporation, sued. The court found that the appellant's "core claims" of improper selling and purchasing of assets amounted to a claim of injury to the corporation itself. *Id.* at 1115. Appellant argued, in part, that the defendants knew about investors willing to rescue the corporation to the benefit of all shareholders, but that they chose "to pursue their own self-serving arrangements, causing the demise" of the corporation. *Id.* at 1115. The court found that this was "a claim of damage to the corporation generally." *Id.* Appellant's own damages—which were the loss in value of their investment in the corporation—were "merely incidental" to the harm inflicted on the corporation and *all* of its shareholders. *Id.* The court also found that the restraining order precluded the appellant's claims no matter who they were brought against. *Id.*

The instant case has quite a different context. There has been no restraining order, and WDE's rights of action have not been specifically vested in anyone. Further, appellant in *Avikian* was shareholder. Here, Plaintiff is a *creditor* seeking to bring a direct suit.

> [A] creditor's individual or direct claim is one for which the creditor does not seek to recover on behalf of the corporation for injury done to it. The injury need not be different from that suffered by a class of shareholders or be unique to the plaintiff and it still may affect a substantial number of shareholders or in this case, creditors. But the direct claim is simply one that reflects an injury that is not incidental to an injury to the corporation as a whole.

*Berg & Berg*, 178 Cal. App. 4th at 1028.

While Plaintiff, as the creditor of an insolvent corporation, may have a right to bring a derivative action in the corporation's name, the Court finds that Plaintiff is not precluded from bringing a direct suit.[7] Plaintiff seeks to recover for "diversions of millions in funds and other assets which . . . remov[ed] WDE assets against which *Tatung* could have enforced *the debt owed by WDE*." BM Opp'n at 83 (emphasis added). Plaintiff's claims are unique and individual to itself, despite the fact that other creditors may have also been damaged in a similar way. Accordingly, the Court will not grant summary judgment on Plaintiff's breach of fiduciary duty claim on these grounds.

### b. Dissipation of Assets

The Bird Marella Defendants also argue that Plaintiff cannot demonstrate that "Shou-Por Houng and Howard Houng acted in their capacities as directors of Nexis to dissipate WDE's assets at the expense of its creditors." BM Mot. at 83.

First, the Bird Marella Defendants argue that the PTTV business opportunity was just an "opportunity" and not a tangible asset. *Id.* at 84. Defendants argue that there is no evidence the opportunity would have been profitable or that it was ever profitable. *Id.* Therefore, Defendants argue, the waiver of the opportunity did not divert, dissipate, or unduly risk "corporate assets that might otherwise have been used to satisfy creditors' claims." *Berg & Berg*, 178 Cal. App. 4th at 1040–41.

---

[7] The Court advises defendants that it is not bound by out-of-Circuit district court and bankruptcy court decisions. Defendants would be well advised to cite controlling case law, and to resist the urge to cite non-binding case law as the authoritative rule.

Plaintiff argues that the fact that Bird Marella Defendants did not know *how* successful the PTTV business would be does not mean that it had *no* value at the time of the transfer. BM Opp'n at 85. Plaintiff offers evidence that WDE funded Nexcast to support the development of the PTTV business and that Nexcast was merged into another company in order to continue pursuing the PTTV business. Plaintiff's AMF—BM Nos. 361, 362. *See also* 4AC ¶¶ 173–99; Plaintiff's SGDMF—FE Nos. 118, 123 (describing Lin and others' role in setting aside WDE funds for Nexcast). Plaintiff argues that even when the "measure of . . . damages may be the subject of some uncertainty," courts have found diversion of corporate opportunities to have caused damage. BM Opp'n at 86. Drawing all inferences in favor of Plaintiff, the Court finds the PTTV opportunity had *some* value which could have otherwise been used to pay creditors' claims, the diversion of which could amount to a breach of fiduciary duty.

Second, the Bird Marella Defendants argue that Shou-Por Houng and Howard Houng had nothing to do with the allegedly fraudulent LED TV Asset transfer. BM Mot. at 85. However, Plaintiff has offered evidence disputing this assertion, as discussed under Count VII above. Accordingly, there is a triable issue of material fact regarding Shou-Por Houng and Howard Houng's liability for a breach of fiduciary duty resulting from involvement in the LED TV Asset transfer.

### c. Other of Plaintiff's Breach of Fiduciary Duties Claims against the Bird Marella Defendants

Further, there are triable issues of fact regarding Plaintiff's other theories of the Bird Marella Defendants' breach of fiduciary duty. For example, Plaintiff alleges that Sou-Por Houng and Howard Houng "continu[ously] siphon[ed]  . . . WDE funds for non-WDE purposes," used "WDE assets and resources for non-WDE purposes for the ultimate benefit of their co-defendants," and, through "the WSI exclusive vendor relationship" illegally diverted WDE revenues offshore to WSI for the benefit of the Houng Family. BM Opp'n at 87– 88.

For the reasons explained above, the Court DENIES the Bird Marella Defendant's Motion for Summary Judgment on Plaintiff's breach of fiduciary duty claim.

### J.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff asks the Court to grant summary judgment on a number of defenses asserted by the defendants in their Answers to the Complaint, as well as some that have not yet been asserted. *See generally* Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Mot.") (Dkt. 762). Plaintiff asks the Court to "clean up" the case by granting summary judgment on these defenses because they are inapplicable or unsupported. *Id.* at 1. According to email correspondence between counsel attached to the Motion, the authenticity of which is undisputed, on August 10, 2016, the Former Employees and David Chen agreed to withdraw and not pursue fourteen specific defenses asserted in their Answer(s) and the Bird Marella Defendants agreed to withdraw and not pursue thirteen defenses asserted in their Answer(s), as well six other defenses. Plaintiff's Mot. Ex. 4 (Declaration of Joseph R. Dunn) Exs. I, J, K. However, the defendants uniformly reserved their right to raise the "withdrawn" defenses at trial and also declined to formerly withdraw the defenses by filing notice with the Court. *See id.*

Plaintiff asks the Court to grant summary judgment on the following defenses as facially inapplicable to Plaintiff's causes of action: (1) contributory/comparative fault; (2) assumption of risk; (3) fault of Plaintiff; (4) consent or acquiescence; and (5) privilege/justification/excuse. Plaintiff's Mot. at 6. Plaintiff asks the Court to grant summary judgment on the following defenses as improper affirmative defenses aimed only at negating an element of a claim, as opposed to precluding liability even if all elements are met: (1) failure to mitigate; (2) contribution and indemnity; (3) damage not caused by defendants; (4) failure to state a claim; (5) intervening/superseding causes; (6) lack of knowledge/reasonable grounds; (7) lawful conduct; (8) absence of damage to Plaintiff; (9) third-party liability; and (10) uncertain or speculative damages. *Id.* at 7. Plaintiff also asks the Court to grant summary judgment on the following defenses as defenses for which the defendants have failed to raise a genuine issue of material fact: (1) statute of limitations (for RICO, fraud, and breach of fiduciary duty); (2) abandonment; (3) waiver; (4) estoppel; and (5) laches. *Id.* Finally, Plaintiff asks the Court to grant summary judgment on the following defenses as attempts to re-litigate issues decided in

the 2010 arbitration between Plaintiff and WDE/Richard Houng: (1) unclean hands; (2) in pare delicto; and (3) unjust enrichment. *Id.* at 8.

The Bird Marella Defendants do not oppose Plaintiff's Motion as to any of the defenses listed above, with the exception of (1) statute of limitations, (2) mitigation, (3) estoppel, and (4) unclean hands. Bird Marella Defendants' Opposition to Tatung's Motion for Partial Summary Judgment (Dkt. 793). Thus, the Court GRANTS Plaintiff's Motion against the Bird Marella Defendants as to all but these four defenses.

The Former Employee Defendants and Defendant David Chen agree that they have withdrawn all but seven defenses, subject to seeking reinstatement at trial. John Araki, David Chen, Benson Lin, Arthur Moore, Juan Salcedo, and Douglas Woo's Opposition to Tatung Company, Ltd.'s Motion for Partial Summary Judgment (Dkt. 795). The defenses that these defendants declined to withdraw are: (1) failure to mitigate, (2) statute of limitations, (3) waiver, (4) estoppel, (5) laches, (6) unclean hands, and (7) unjust enrichment. *Id.* at 16. The Court GRANTS Plaintiff's Motion against the Former Employee Defendants and David Chen as to all but these seven defenses.

Seven defenses remain at issue: (1) statute of limitations, (2) mitigation, (3) estoppel, (4) unclean hands, (5) waiver, (6) laches, and (7) unjust enrichment. The Court finds that there are genuine disputes of material fact regarding these seven defenses. Accordingly, the Court DENIES summary judgment on these defenses.

## VI.    DISPOSITION

For the foregoing reasons, the Court GRANTS Defendants' Motions for Summary Judgment IN PART. Specifically, the Court:

- GRANTS summary judgment for Rui-Lin Hsu on Count I;
- GRANTS summary judgment for Douglas Woo on Count I;
- GRANTS summary judgment for Rui-Lin Hsu and Gregory Hu on Count III;
- GRANTS summary judgment for John Araki, Juan Salcedo, and Arthur Moore on Count III;

- GRANTS summary judgment for John Araki and Juan Salcedo on Count V (conspiracy to commit fraud);
- GRANTS summary judgment for Chin-Ying Hsu on Count VII (conspiracy to commit fraudulent transfer);
- GRANTS summary judgment for Juan Salcedo on Count VII (conspiracy to commit fraudulent transfer);
- GRANTS summary judgment for Arthur Moore on Count VIII (breach of fiduciary duty); and
- GRANTS summary judgment for Chin-Ying Hsu on Count X (alter ego).

The Court DENIES summary judgment as to all other defendants on all other counts.

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment IN PART. Specifically, the Court:

- GRANTS summary judgment for Plaintiff on (1) contributory/comparative fault; (2) assumption of risk; (3) fault of Plaintiff; (4) consent or acquiescence; (5) privilege/justification/excuse, (6) contribution and indemnity; (7) damage not caused by defendants; (8) failure to state a claim; (9) intervening/superseding causes; (10) lack of knowledge/reasonable grounds; (11) lawful conduct; (12) absence of damage to Plaintiff; (13) third-party liability; (14) uncertain or speculative damages; (15) abandonment; (16) waiver; (17) laches; (18) in pare delicto; and (19) unjust enrichment as to the Bird Marella Defendants.
- GRANTS summary judgment for Plaintiff on (1) contributory/comparative fault; (2) assumption of risk; (3) fault of Plaintiff; (4) consent or acquiescence; (5) privilege/justification/excuse, (6) contribution and indemnity; (7) damage not caused by defendants; (8) failure to state a claim; (9) intervening/superseding causes; (10) lack of knowledge/reasonable grounds; (11) lawful conduct; (12) absence of damage to Plaintiff; (13) third-party liability; (14) uncertain or speculative damages; (15) abandonment; and (16) in pare delicto as to the Former Employee Defendants and Defendant David Chen.

The Court DENIES summary judgment as to all other defenses listed in Plaintiff's motion.

_David O. Carter_

DAVID O. CARTER
U.S. DISTRICT JUDGE

DATED:  November 14, 2016